## SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND – CITY OF COVINGTON, KENTUCKY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

CITY OF COVINGTON, KENTUCKY,

                                        Plaintiff,

v.                                      **INDEX NO.
                                        18-OP-45967**

PURDUE PHARMA, L.P.; PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;
RICHARD S. SACKLER; JONATHAN D. SACKLER;
MORTIMER, D.A. SACKLER; KATHE A. SACKLER;
ILENE SACKLER LEFCOURT; BEVERLY SACKLER;
THERESA SACKLER; DAVID A. SACKLER;
RHODES TECHNOLOGY; RHODES TECHNOLOGY, INC.;
RHODES PHARMACEUTICALS, L.P.;
RHODES PHARMACEUTICALS, INC.;
TRUST FOR THE BENEFIT OF MEMBERS OF THE
RAYMOND SACKLER FAMILY; THE P.F. LABORATORIES, INC.;
STUART D. BAKER; CEPHALON, INC.;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.;
DEPOMED, INC. N/K/A ASSERTIO THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.;
ENDO GENERICS HOLDING, INC.; PAR PHARMACEUTICAL COMPANIES, INC.;
PAR PHARMACEUTICAL, INC.; MALLINCKRODT PLC;
MALLINCKRODT, LLC; SPECGX, LLC;
MALLINCKRODT BRAND PHARMACEUTICALS, INC.;
MALLINCKRODT ENTERPRISES, LLC;
MALLINCKRODT ENTERPRISES HOLDINGS, INC.;
ALLERGAN PLC F/K/A ACTAVIS PLC; ALLERGAN FINANCE, LLC
F/K/A ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.;
ALLERGAN USA, INC.; WATSON LABORATORIES, INC.;
ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.;
INSYS THERAPEUTICS, INC.; HIKMA PHARMACEUTICALS USA INC.;

WEST-WARD PHARMACEUTICALS CORP.; INDIVIOR, INC.;
MYLAN PHARMACEUTICALS, INC.; MYLAN INSTITUTIONAL, INC.;
AMNEAL PHARMACEUTICALS, LLC; SANDOZ, INC.;
AMERISOURCEBERGEN DRUG CORPORATION;
CARDINAL HEALTH, INC.; CARDINAL HEALTH 110, LLC;
MCKESSON CORPORATION; MCKESSON MEDICAL-SURGICAL, INC.;
MCKESSON SPECIALTY DISTRIBUTION, LLC;
MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION;
H.D. SMITH, LLC F/K/A H.D. SMITH WHOLESALE DRUG COMPANY;
ANDA, INC.; ANDA PHARMACEUTICALS, INC.; WALGREEN CO.;
WALMART INC. F/K/A WAL-MART STORES, INC.;
WAL-MART STORES EAST, L.P.; CVS PHARMACY, INC.;
KENTUCKY CVS PHARMACY, LLC;
CVS TN DISTRIBUTION CENTER, LLC; CVS INDIANA, LLC;
CVS RX SERVICES, INC.; THE KROGER CO.;
KROGER LIMITED PARTNERSHIP I; KROGER LIMITED PARTNERSHIP II;
ASSOCIATED PHARMACIES, INC.; MASTERS PHARMACEUTICAL, INC.;
MIAMI-LUKEN, INC.; KEYSOURCE MEDICAL, INC.;
QUALITEST PHARMACEUTICALS; JOHN DOE, JOHN DOES
OR JOHN DOE CORPORATION BEING A FICTITIOUS NAME(S)
USED TO DESIGNATE A PERSON, PERSONS, PARTNERSHIP,
SOLE PROPRIETORSHIP, CORPORATION OR OTHER ENTITY
RESPONSIBLE FOR DEVELOPING, MARKETING, DISTRIBUTING
AND/OR SELLING PRESCRIPTION OPIOID DRUGS,

Defendants.

## TABLE OF CONTENTS TO SHORT FORM SUPPLEMENTAL AND AMENDED COMPLAINT – CITY OF COVINGTON, KENTUCKY

Page

Short Form for Supplementing Complaint and Amending Defendants
and Jury Demand – City of Covington, Kentucky ........................................ 1

1.  Incorporation By Reference of Existing Complaint .................................. 1

2.  Parties-Defendants ................................................................................. 1

2.1  Additional Defendants ......................................................................... 5

    A.  Purdue-Related Additional Defendants ......................................... 5
    B.  Actavis-Related Additional Defendant ........................................... 8
    C.  Other Manufacturers of Prescription Opioid Drugs .................... 8

        1.  Hikma/West-Ward Pharmaceuticals Corp. .......................... 8
        2.  Indivior, Inc. ........................................................................ 9
        3.  Mylan Pharmaceuticals, Inc. .............................................. 10
        4.  Amneal Entities ................................................................... 10
        5.  Sandoz, Inc. ......................................................................... 10

    D.  Additional Distributors of Prescription Drugs at Both
        the Wholesale and/or Retail Levels ............................................. 11

        1.  Cardinal Health Entities ...................................................... 11
        2.  McKesson Entities ............................................................... 12
        3.  Anda Entities ....................................................................... 13
        4.  Walgreens ............................................................................ 13
        5.  Walmart Entities .................................................................. 14
        6.  CVS Entities ......................................................................... 14
        7.  Kroger Entities ..................................................................... 16
        8.  Associated Pharmacies, Inc. ............................................... 17
        9.  Masters Pharmaceuticals, Inc. ............................................ 17
        10. Miami-Luken, Inc. ............................................................... 17
        11. Keysource Medical, Inc. ...................................................... 17
        12. Qualitest Pharaceuticals, Inc. ............................................. 18

2.2  Factual Allegations Regarding New Defendants ................................. 18

    A.  Individual Sackler Defendants and PURDUE
        Related Entities .......................................................................... 18

        1.  Additional Allegations Against PURDUE ............................ 20

2.  New Allegations Against the Directors, CEOs and
Other Executives of PURDUE Responsible
for the Company's Deadly Misconduct..............................35

a.  A Group of Sackler Family Directors, CEOs
and Other Executives Knowingly Participated
in, Controlled and Directed PURDUE's
Misconduct ...........................................................35

b.  In 2007, PURDUE Directors Decided to
Plead Guilty to a Felony, Pay Nearly
$700 Million, and Promise Never to Deceive
Doctors and Patients Again ...................................53

c.  The PURDUE Directors and CEOs had Many
Chances to Stop the Deception...............................57

i.  2007 ................................................................57
ii.  2008 ................................................................61
iii.  2009 ................................................................72
iv.  2010 ................................................................79
v.  2011 ................................................................90
vi.  2012 ..............................................................101
vii.  2013 ..............................................................110
viii  2014 ..............................................................122
ix  2015 ..............................................................133
x.  2016 ..............................................................137
xi  2017 ..............................................................143
xii  2018 ..............................................................147

d.  The PURDUE Directors, CEOs and Other
Executives Directed the Deception......................149

B.  Actavis-Related Entities..............................................156

C.  Other Manufacturers of Prescription Opioid Drugs.................157

1.  Hikma/West-Ward Entities....................................157
2.  Indivior Entity..................................................159
3.  Mylan Entities..................................................161
4.  Amneal Entities ................................................164
5.  Sandoz, Inc. .....................................................166

D.  Additional Distributors of Prescription Drugs at Both the
Wholesale and/or Retail Levels ..............................168

1.  Cardinal Health 110, LLC ...............................168

2.  McKesson Medical-Surgical, Inc., McKesson Specialty Distribution LLC and McKesson Specialty Care Distribution Corporation ........................170

3.  Anda Entities .................................................171

4.  Walgreens. ....................................................173

5.  Walmart, Inc. .................................................175

6.  CVS Entities .................................................176

7.  Kroger .........................................................178

8.  API .............................................................179

9.  Master Pharmaceuticals, Inc. ...........................181

10. Miami-Luken, Inc. ..........................................186

11. Keysource Medical, Inc. ..................................190

12. Qualitest Pharmaceuticals, Inc. ........................196

2.3  Distributor and Pharmacy Defendants Breached Their Duties by Failing to Identify, Monitor, and Report Suspicious Sales of Opioid Drugs and Participated in a Drug Division Concealment Enterprise.....................................................198

A.  WALGREENS Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................205

B.  WALMART Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................209

C.  CVS Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................211

D.  KROGER Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................214

E.  API Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................216

F.  MASTERS Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................218

G.  MIAMI-LUKEN Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................219

H.  KEYSOURCE Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................221

I.  QUALITEST Failed to Track and Report Suspicious Sales of Opioid Drugs..................................................223

3.    Common Factual Allegations………………………………….....225

4.    Claims……………………………………………………….....225

## SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND – CITY OF COVINGTON, KENTUCKY

Plaintiff, the CITY OF COVINGTON, Kentucky, by and through its attorneys, submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of *The County of Summit, Ohio, et al., v. PURDUE Pharma L.P., et al.,* Case No. 1:18-op-45090 ("*Summit County* Pleadings"), *In Re National Prescription Opiate Litigation,* in the United States District Court for the Northern District of Ohio, Doc. ##: 513, 514[1], and as may be amended in the future, and any additional claims asserted herein. Plaintiff also hereby amends its complaint to add the defendants against which claims are asserted as identified below. To the extent defendants were previously sued in plaintiff(s)' existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e). Doc. #: 232.

1. **INCORPORATION BY REFERENCE OF EXISTING COMPLAINT**

Plaintiff(s)' Existing Complaint (No. 1:18-OP-45967) is expressly incorporated by reference to this Short Form as if fully set forth herein except to the extent that allegations regarding certain defendants that are not listed in section 2 below are dismissed without prejudice.

2. **PARTIES - DEFENDANTS**

A.    Having reviewed the relevant ARCOS data, Plaintiff asserts claims against the

---

[1] *Corrected Second Amended Complaint and Jury Demand in the case of The County of Summit, Ohio, et al., v. PURDUE Pharma L.P., et al., Case No. 1:18-op-45090 ("Summit County Pleadings"), In Re National Prescription Opiate Litigation, in the United States District Court for the Northern District of Ohio, Doc. ##: 513, 514,*

following Defendants:

- PURDUE Pharma, L.P.
- PURDUE Pharma, Inc.
- The PURDUE Frederick Company, Inc.
- Richard S. Sackler*
- Jonathan D. Sackler*
- Mortimer, D.A. Sackler*
- Kathe A. Sackler*
- Ilene Sackler Lefcourt*
- Beverly Sackler*
- Theresa Sackler*
- David A. Sackler*
- Rhodes Technology*
- Rhodes Technology, Inc.*
- Rhodes Pharmaceuticals, L.P.*
- Rhodes Pharmaceuticals, Inc.*
- Trust for the Benefit of Members of the Raymond Sackler Family*
- The P.F. Laboratories, Inc.*
- Stuart D. Baker*
- Cephalon, Inc.
- Teva Pharmaceutical Industries, Ltd.
- Teva Pharmaceuticals USA, Inc.
- Johnson & Johnson
- Janssen Pharmaceuticals, Inc.
- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.
- Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.
- Depomed, Inc. n/k/a Assertio Therapeutics, Inc.
- Endo Health Solutions, Inc.
- Endo Pharmaceuticals, Inc.
- Endo Generics Holding, Inc.
- Par Pharmaceutical Companies, Inc.
- Par Pharmaceutical, Inc.
- Mallinckrodt PLC
- Mallinckrodt, LLC
- SpecGX, LLC
- Mallinckrodt Brand Pharmaceuticals, Inc.
- Mallinckrodt Enterprises, LLC
- Mallinckrodt Enterprises Holdings, Inc.
- Allergan PLC f/k/a Actavis PLC
- Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.
- Allergan USA, Inc.*
- Watson Laboratories, Inc.
- Actavis LLC

- Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.
- Insys Therapeutics, Inc.
- Hikma Pharmaceuticals USA Inc.*
- West-Ward Pharmaceuticals Corp.*
- Indivior, Inc.*
- Mylan Pharmaceuticals, Inc.*
- Mylan Institutional, Inc.*
- Amneal Pharmaceuticals, LLC*
- Sandoz, Inc.*
- AmerisourceBergen Drug Corporation
- Cardinal Health, Inc.
- Cardinal Health 110, LLC*
- McKesson Corporation
- McKesson Medical-Surgical, Inc.*
- McKesson Specialty Distribution, LLC*
- McKesson Specialty Care Distribution Corporation*
- H.D. Smith, LLC f/k/a H.D. Smith Wholesale Drug Company
- Anda, Inc.
- Anda Pharmaceuticals, Inc.*
- Walgreen Co.*
- Walmart Inc. f/k/a Wal-Mart Stores, Inc.*
- Wal-Mart Stores East, L.P.*
- CVS Pharmacy, Inc.*
- Kentucky CVS Pharmacy, LLC*
- CVS TN Distribution Center, LLC*
- CVS Indiana, LLC*
- CVS Rx Services, Inc.*
- The Kroger Co.*
- Kroger Limited Partnership I*
- Kroger Limited Partnership II*
- Associated Pharmacies, Inc.*
- Masters Pharmaceutical, Inc.*
- Miami-Luken, Inc.*
- Keysource Medical, Inc.*
- Qualitest Pharmaceuticals*
- John Doe, John Does or John Doe Corporation Being a Fictitious Name(s) Used to Designate a Person, Persons, Partnership, Sole Proprietorship, Corporation or other Entity Responsible for Developing, Marketing, Distributing and/or Selling Prescription Opioid Drugs

*indicates a newly added Defendant not in the existing Complaint*

I further certify that, except as set forth below, each of the Defendant(s) newly added herein appears in the ARCOS data I reviewed.

I understand that for each newly added Defendant not appearing in the

ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.

The following newly added Defendant(s) *do not appear* in the ARCOS data I reviewed:

- Richard S. Sackler
- Jonathan D. Sackler
- Mortimer, D.A. Sackler
- Kathe A. Sackler
- Ilene Sackler Lefcourt
- Beverly Sackler
- Theresa Sackler
- David A. Sackler
- Rhodes Technology
- Rhodes Technology, Inc.
- Trust for the Benefit of Members of the Raymond Sackler Family
- The P.F. Laboratories, Inc.
- Stuart D. Baker
- Allergan USA, Inc.
- Hikma Pharmaceuticals USA Inc.
- McKesson Specialty Distribution, LLC
- Wal-Mart Stores East, L.P.
- CVS Rx Services, Inc.

All of the newly named defendants fall into four separate categories (a) Purdue-Related Additional Defendants; (b) Actavis-Related Additional Defendant; (c) Manufacturers of prescription drugs, who, as described below, engaged in conduct similar to the Manufacturing Defendants named in the Original Complaint, but who were not yet identified, who also deceptively manufactured, marketed, sold and flooded Plaintiff's community with opioids; or (d) Distributors of prescription drugs at both the wholesale and retail level, who, as described below, engaged in conduct similar to the Distributor Defendants named in the Original Complaint, but who were not yet identified, that, *inter alia*, also flooded Plaintiff's community with opioids, failed to detect suspicious orders, and failed to prevent diversion of these dangerous products and are being added through Plaintiff's Short Form Supplemental and Amended Complaint.

Dated: March   , 2019    Signed: _____

## 2.1 ADDITIONAL DEFENDANTS

### A. Purdue-Related Additional Defendants

1.    RICHARD S. SACKLER, is a natural person residing in Travis County, Texas. He is the son of Raymond Sackler and, beginning in the 1990s, served as a member of the board of directors of PURDUE and PURDUE related entities.

2.    Defendant, JONATHAN D. SACKLER, is a natural person residing in Fairfield County, Connecticut. He is the son of Raymond Sackler and has been a member of the board of directors of PURDUE and PURDUE related entities since the 1990s.

3.    Defendant, MORTIMER D.A. SACKLER, is a natural person residing in New York County, New York. He is the son of Mortimer Sackler and has been a member of the board of directors of PURDUE and PURDUE related entities since the 1990s.

4.    Defendant, KATHE A. SACKLER, is a natural person residing in Fairfield County, Connecticut. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of PURDUE and PURDUE related entities since the 1990s.

5.    Defendant, ILENE SACKLER LEFCOURT, is a natural person residing in New York County, New York. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of PURDUE and PURDUE related entities since the 1990s.

6.    Defendant, BEVERLY SACKLER, is a natural person residing in Fairfield County, Connecticut. She is the widow of Raymond Sackler and has served as a member of the board of directors of PURDUE and PURDUE related entities since the 1990s.

7.    Defendant, THERESA SACKLER, is a natural person residing in New York County, New York. She is the widow of Mortimer Sackler and has served as a member of the

board of directors of PURDUE and PURDUE related entities since the 1990s.

8.     Defendant, DAVID A. SACKLER, is a natural person residing in New York County, New York. He is the son of Richard Sackler (and thus the grandson of Raymond Sackler) and has served as a member of the board of directors of PURDUE and PURDUE related entities since the 2012.

9.     Defendant RHODES TECHNOLOGY ("RHODES TECH") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, Rhode Island. At all times relevant hereto RHODES TECH or its predecessor has manufactured and supplied PURDUE with oxycodone, the active pharmaceutical ingredient in Oxycontin for use in the manufacture of pharmaceutical preparations.

10.    Defendant RHODES TECHNOLOGY, INC. ("RHODES TECH INC.") is a Delaware corporation formed on January 29, 1999 with its principal place of business in Coventry, Rhode Island. RHODES TECH INC is a general partner of RHODES TECH. At all times relevant hereto, RHODES TECH INC. has manufactured and supplied PURDUE with oxycodone, the active pharmaceutical ingredient in Oxycontin for use in the manufacture of pharmaceutical preparations or has managed RHODES TECH or its predecessor in doing so.

11.    Defendant RHODES PHARMACEUTICALS, L.P. ("RHODES PHARMA") is a Delaware limited partnership formed on November 9, 2007 with its principal place of business in Coventry, Rhode Island. At all times relevant hereto, RHODES PHAMA has marketed a generic form of Oxycontin which is manufactured by PURDUE Pharmaceuticals, L.P., ("PPNC") a Delaware limited partnership, which is a subsidiary of PPLP and which owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

12.    Defendant RHODES PHARMACEUTICALS, INC. ("RHODES PHARMA,

INC.") is a New York corporation formed on November 9, 2007. RHODES PHARMA, INC. is a general partner of RHODES PHARMA. At all times relevant hereto, RHODES PHAMA, INC. has marketed a generic form of Oxycontin which is manufactured by PPNC.

13.     Defendant, TRUST FOR THE BENEFIT OF MEMBERS OF THE RAYMOND SACKLER FAMILY (the "RAYMOND SACKLER TRUST"), is a trust of which Defendants, BEVERLY SACKLER, RICHARD S. SACKLER, and/or JONATHAN D. SACKLER are trustees. It is the 50% direct or indirect beneficial owner of PURDUE and PURDUE related entities and the recipient of 50% of the profits from the sale of opioids by PURDUE and PURDUE related entities.

14.     Defendant, THE P.F. LABORATORIES, INC. ("PF LABS") is a New Jersey corporation with its principal place of business in Totowa, New Jersey. It was, at all relevant times, engaged in manufacturing Oxycontin for PURDUE. At all relevant times, PF LABS has been beneficially owned, managed, and controlled by Defendant Sackler Family members. On May 7th of 2004, a small patent medicine company called the PURDUE Frederick Company ("PF Co."), which was purchased in 1952 by the Sackler brothers, Arthur, Mortimer and Raymond, merged into PF Labs.

15.     Defendant, STUART D. BAKER, is a natural person residing in Suffolk County, New York. He has served as a senior executive of, and/or counsel to, PURDUE and its related entities and members of the Sackler Family since the 1990s.

16.     Hereinafter, RICHARD S. SACKLER, JONATHAN D. SACKLER, MORTIMER D.A. SACKLER, KATHE A. SACKLER, ILENE SACKLER LEFCOURT, BEVERLY SACKLER, THERESA SACKLER, DAVID A. SACKLER (may sometimes collectively be referred to as the "SACKLERS"). RHODES TECH, RHODES TECH INC.,

RHODES PHARMA, RAYMOND SACKLER TRUST, PF LABS and STUART D. BAKER, along with the SACKLERS, may sometimes individually or collectively be referred to as "PURDUE" or "PURDUE RELATED PERSONS AND/OR ENTITIES". Any and all allegations against PURDUE in the Plaintiff's existing Complaint is expressly incorporated by reference to this Short Form as if fully set forth herein and shall specifically include the SACKLERS and/or the PURDUE RELATED PERSONS AND/OR ENTITIES.

### B. Actavis-Related Additional Defendant

17.     Defendant ALLERGAN USA. INC. is a foreign limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.   The Defendant ALLERGAN USA, INC. is a direct or indirect wholly owned subsidiary of ALLERGAN, Plc through a chain of affiliated non-public entities.

### C. Other Manufacturers of Prescription Opioid Drugs

#### 1. Hikma/West-Ward Pharmaceuticals Corp

18.     Hikma Pharmaceuticals, Plc is a public limited company registered in England and Wales with its principal offices located at 1 New Burlington Place, London, United Kingdom. Hikma is a worldwide pharmaceutical company in the business of developing and manufacturing branded and generic drugs.

19.     Defendant HIKMA PHARMACEUTICALS USA INC., is a Delaware corporation that is a wholly-owned subsidiary of Hikma Pharmaceuticals Plc.  Its headquarters office is located at 246 Industrial Way West, Eatontown, New Jersey 07724.

20.     Defendant WEST-WARD PHARMACEUTICALS CORP. is a Delaware corporation and, upon information and belief, is a wholly-owned subsidiary of Eurohealth

(U.S.A.) Inc., and its parent, Hikma Pharmaceuticals Plc. Its headquarters office is located at 401 Industrial Way West, Eatontown, New Jersey 07724. It manufactures, markets and distributes pharmaceutical products throughout the United States for entities affiliated with Hikma, including, but not limited to, branded and generic opioid-related products including oral and/or injectable forms of buprenorphine, naloxone, fentanyl citrate, hydromorphone HCI, methadone HCI, and morphine.

21.     Hereinafter, Defendants HIKMA PHARMACEUTICALS USA INC. and WEST-WARD PHARMACEUTICALS CORP., its registered subsidiaries and entities, will collectively be referred to as "HIKMA/WEST-WARD". Defendant HIKMA/WEST-WARD manufactures, markets, sells and distributes pharmaceutical drugs throughout the United States, including, opioid medications.

### 2. Indivior, Inc.

22.     Indivior Plc is a public limited company incorporated in England and Wales. Its registered office is located at 103-105 Bath Rd., Slough, Berkshire, SL1 3UH. Its core product is Suboxone Film®, a sublingual buprenorphine-naloxone treatment for opioid addiction. Seventy seven percent of its net revenues come from United States sales. Endo, Actavis and Cephalon, upon information and belief, through their subsidiaries or related entities, also produce generic versions of this product.

23.     Defendant Indivior Inc. (hereinafter "INDIVIOR") is a Delaware corporation that is authorized to do business in Kentucky and is a wholly-owned subsidiary of Indivior Plc with offices located at 10710 Midlothian Turnpike, Suite 430, Richmond, Virginia. Defendant INDIVIOR, and/or its parent company, its registered subsidiaries and affiliated entities, manufacture, market, sell and distribute pharmaceutical drugs throughout the United States,

9

including, opioid medications.

### 3.  *Mylan Pharmaceuticals, Inc.*

24.     Mylan N.V. is a publicly traded company based in the Netherlands.  Defendant
MYLAN PHARMACEUTICALS, INC. is a West Virginia corporation that is authorized to do
business in Kentucky with its principal offices located at 781 CHESTNUT RIDGE ROAD,
MORGANTOWN, WV, 26505 and is a wholly-owned U.S. subsidiary of Mylan N.V.

25.     Defendant MYLAN INSTITUTIONAL, INC. is an Illinois corporation that is
authorized to do business in Kentucky with its principal offices located at 1718 Northrock
Court, Rockford, Illinois 61103, and is a wholly-owned U.S. subsidiary of Mylan N.V.

26.     Defendants   MYLAN   PHARMACEUTICALS,   INC.   and   MYLAN
INSTITUTIONAL, INC. (hereinafter "MYLAN"), and/or its registered subsidiaries and
affiliated entities,  manufacture, market, sell and distribute pharmaceutical drugs throughout
the United States, and in Plaintiff's community, including, opioid medications.

### 4.  *Amneal Entities*

27.     Defendant AMNEAL PHARMACEUTICALS, LLC (hereinafter, "AMNEAL")
is a Delaware company that is authorized to do business in Kentucky with its headquarters
office located in Bridgewater, New Jersey.  Defendant AMMEAL PHARMACEUTICALS,
LLC merged with Impax. The merger was approved in 2018.

28.     Defendant AMNEAL and/or its registered subsidiaries and affiliated entities,
manufacture, market, sell and distribute pharmaceutical drugs throughout the United States,
and in Plaintiff's community, including, opioid medications.

### 5.  *Sandoz, Inc.*

29.     Defendant SANDOZ, INC. (hereinafter, "SANDOZ") is a Colorado corporation

with its headquarters office located in Princeton, New Jersey. Defendant SANDOZ is a wholly owned subsidiary of Novartis International AG, which is based in Basel, Switzerland. Defendant SANDOZ, and/or its parent company, registered subsidiaries and entities, manufacture, market, sell and distribute pharmaceutical drugs throughout the United States, and in Plaintiff's community, including, opioid medications.

### D. *Additional Distributors of Prescription Drugs at Both the Wholesale and/or Retail Levels*

30.     The following additional defendants are distributors of prescription drugs at both the wholesale and/or retail level, who, as described below, engaged in conduct similar to the Distributor Defendants named in the Original Complaint, but who were not yet identified, that, inter alia, also flooded Plaintiff's community with opioids, failed to detect suspicious orders, and failed to prevent diversion of these dangerous products and are being added through Plaintiff's Short Form Supplemental and Amended Complaint.

31.     These additional defendants who sold opioids, as pharmaceutical wholesalers, typically conducted their business behind the scenes, supplying retail drug stores, hospitals and nursing homes with the pharmaceuticals they ordered for their patients and customers. But the tsunami of pain pills that washed over the country and, in particular, in Plaintiff's community, would not have happened without their participation.

### 1.     *Cardinal Health Entities*

32.     Defendant CARDINAL HEALTH 110, LLC is a Delaware Corporation that is authorized to do business in Kentucky with its principal place of business in Dublin, Ohio. The Defendant CARDINAL HEALTH 110, LLC, upon information and belief, is a direct or indirect wholly owned subsidiary of Defendant CARDINAL HEALTH, INC., who was named as a Defendant in Plaintiff's Original Complaint (hereinafter, CARDINAL HEALTH, INC.

and CARDINAL HEALTH 110, LLC are collectively referred to as "CARDINAL" or "CARDINAL HEALTH"). CARDINAL does substantial business in the Commonwealth of Kentucky where it distributes pharmaceuticals in Plaintiff's community. Any references to Defendant CARDINAL HEALTH in the Plaintiff's existing Complaint shall also be deemed to include CARDINAL HEALTH 110, LLC.

### 2. *McKesson Entities*

33. Defendant MCKESSON MEDICAL-SURGICAL, INC. is a Virginia Corporation that is authorized to do business in Kentucky with its principal offices located at 9954 Mayland Drive, Suite 4000, Richmond, Virginia 23233.

34. Defendant MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION is a Delaware Corporation that was authorized to do business in Kentucky with its principal offices located at One Post Street, San Francisco, California 94104.

35. Defendant MCKESSON SPECIALTY DISTRIBUTION, LLC is a Delaware Corporation that is authorized to do business in Kentucky with its principal offices located at 1220 Senilac Drive, Carrollton, Texas.

36. MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION, and MCKESSON SPECIALTY DISTRIBUTION, LLC, upon information and belief, are direct or indirect wholly owned subsidiaries of Defendant MCKESSON CORPORATION, who was named as a Defendant in Plaintiff's Original Complaint. Any references to Defendant MCKESSON in the Plaintiff's existing Complaint shall also be deemed to include MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY DISTRIBUTION, LLC, and MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION. Hereinafter, MCKESSON CORPORATION,

MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY DISTRIBUTION, LLC and MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION are collectively referred to as "MCKESSON". MCKESSON does substantial business in the Commonwealth of Kentucky where it distributes pharmaceuticals in Plaintiff's community.

### 3. *Anda Entities*

37.     Defendant, ANDA PHARMACEUTICALS, INC., is a Florida corporation that is authorized to do business in Kentucky with its principal place of business located in Weston, Florida.

38.     Defendant ANDA, INC., through its various DEA registered subsidiaries and affiliated entities, including but not limited to, Defendant, ANDA PHARMACEUTICALS, INC., is the fourth largest distributor of generic pharmaceuticals in the United States. Any references to Defendant ANDA, INC. in the Plaintiff's existing Complaint shall also be deemed to include Defendant ANDA PHARMACEUTICALS, INC. Defendant ANDA, INC. and Defendant, ANDA PHARMACEUTICALS, INC. will hereinafter collectively be referred to as ANDA.

39.     Defendant ANDA is a wholesaler and/or retailer of pharmaceutical drugs that distributes opioids throughout the country, including in Plaintiff's community.

### 4. *Walgreens*

40.     WALGREENS BOOTS ALLIANCE, INC., was incorporated in September of 2014 under the laws of the State of Delaware, and has headquarters located at 108 Wilmot Road, Deerfield, Illinois 60015. On December 31, 2014, WALGREENS BOOTS ALLIANCE, INC. became the parent company of Defendant WALGREEN CO. (hereinafter, "WALGREENS"), an Illinois corporation that is authorized to do business in Kentucky,

pursuant to a merger and corporate reorganization into a holding company structure. Defendant WALGREEN CO. continues to be a subsidiary of WALGREENS BOOTS ALLIANCE, INC., and is a licensed distributor and operator of retail drug stores with pharmacies across the United States, including in Plaintiff's community, as it did before the merger. WALGREENS is authorized to conduct business in Kentucky.

41.    Defendant WALGREENS is a wholesaler and retailer of pharmaceutical drugs that distributes opioids throughout the country, including in Plaintiff's community.

### 5.    *Walmart Entities*

42.    Defendant WALMART INC. f/k/a Wal-Mart Stores, Inc. is a Delaware corporation that is authorized to do business in Kentucky with its principal place of business located in Bentonville, Arkansas.

43.    Defendant WALMART STORES EAST, L.P. is a Delaware limited partnership that is authorized to do business in Kentucky with its principal place of business located in Bentonville, Arkansas.

44.    The Defendant WALMART, INC. f/k/a Wal-Mart Stores, Inc., and WALMART STORES EAST, L.P. shall collectively be referred to as "WALMART".

45.    WALMART, at all times relevant hereto, was involved in the regulated distribution of opioid medications to WALMART'S retail pharmacies located in Plaintiff's community.

### 6.    *CVS Entities*

46.    CVS Health Corporation is a Delaware corporation with its principal place of business in Rhode Island. Defendant CVS PHARMACY, INC. is a Rhode Island corporation that is authorized to do business in Kentucky with a principal place of business in Rhode

Island and is a wholly owned subsidiary of CVS Health Corporation. CVS PHARMACY, INC., through its DEA registered parent company, is licensed to distribute prescription opioids throughout the country, including in Plaintiff's municipality.

47. Defendant KENTUCKY CVS PHARMACY, LLC is a Kentucky limited liability corporation and is a wholly owned or indirectly owned subsidiary of CVS Health Corporation. KENTUCKY CVS PHARMACY, LLC, through its DEA registered parent company, is licensed to distribute prescription opioids throughout the country, including in Plaintiff's municipality.

48. Defendant CVS TN DISTRIBUTION CENTER, LLC is a Tennessee limited liability corporation that is authorized to do business in Kentucky and is a wholly owned or indirectly owned subsidiary of CVS Health Corporation. CVS TN DISTRIBUTION CENTER, LLC, through its DEA registered parent company, is licensed to distribute prescription opioids throughout the country, including in Plaintiff's municipality.

49. Defendant CVS INDIANA, LLC is an Indiana limited liability corporation that is authorized to do business in Kentucky with a principal place of business in Indiana and a wholly owned or indirectly owned subsidiary of CVS Health Corporation. CVS INDIANA, LLC, through its DEA registered parent company, is licensed to distribute prescription opioids throughout the country, including in Plaintiff's municipality.

50. Defendant CVS RX SERVICES, INC. is a New York corporation that is authorized to do business in Kentucky with a principal place of business in Rhode Island and a wholly owned or indirectly owned subsidiary of CVS Health Corporation. CVS RX SERVICES, INC., through its DEA registered parent company, is licensed to distribute prescription opioids throughout the country, including in Plaintiff's municipality.

51.     Defendants, CVS PHARMACY, INC., KENTUCKY CVS PHARMACY, LLC, CVS TN DISTRIBUTION CENTER, LLC, CVS INDIANA, LLC, CVS RX SERVICES, INC., are collectively referred to herein as "CVS." CVS, including through its DEA registered parent company, subsidiaries and affiliated entities, operates as a distributor and/or as a chain of retail pharmacies in Plaintiff's community. CVS is among the top distributors of opioids in Plaintiff's community. In addition to dispensing and distributing opioids, CVS has marketed opioids during the relevant times.

7.     *Kroger Entities.*

52.     Defendant THE KROGER CO. is an Ohio corporation that is registered to do business in Kentucky with its principal offices located at 1014 Vine Street, Cincinnati, Ohio, 45202.  Defendant THE KROGER CO. is licensed by the DEA to distribute opioids within Plaintiff's community.

53.     Defendant KROGER LIMITED PARTNERSHIP I is an Ohio corporation that is registered to do business in Kentucky with its principal offices located at 1014 Vine Street, Cincinnati, Ohio, 45202.  Defendant THE KROGER LIMITED PARTNERSHIP I is licensed by the DEA to distribute opioids within Plaintiff's community.

54.     Defendant KROGER LIMITED PARTNERSHIP II is an Ohio corporation that is registered to do business in Kentucky with its principal offices located at 1014 Vine Street, Cincinnati, Ohio, 45202.  Defendant KROGER LIMITED PARTNERSHIP II is licensed by the DEA to distribute opioids within Plaintiff's community.

55.     Defendants THE KROGER CO., KROGER LIMITED PARTNERSHIP I, and KROGER LIMITED PARTNERSHIP II (hereinafter, collectively "KROGER") are among the top distributors of opioids in Plaintiff's community. In addition to dispensing and distributing

opioids, KROGER marketed opioids during the relevant times.

### 8.    *Associated Pharmacies, Inc.*

56.    Defendant ASSOCIATED PHARMACIES, INC. (hereinafter, "API") is an Alabama corporation that is registered to do business in Kentucky with its principal offices located at 211 Lonnie East Crawford Blvd., Scottsboro, Alabama 35769. API is licensed by the DEA to distribute opioids within Plaintiff's community. It is a wholly owned, warehouse subsidiary of American Associated Pharmacies, Inc. (hereinafter, AAP"). In addition to dispensing and distributing opioids, API marketed opioids during the relevant times.

### 9.    *Masters Pharmaceutical, Inc.*

57.    Defendant, MASTERS PHARMACEUTICAL, INC. (hereinafter, "MASTERS), is an Ohio corporation with its principal office located in Cincinnati, Ohio. MASTERS is licensed to distribute prescription opioids throughout the country, including in Plaintiff's municipality. MASTERS is a sales and marketing division of Masters Drug Company, Inc. In addition to dispensing and distributing opioids, MASTERS marketed opioids during the relevant times within Plaintiff's community.

### 10.    *Miami-Luken, Inc.*

58.    Defendant, MIAMI-LUKEN, INC. (hereinafter "MIAMI-LUKEN"), is an Ohio corporation with its principal office located in Springboro, Ohio. MIAMI-LUKEN is a wholesaler that distributes to pharmacies and also operates a chain of its own retail pharmacies. In addition to dispensing and distributing opioids, MIAMI-LUKEN marketed opioids during the relevant times within Plaintiff's community.

### 11.    *Keysource Medical, Inc.*

59.    Defendant, KEYSOURCE MEDICAL, INC. ("KEYSOURCE"), is an Ohio

corporation with its principal office located in Cincinnati, Ohio. In addition to dispensing and distributing opioids, KEYSOURCE marketed opioids during the relevant times within Plaintiff's community.

### 12. Qualitest Pharmaceuticals, Inc.

60. Defendant Qualitest Pharmaceuticals, Inc. (hereinafter, "QUALITEST") is an Alabama corporation with its principal office located in Huntsville, Alabama. QUALITEST was acquired by Endo International Plc in 2010 and merged with Defendant PAR PHARMACEUTICALS in 2010. In addition to dispensing and distributing opioids, QUALITEST marketed opioids during the relevant times within Plaintiff's community.

61. Any and all allegations against ENDO in the Plaintiff's existing Complaint is expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall specifically include QUALITEST.

## 2.2. FACTUAL ALLEGATIONS REGARDING NEW DEFENDANTS

### A. Individual Sackler Defendants and PURDUE Related Entities

62. The newly named Defendants, Richard S. Sackler, Jonathan D. Sackler, Mortimer, D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, Trust for the Benefit of Members of the Raymond Sackler Family, The P.F. Laboratories, Inc., and Stuart D. Baker fall into the category of Purdue-related Additional Defendants (the "Purdue-related Additional Defendants"), which are entities and individuals related to the Original Defendants Purdue Pharma, L.P. ("PPLP"), Purdue Pharma, Inc. ("PPI"), and The Purdue Frederick Company, Inc. that were named in the Original Complaint. PPLP, PPI, The Purdue Frederick Company and the Purdue-related Additional Defendants (collectively, PURDUE'), all acted together to carry out all of the misconduct

alleged in the existing Complaint and as hereinafter alleged in this Short Form Supplemental and Amended Complaint.

63.     PURDUE and its related entities are members of a world wide group of associated companies all of which are owned and controlled directly or indirectly through trusts and holding companies, 50% by the widow and descendants of Mortimer D. Sackler ("MORTIMER SACKLER FAMILY") and 50% by the widow and descendants of Raymond R. Sackler ("RAYMOND SACKLER FAMILY") (together, the Mortimer Sackler Family and the Raymond Sackler Family are referred to as the "SACKLER FAMILIES"). At all relevant times, the SACKLER FAMILIES jointly managed and controlled all of the associated companies that the two families owned. Each of the PURDUE related individuals and entities named herein knowingly aided, abetted, participated in and benefitted from the wrongdoing of PURDUE as alleged in this Complaint; and none are named merely because of his or her or its status as a shareholder, limited partner, member of a limited liability company, or beneficiary of a trust.

64.     According to its official corporate documents, PPI's purpose is manufacturing, sales, distribution, and research and development with respect to pharmaceutical, toiletry, chemical and cosmetic products, directly or as the general partner of a partnership engaged in those activities. That is the conduct at issue in this suit.

65.     PPI controlled PPLP as its general partner and is liable for the misconduct of the partnership as a matter of law. PPI is also the general partner of Purdue Holdings L.P., which holds the sole limited partnership interest in PLP.

66.     PPLP employed the sales reps and paid the doctors to promote PURDUE's drugs. That is a key element of the conduct at issue in this suit.

67.    PPI and PPLP shared the same physical offices, the same CEO, and many of the same officers.

68.    It is believed that the PURDUE entities may lack sufficient assets to satisfy their liabilities to Plaintiff and to the multitude of other plaintiffs that have commenced litigation against PURDUE nationwide for their role in creating the opioid epidemic, a role that is more fully described herein, as well as to their other creditors, because the billions of dollars of profits have been distributed to the SACKLER FAMILIES since the 1980s. Accordingly, the SACKLER FAMILIES and their controlled entities have also knowingly participated in the wrongdoing of PURDUE as alleged herein and knowingly profited and received the benefits of that wrongdoing.

### 1. Additional Allegations Against PURDUE

69.    In addition to the allegations against PURDUE in the existing Complaint, which are expressly incorporated by reference hereto, as if fully set forth herein, the Plaintiff supplements and recites additional allegations against PURDUE in this Short Form Supplemental and Amended Complaint as hereinafter set forth.

70.    PURDUE's pushing of opioids for "trustworthy" patients was a method used by PURDUE to get more people on drugs. To expand the market for opioids, PURDUE and the other Manufacturing Defendants trained sales reps to target vulnerable populations and encourage doctors to put them on opioids, without disclosing the risks. In Kentucky, PURDUE deceptively promoted opioids for elderly patients, veterans, patients who had never taken opioids, and patients with osteoarthritis — putting thousands more patients at risk.

71.    Upon information and belief, PURDUE and the other Manufacturing

Defendants, held special events to encourage doctors to prescribe opioids to veterans.[2]



*Purdue flyer from 2011*

72. PURDUE, and, upon information and belief, the other Manufacturing Defendants, also targeted patients who were not already taking opioids, described in the field as *"opioid-naive."* The Manufacturing Defendants unfairly and deceptively marketed its drugs as appropriate treatments for *opioid-naive* patients, without disclosing that they face even higher risks of overdose and death.

73. For example, PURDUE trained its sales reps to promote its drugs specifically for opioid-naive patients. In training calls, PURDUE managers instructed:

- *"Your opportunity here is with the naive community, let's use the naive trial to make your case."*

- *"You created an epiphany with the doctor today (potentially) by reviewing the opiate naive patient profile. What made him more pat to write for this patient, being an amiable doctor, is the fact that he would not have to talk patients out of their short acting [opioids]."*

- *"This was an example of what a good call looks like ... [Dr.] was particularly*

---

[2] *2011 flyer.*

> *interested in the RM case study of*
> *Marjorie, which generated a robust*
> *discussion of opioid naive patients ... "*

74.     A PURDUE sales script prompted sales reps to ask: *"Would you consider*

*OxyContin for an opioid-naive patient?"* Another PURDUE script read:[3]

---

**CLOSE #1**
Opioid-naïve (5 mcg/hour):
- "Doctor, either today or tomorrow, do you anticipate seeing this commercially insured, opioid-naïve patient with moderate to severe chronic pain, who you believe would benefit from Butrans?

---

*Purdue sales script from 2011*

75.     PURDUE also promoted its drugs for opioid-naive patients using the deceptive

term *"first line opioid." "First line"* is a medical term for the preferred first step in treating a

patient. Opioids are not an appropriate first line therapy. Nevertheless, PURDUE's internal

documents and testimony from sales reps shows that PURDUE repeatedly promoted

OxyContin as *"first line" — "the first thing they would take to treat pain."*

76.     PURDUE also found vulnerable opioid-naive patients by targeting prescribers

with the least training in the risks of opioids. PURDUE determined that nurse practitioners,

physician assistants, and primary care doctors were especially responsive to sales reps, so it

targeted them to sell more drugs.

77.     PURDUE and the other Manufacturing Defendants also targeted new patients

with the deceptive claim that its opioids should be used to treat the most common form of

arthritis, osteoarthritis.

78.     For example, PURDUE decided osteoarthritis would be a money-maker

because it is widespread. PURDUE's documents emphasize that more than 20 million

---

[3] *OxyContin sales script, pg. 10.*

Americans have osteoarthritis, including most people over 75.

79.     Opioids are not approved to treat osteoarthritis. PURDUE conducted a single study on osteoarthritis for Butrans, and it failed. PURDUE admitted in internal documents that its opioids *"are not indicated for a specific disease"* and *"it is very important that you never suggest to your HCP [health care professional] that OxyContin is indicated for the treatment of a specific disease state such as Rheumatoid Arthritis or Osteoarthritis."*

80.     Nevertheless, to meet its business goals, PURDUE trained its Kentucky sales reps to mislead doctors by promoting opioids for osteoarthritis without disclosing PURDUE's failed trial. PURDUE even measured how often it targeted osteoarthritis patients. A PURDUE marketing presentation concluded that its sales reps were *"identifying appropriate patients"* because osteoarthritis was specifically mentioned during 35% of sales visits.

81.     PURDUE also directed Kentucky sales reps to use marketing materials that highlight patients with osteoarthritis, even though PURDUE drugs were never indicated for that disease and PURDUE's Butrans trial had failed.



*PURDUE Opioid Promotion from 2015*[4]

82.    PURDUE's sales representatives assured Kentucky and CITY OF COVINGTON prescribers that opioids were just as effective for treating patients' long term and omitted any discussion that increased tolerance would require increasing, and increasingly higher and dangerous doses.

83.    PURDUE knew that for patients, taking higher doses of opioids, there were increased risks of addiction and death. But for PURDUE, higher doses mean higher profits. So PURDUE deceived doctors and patients to get people on higher and higher doses.

84.    PURDUE earned more money every time a patient moved to a higher dose. For example, Purdue's 2015 prices increased dramatically as patients moved to higher doses:

---

[4] *2015 Butrans Patient Identification and Initiation Guide, pg. 16.*

### OxyContin Prices

| | |
|---|---|
| bottle of 100 tablets (10 mg) | $269.17 |
| bottle of 100 tablets (15 mg) | $396.28 |
| bottle of 100 tablets (20 mg) | $501.99 |
| bottle of 100 tablets (30 mg) | $698.15 |
| bottle of 100 tablets (40 mg) | $859.72 |
| bottle of 100 tablets (60 mg) | $1,217.22 |
| bottle of 100 tablets (80 mg) | $1,500.18 |

*A patient taking the lowest dose pill twice a day for a week earns Purdue $38. But if the patient instead takes the highest dose, Purdue collects $210 — an increase of 450%.*

85.     To get that revenue, PURDUE designed its sales tactics to increase doses. PURDUE created a campaign for OxyContin around the slogan, *Individualize The Dose*, because PURDUE determined that it would *Increase The Dose*. PURDUE's CEO prepared a presentation to the Board of Directors explaining that PURDUE would use *Individualize The Dose* to sell more of its highest doses. When PURDUE decided to refresh the campaign with a new slogan, it hired consultants to study what would increase doses the most.

86.     PURDUE trained its sales reps that increasing a patient's dose ("titration") was a key move when making sales. PURDUE's graphics show the one-way path of increasing doses that PURDUE pushed doctors and patients to follow:



*Purdue opioid promotion from 2003*



*PURDUE opioid promotion from 2013[5]*

87.    PURDUE tracked whether its sales reps were getting patients on higher doses and warned staff when doses were not increasing enough: *"Titration up to higher strengths, especially the 40mg and 80mg strengths, is declining."* PURDUE required its sales reps to *"practice verbalizing the titration message"* to get patients' doses up.[6]

88.    PURDUE knew its promotion drove patients to higher doses. PURDUE's internal analysis *"found that there is greater loss in the 60mg and 80mg strengths (compared to other strengths) when we don't make primary sales calls."*[7] PURDUE's business plans emphasized that *"OxyContin is promotionally sensitive, specifically with the higher doses, and recent research findings reinforce the value of sales calls."* In 2014, when public health experts tried to save patients' lives by warning against high doses of opioids, PURDUE pursued a *"strategic initiative"* to fight back and *"maintain 2013 dose mix."*[8]

89.    PURDUE encouraged Kentucky doctors to prescribe high doses and did not tell

---

[5] *2008-04 OxyContin Conversion/Titration Guide, pg. 14; 2013-12 Butrans core visual aid, pg. 20.*

[6] *2013-08-19 OxyContin "Initiation, Conversion, and Titration" workshop.*

[7] *2013-08-19 OxyContin "Initiation, Conversion, and Titration" workshop; 2013-09-23 OxyContin marketing plan.*

[8] *2013-09-23 OxyContin marketing plan, pgs. 35, 57.*

doctors, or even its own sales reps, that higher doses carry heightened risk of addiction, overdose, and death.

90.     PURDUE's deception about the risk of higher doses was deliberate. PURDUE claimed that *"dose was not a risk factor for opioid overdose,"* even while it admitted in internal documents that it was *"very likely"* that patients face "dose-related overdose risk."[9]

91.     PURDUE analyzed, down to the last dollar, how much of its profit depended on patients taking higher doses of opioids. In the slide below, PURDUE reminded staff that a shift to lower doses, which reduces the danger to patients, would be bad for PURDUE's bottom line.[10]



Purdue internal strategy presentation from 2012

92.     When the U.S. Centers for Disease Control issued a national warning against the highest and most dangerous doses of opioids, PURDUE studied prescription data to calculate how much profit it would lose if doctors followed the CDC's advice.

93.     When patients showed signs of addiction to PURDUE's opioids, PURDUE

---

[9] 2013-08-27 Opioid dosage data press release; 2012-10-01 internal PURDUE analysis, pg. 22.

[10] 2012-08-14 OxyContin ACAM Presentation, slide 28.

urged doctors to respond by *increasing* the opioid dose. To convince doctors to increase the dose for addicted patients, PURDUE peddled the false notion that patients suffered from *"pseudoaddiction."*

94.    A PURDUE presentation for doctors titled *Medication Therapy Management* recited what had been the consensus view for decades: *"Many medical students are taught that if opioids are prescribed in high doses or for a prolonged time, the patient will become an addict."* PURDUE then assured doctors that this traditional concern about addiction was wrong — that patients instead suffer from "pseudoaddiction" because *"opioids are frequently prescribed in doses that are inadequate."*[11]

95.    A PURDUE pamphlet titled *Clinical Issues in Opioid Prescribing* urged doctors to look for pseudoaddiction:

> *"A term which has been used to describe patient behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may 'clock watch,' and may otherwise seem inappropriately "drug-seeking.' Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."*

96.    PURDUE again urged doctors to prescribe higher doses, stating that opioids *"are frequently underdosed - or even withheld due to a widespread lack of information ... about their use among healthcare professionals."*[12]

97.    In another pamphlet, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substances Prescribing Practices*, PURDUE admonished doctors that *"[u]ndertreatment of pain is a serious problem"* and *"pain should be treated aggressively."*

---

[11] 2007-11 *Medication Therapy Management: Opportunities For Improving Pain Care*, slide 31.
[12] *Clinical Issues in Opioid Prescribing* (2008), pgs. 1-3.

PURDUE stated: *"Facts About Addiction: 'Misunderstanding of addiction and mislabeling of patients as addicts result in unnecessary withholding of opioid medications.'"*[13]

98.     PURDUE released a second edition of *Providing Relief, Preventing Abuse*, which continued to urge higher doses, and added a new deception about the scientific "literature":

> *"The term pseudoaddiction has emerged in the literature to describe the inaccurate interpretation of [drug-seeking] behaviors in patients who have pain that has not been effectively treated."*[14]

99.     The revised pamphlet failed to disclose that none of the "literature" it cited included scientific or medical evidence supporting pseudoaddiction as a diagnosis separate from addiction. Nor did it disclose that all of the cited "literature" was linked to organizations and doctors paid by PURDUE.

100.     PURDUE also urged doctors to prescribe higher doses in a PURDUE-sponsored book, *Responsible Opioid Prescribing*, which again suggested that patients who appear to be addicted were instead "receiving an inadequate dose" and needed more drugs.[15]

101.     PURDUE knew its campaign to push higher doses of opioids was wrong. Doctors on PURDUE's payroll admitted in writing that *pseudoaddiction* was used to describe "behaviors that are clearly characterized as drug abuse" and put PURDUE at risk of "ignoring" addiction and "sanctioning abuse." But PURDUE nevertheless urged doctors to respond to signs of addiction by prescribing higher doses of PURDUE's drugs.

102.     PURDUE also had no justification to steer patients away from safer alternatives, and it knew it. PURDUE's internal documents admit that it *"cannot represent or*

---

[13] *Providing Relief, Preventing Abuse* (2008), pgs. 4, 6,

[14] *Providing Relief, Preventing Abuse* (2nd ed. 2011), pg. 9

[15] *Responsible Opioid Prescribing* (2011), pg. 90

*suggest"* that its drugs are *"safer"* or *"more effective"* or make *"any other sort of comparative claim,"* because it had <u>no drugs</u> with the evidence required for such a claim. In its internal documents, PURDUE admitted that *"making comparative statements of our product versus a competitor's product is never appropriate."*[16]



*Purdue internal presentation from 2011*

103.   But PURDUE went ahead and made deceptive claims to steer patients away from alternatives.

104.   PURDUE and the other Manufacturing Defendants made more money by pushing patients to higher doses, and increased their profits by keeping patients on drugs for longer periods of time. Long-term opioid use causes addiction and death. But for the Manufacturing Defendants keeping patients on drugs longer meant more profits. So they

---

[16] *2011-10 Guidelines on Product Promotion: Comparative Claims Workshop, slide 12.*

deceived doctors and patients to stay on its drugs longer.

105.    According to PURDUE's 2015 price list, a patient taking PURDUE's 80mg OxyContin pill twice a day for a week earned PURDUE $210. If that same patient could be kept on the drug for a year, PURDUE collected far more money: $10,959.[17]

106.    By getting patients addicted, PURDUE and the other Manufacturing Defendants greatly increased the patients' risk of harm from many drugs in the opioid class — including, heroin, fentanyl, and generic oxycodone — which share the same addictive chemistry as opioids.

107.    To get patients to take that awful risk, PURDUE and the other Manufacturing Defendants deceived doctors into keeping patients on opioids for longer and longer periods of time.

108.    PURDUE gave its salespeople explicit instructions to "extend average treatment duration."[18] PURDUE's business plans valued patients by how long they could be kept on PURDUE's opioids and targeted patients who could be kept on opioids for more than a year.[19] To "drive sales and profitability," PURDUE deliberately worked to keep patients on its opioids longer.[20]

109.    PURDUE secretly determined that pushing patients to higher doses would keep them on opioids longer. PURDUE developed tactics specifically to keep patients hooked on opioids longer, which it called by the euphemism: "*Improving the Length Of Therapy*" — sometimes abbreviated as "LOT" or "LoT."[21] PURDUE taught its employees that there is "a

---

[17] *2015-01-12 Price Increase Notification.*

[18] *2011-10-18 OxyContin Level 300 Training, slide 49.*

[19] *2012-04-27 Marketing Welcome, slides 48-49.*

[20] *2012-02-15 10-Year Plan, slides 31-33.*

[21] *2013-07 Sales & Marketing Opioid Market Overview, slide 35.*

direct relationship" between getting patients on higher doses and keeping them on PURDUE's opioids longer.[22]

110.    PURDUE's internal marketing plan showed a graph that broke down exactly how getting patients on higher doses of opioids would get more patients to stay on drugs longer:



*PURDUE internal strategy presentation from 2012*

111.    PURDUE's sales reps promoted higher doses, but they did not tell doctors and patients that the higher doses were a scheme to trap patients on PURDUE's drugs.

112.    To *"extend average treatment duration,"* PURDUE deceptively claimed that patients' becoming dependent on its drugs was not dangerous or deadly, but *"normal."* PURDUE taught doctors that: *"Healthcare professionals should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not the same as addiction."*[23] PURDUE deceptively claimed that physical dependence on its opioids was "a normal physiologic response," "an expected occurrence," and no more

---

[22]  *2012-08-14 OxyContin marketing plan, slide 25.*
[23]  *2009-11 FACETS, slide 9.*

dangerous than "many classes of medications" that are not addictive, including drugs used to treat high blood pressure.[24] PURDUE set as one of its *"key messages"* that *"data support the use of opioids beyond 90 days and maintained through 52 weeks."*[25]

113. One of PURDUE's most powerful tactics to keep patients on opioids longer was an opioid savings card that gave patients discounts on their first prescriptions. Discounts could have cut PURDUE's revenue *if* patients took opioids for a short time. But PURDUE's internal 10 year plan highlighted its discovery that opioid savings cards kept patients on opioids longer: *"more patients remain on OxyContin after 90 days."*[26] PURDUE determined that opioid savings cards worked like the teaser rate on a long-term and very high-stakes mortgage. According to PURDUE's internal analysis, the savings cards had the highest "return on investment" in the entire *"OxyContin Marketing Mix."* The return on investment for PURDUE was 4.28, so that every $1,000,000 PURDUE gave away in savings came back to PURDUE as $4,280,000 in revenue because patients stayed on dangerous opioids longer.[27]



*PURDUE internal strategy presentation from 2011*[28]

---

[24] *Is It Pain (2011), slide 6.*

[25] *2013-07 Publication Plan for Long-Term Opioid Therapy for Chronic Non-Cancer Pain, pg. 3.*

[26] *2012-02-15 10-Year Plan, slide 33.*

[27] *2012-11-01 Board report, pg. 31.*

[28] *2011-12-06 Manager's Meeting Presentation, slide 13.*

114.    Keeping more patients on opioids for longer than 90 days was one of PURDUE's "2011 Highlights."[29]  PURDUE's directors and CEO were briefed specifically on "emails targeted towards HCPs [healthcare professionals]" to push opioid savings cards.[30] But it was a public health disaster. It was found that patients who stayed on prescription opioids for more than 90 days were *thirty times more likely to die of an overdose*.

115.    PURDUE aimed to "drive" patients to higher doses and longer periods on drugs so forcefully that it could control how many kilograms of opioids were taken within 2%:[31]

> Drive appropriate titration and length of therapy with continuing patients, to maintain total Kg within 2% of forecast

*Purdue internal strategy presentation from 2012*

116.    When PURDUE's sales reps talked with doctors about how to dose its drugs, and when PURDUE sent opioid savings cards to patients, PURDUE did not disclose that higher doses and savings were designed to keep patients on its drugs longer. PURDUE did not disclose that its promotion to doctors was designed to drive the amount of drugs consumed by patients to within 2% of its desired profit. PURDUE did not disclose that its business target would cause many more patients to get addicted and die.

117.    PURDUE's campaign to "extend average treatment duration" succeeded. A national study of tens of thousands of medical and pharmacy claims records published in the *Journal of General Internal Medicine* found that two-thirds of patients who took opioids for 90 days were still taking opioids five years later.[32]

---

[29] *2012-01-15 10 year Plan, Slide 33.*

[30] *2012-11-01 Board report, pg. 17.*

[31] *2012-08-14 OxyContin marketing plan, slide 23.*

[32] *Martin et al., Long-term chronic opioid therapy discontinuation rates from the TROUP study. J Gen*

### 2. New Allegations Against The Directors, CEOs and Other Executives of PURDUE Responsible for the Company's Deadly Misconduct

118.    The directors and CEOs of PURDUE had oversight and control over the unlawful sales and marketing conduct at issue in this Complaint, and they are personally liable for the misconduct because: (a) they participated in the misconduct; and/or (b) they knew about the misconduct and failed to stop it; and/or (c) they should have known about the misconduct and they failed to stop it. In this case, the directors, CEOs and other executives are personally liable for all three reasons.

### a. A Group of Sackler Family Directors, CEOs and Other Executives Knowingly Participated in, Controlled and Directed PURDUE's Misconduct

119.    In this case, the individual defendants made the decisions to break the law; they controlled the unfair and deceptive conduct of PURDUE; and they personally collected many millions of dollars from the deception.

120.    The individual defendants were the chief architects and beneficiaries of PURDUE's deception.

121.    The individual defendants controlled the misconduct described herein.

122.    Each individual defendant knowingly and intentionally sent sales representatives to promote opioids to prescribers in Kentucky thousands of times.

123.    Each individual defendant knew and intended that the sales reps in Kentucky would unfairly and deceptively promote opioid sales that are risky for patients, including by:

- falsely blaming the dangers of opioids on patients instead of the addictive drugs;

- pushing opioids for elderly patients, without disclosing the higher risks;

*Intern Med. 2011;26(12):1450-7. Summarized in Purdue's files on pg. 15.*

- pushing opioids for patients who had never taken them before, without disclosing the higher risks;

- pushing opioids as substitutes for safer medications, with improper comparative claims;

- falsely assuring doctors and patients that reformulated OxyContin was safe;

- pushing doctors and patients to use higher doses of opioids, without disclosing the higher risks;

- pushing doctors and patients to use opioids for longer periods of time, without disclosing the higher risks; and

- pushing opioid prescriptions by doctors that Purdue knew were writing dangerous prescriptions.

124. Each individual defendant knew and intended that the sales reps would not tell Kentucky doctors and patients the truth about PURDUE's opioids. Indeed, they knew and intended these unfair and deceptive tactics achieved their purpose by concealing the truth.

125. Each individual defendant knew and intended that prescribers, pharmacists, and patients in Kentucky would rely on PURDUE's deceptive sales campaign to prescribe, dispense, and take Purdue opioids. Securing that reliance was the purpose of the sales campaign.

126. Each individual defendant knew and intended that staff reporting to them would pay top prescribers tens of thousands of dollars to encourage other doctors to write dangerous prescriptions in Kentucky.

127. Each individual defendant knew and intended that staff reporting to them would reinforce these misleading acts through thousands of additional acts in Kentucky, including by sending deceptive publications to Kentucky doctors and deceptively promoting PURDUE opioids at Kentucky hospitals and clinics.

128.     Each individual defendant knowingly and intentionally took money from Purdue's deceptive business in Kentucky.

129.     Each individual defendant knowingly and intentionally sought to conceal his or her misconduct.

130.     PURDUE's deadly misconduct has been directed and encouraged by these individual defendants - people at the top - their CEOs and directors. A small group of people controlled PURDUE and got extraordinarily rich from it, including, but not limited to, the SACKLER FAMILIES – in particular, as detailed below, RICHARD S. SACKLER, JONATHAN D. SACKLER, MORTIMER D.A. SACKLER, KATHE A. SACKLER, ILENE SACKLER LEFCOURT, BEVERLY SACKLER, THERESA SACKLER, DAVID A. SACKLER and the RAYMOND SACKLER TRUST (hereinafter, the "SACKLER DEFENDANTS" or the "SACKLERS").

131.     At all relevant times, Defendant, RICHARD S. SACKLER, played an active and central role in the management of PURDUE and its related entities. He began working for PURDUE as assistant to the president, his father, Raymond, in the 1970s. He later served as vice president of marketing and sales. In the early 1990s he became senior vice president, which was the position he held at the time Oxycontin was launched in 1996. In 1999 he became president, and served in that position until 2003.

132.     Defendant, RICHARD S. SACKLER, resigned as president in 2003, apparently due to a concern that executive officers of PURDUE would be held personally liable for opioid related liabilities and crimes. However, he continued to serve, with his uncle, Mortimer, as co-chair of the board of PURDUE. In that way, among others, the family maintained control over their family business, even though they were no longer officers, because the officers

reported to them.

133.    As a senior executive of PURDUE, Defendant, RICHARD S. SACKLER, was actively involved in the invention, development, marketing, promotion, and sale of PURDUE's opioid products, including Oxycontin. He worked tirelessly to make Oxycontin a blockbuster, telling colleagues how devoted he was to the drug's success. Along with his father, Raymond, and his uncle, Mortimer, he launched Oxycontin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by his uncle Arthur.  Within 5 years of its introduction, Oxycontin was generating a billion dollars a year. When Oxycontin met with resistance, Richard participated in PURDUE's efforts to counter that resistance.

134.    At all times relevant, Defendant, RICHARD S. SACKLER, served as a trustee of one or more trusts that beneficially own and control PURDUE and the PURDUE related entities.

135.    Defendant, RICHARD S. SACKLER, is the direct or indirect beneficiary of some portion of 25 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids.

136.    Defendant, JONATHAN D. SACKLER, was a vice president of PURDUE in 1991, and by 2000 he was a senior vice president.  Like his brother, Richard, he resigned that position in or after 2003, apparently due to a concern that executive officers of PURDUE would be held personally liable for opioid related liabilities and crimes.  However, he continued to serve on the board of PURDUE.

137.    At all times relevant, Defendant, JONATHAN D. SACKLER, served as a trustee of one or more trusts that beneficially own and control PURDUE and the PURDUE

related entities named herein.

138. Defendant, JONATHAN D. SACKLER, is the direct or indirect beneficiary of some portion of 25 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids.

139. Defendant, MORTIMER D.A. SACKLER, served as a vice president of PURDUE during the period of the development, launch, and promotion of Oxycontin. He resigned that position in or after 2003, apparently due to a concern that executive officers of PURDUE would be held personally liable for opioid related liabilities and crimes. However, he continued to serve on the board of PURDUE.

140. Defendant, MORTIMER D.A. SACKLER, is the direct or indirect beneficiary of 7.14 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids.

141. Defendant, KATHE A. SACKLER, was a vice president of PURDUE in 1991, and by 2000 she was a senior vice president. She resigned that position in or about 2003 due to a concern that executive officers of PURDUE would be held personally liable for opioid related liabilities and crimes. However, she continued to serve on the board of PURDUE.

142. Defendant, KATHE A. SACKLER, is the direct or indirect beneficiary of 7.14 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids.

143. Defendant, ILENE SACKLER LEFCOURT, served as vice president of PURDUE during the period of the development, launch, and promotion of Oxycontin. She resigned that position in or after 2003, apparently due to a concern that executive officers of PURDUE would be held personally liable for opioid related liabilities and crimes. However,

she continued to serve on the board of PURDUE.

144.     Defendant, ILENE SACKLER LEFCOURT, is the direct or indirect beneficiary of 7.14 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids.

145.     At all relevant times, Defendant, BEVERLY SACKLER, served as a trustee of one or more trusts that beneficially own and control PURDUE and the PURDUE related entities named herein and to which 50 percent of the profits of PURDUE and the PURDUE related entities named herein from the sale of opioids has been conveyed. She has also served as a member of the board of directors of PURDUE and PURDUE related entities since the 1990s.

146.     Defendant, BEVERLY SACKLER, is the direct or indirect beneficiary of some portion of 50 percent of the profits earned by PURDUE and the PURDUE related additional entities named herein from the sale of opioids.

147.     Defendant, THERESA SACKLER, is the direct or indirect beneficiary of 50 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids. She has also served as a member of the board of directors of PURDUE and the PURDUE related entities named herein since the 1990s.

148.     Defendant, DAVID A. SACKLER, is the direct or indirect beneficiary of some portion of 25 percent of the profits earned by PURDUE and the PURDUE related entities named herein from the sale of opioids. He has also served as a member of the board of directors of PURDUE and PURDUE related entities since 2012.

149.     Defendant, STUART BAKER, joined PURDUE in 1994 as executive vice president of PPLP and vice president of PF Co. He served as legal counsel to the entire

PURDUE organization and the SACKLER FAMILIES. He also served as an officer of the other Sackler-owned, PUARDUE related entities. He served as a trustee of one or more trusts that beneficially own and control PURDUE and its related entities. He served as corporate secretary for PURDUE, and, as such, he gained direct knowledge of the wrongdoing alleged in this Complaint. In his capacity as an officer, director and lawyer, he knowingly aided, abetted, participated in and benefitted from the wrongdoing of PURDUE as alleged in this Complaint and knowingly aided and abetted the SACKLER FAMILIES, SACKLER DEFENDANTS and PURDUE and its related entities, to structure their personal affairs and the personal and business organizations they beneficially owned and controlled in such a way as to attempt to evade personal liability for the wrongdoing in which he knew they had engaged and in which he knew they intended to continue to engage. Hereinafter, STUART BAKER may sometimes be referred to as part of "the SACKLER DEFENDANTS" or as part of "the SACKLERS).

150.    The SACKLER FAMILIES are the sole beneficial owners of PURDUE and its related/associated entities. All of PURDUE's and its related/associated companies' profits go to Sackler family trusts and entities.

151.    RICHARD S. SACKLER, JONATHAN D. SACKLER, MORTIMER D.A. SACKLER, KATHE A. SACKLER, ILENE SACKLER LEFCOURT, BEVERLY SACKLER, THERESA SACKLER, DAVID A. SACKLER, RHODES TECH, RHODES TECH, INC., RHODES PHARMA, RHODES PHARMA, INC. THE RAYMOND SACKLER TRUST (through its trustees), PF LABS and STUART D. BAKER, each knowingly aided, abetted, participated in, and benefitted from the wrongdoing of PURDUE and its related entities, as alleged in this Complaint.

152.    PURDUE is part of a complicated web of entities through which the

SACKLER FAMILIES operate. PPI is the managing general partner of PPLP and many of the other various PURDUE related entities. Its status as managing general partner ensures it control of those entities. In turn, at all relevant times, the members of the board of PPI have been members of the SACKLER FAMILIES or Sackler family retainers. Since the SACKLER FAMILIES control the board of PPI, the officers of PPI and PPLP reported to them. This ensured the SACKLER DEFENDANTS control of PPI and PPLP, even when officers of those entities were not themselves members of the SACKLER FAMILIES.

153. The SACKLER DEFENDANTS are beneficial owners of, and exercise complete control over all four RHODES DEFENDANTS and PF LABS. The SACKLER DEFENDANTS made the decision that the SACKLER FAMILIES should enter the generic market for Oxycontin in or about 2008 and that it should do so through RHODES PHARMA, a Sackler-owned entity created for that purpose.

154. With great power came the obligation to act responsibly. The directors and CEOs of PURDUE and its related entities disregarded their obligations and instead directed PURDUE's massive and deadly deception.

155. The directors and CEOs of PURDUE and its related entities run the companies as their personal enterprise. Each of the SACKLER DEFENDANTS has served on the Board of Directors of, or as an officer of, PURDUE or its related entities. Their family owns the company. RICHARD SACKLER, JONATHAN SACKLER, BEVERLY SACKLER, THERESA SACKLER, MORTIMER SACKLER, KATHE SACKLER, ILENE SACKLER LEFCOURT have been on the board since the 1990s. DAVID A. SACKLER has been on the board since 2012.

156. RICHARD SACKLER was as an inventor of the original patent for Oxycontin.

He testified that the family has made more than $1 billion from Oxycontin alone.

157. Board members are intimately involved in the activities of PURDUE and its related entities often on a weekly or even daily basis.

158. PURDUE launched OxyContin in 1996. It became one of the deadliest drugs of all time.[33] The FDA scientist who evaluated OxyContin wrote in his original review: *"Care should be taken to limit competitive promotion."*[34] The SACKLERS did not agree. From the beginning, the SACKLERS viewed limits on opioids as an obstacle to greater profits.

159. At the OxyContin launch party, RICHARD SACKLER spoke as the Senior Vice President responsible for sales. He asked the audience to imagine a series of natural disasters: an earthquake, a volcanic eruption, a hurricane, and a blizzard. He said: *"the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white...."* Over the next twenty years, the SACKLERS made Richard's boast come true. They created a manmade disaster. Their blizzard of dangerous prescriptions buried children and parents and grandparents across Kentucky, and the burials continue.

160. With the launch of Oxycontin came one of the biggest pharmaceutical marketing campaigns in history. PURDUE, PF CO., PF LABS and the SACKLER FAMILIES trained and armed a force of approximately 1,000 sales representatives with charts showing Oxycontin's purported benefits. A major thrust of the campaign was that Oxycontin should be prescribed not merely for the kind of severe short-term pain associated with surgery or for

---

[33] *See, e.g., 2016-03-15 telebriefing by CDC Director Tom Frieden ("We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently ... those who got the highest doses of opioids, more than 200 MMEs per day had a 1 in 32 chance of dying in just 21/2 years ... almost all the opioids on the market are just as addictive as heroin.), available at https://www.cdc.gov/media/releases/2016/t0315-prescribing- opioids-guidelines.html.*
[34] *1995-10 Overall Conclusion to 1995 FDA review, Curtis Wright, #785793.1.*

cancer pain but also for less acute, longer-lasting pain, such as arthritis, back pain, sports injuries, and fibromyalgia. The number of conditions that Oxycontin could treat seemed almost unlimited.

161.     The training included "training in 'overcoming objections' from clinicians." "If a doctor inquired about addiction," the representative was instructed to respond thus "The delivery system is believed to reduce the abuse liability of the drug." Another sales representative said that PURDUE executives "told us to say things like it is 'virtually' non-addicting."

162.     PURDUE sales representatives were provided with studies and literature provided by other physicians. PURDUE had a speakers' bureau through which it paid several thousand doctors to attend medical conferences and deliver presentations about Oxycontin's merits. "Doctors were offered all-expenses-paid trips to pain management seminars in places like Boca Raton." Internal documents reflect that doctors who attended these seminars wrote Oxycontin prescriptions more than twice as often as those who didn't.

163.     PURDUE also advertised in medical journals and produced promotional videos featuring not just satisfied patients but also doctor testimonials. "The marketing of Oxycontin relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company".

164.     According to a former Oxycontin sales representative, Defendant, RICHARD S. SACKLER, was "the dude that made it happen." He was tireless in his dedication to Oxycontin's success. When benefit plans began citing Oxycontin abuse as an excuse not to pay, he sent an email to sales representatives stating that, for insurers, "addiction may be a convenient way to just say NO."

165.     Members of the Sackler family were daily on site at PURDUE's headquarters, controlling the management of their family business and all of its employees.

166.     Defendant, RICHARD S. SACKLER, is named as an inventor on some 50 patents relating to oxycodone and other pain medications, including, several patents apparently issued as late as 2016. Virtually all such patents invented by Defendant, RICHARD S. SACKLER, were assigned to PURDUE.

167.     From the beginning, the SACKLERS were behind PURDUE's decision to deceive doctors and patients. In 1997, RICHARD SACKLER, KATHE SACKLER, and other PURDUE executives determined — and recorded in secret internal correspondence — that doctors had the crucial misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin much more often, even as a substitute for Tylenol.[35] In fact, OxyContin is more potent than morphine. Richard directed PURDUE staff not to tell doctors the truth, because the truth could reduce OxyContin sales.[36]

168.     The Defendants, RICHARD S. SACKLER and KATHE A. SACKLER, were part of a conspiracy to deceive physicians into believing that oxycodone was half as strong as morphine, when in fact the opposite was true, this deception was known by PURDUE to ease the fears of well-meaning and careful physicians about prescribing Oxycontin for non-cancer patients and pain use.

169.     From the start, the SACKLERS were also the driving force behind PURDUE's

---

[35] 1997-06-12 email from Richard Sackler (Staff reported: "Since oxycodone is perceived as being a 'weaker' opioid than morphine, it has resulted in OxyContin being used much earlier for non-cancer pain. Physicians are positioning this product where Percocet, hydrocodone, and Tylenol with Codeine have been traditionally used. Since the non-cancer pain market is much greater than the cancer pain market, it is important that we allow this product to be positioned where it currently is in the physician's mind." Richard Sackler replied: "I think you have this issue well in hand. If there are developments, please let me know."); 1997-05-28 email from Richard Sackler; 1997-04-23 email from Richard Sackler.

[36] 1997-06-12 email from Richard Sackler; 1997-05-28 email from Richard Sackler; 1997-04-23 email from Richard Sackler.

strategy to push opioids with the false promise that they create an enhanced *"lifestyle."* In 1998, RICHARD SACKLER instructed PURDUE's executives that OxyContin tablets provide more than merely *"therapeutic"* value and instead *"enhance personal performance,"* like Viagra.[37]

170. In 1999, RICHARD SACKLER became the CEO of PURDUE and Jonathan, Kathe, and Mortimer were Vice Presidents.[38] The company hired hundreds of sales representatives and taught them false claims to use to sell drugs.[39] PURDUE managers tested the sales reps on the most important false statements during training at company headquarters. On the crucial issue of addiction, which would damage so many lives, PURDUE trained its sales reps to deceive doctors that the risk of addiction was "less than one percent."[40] PURDUE mailed thousands of doctors promotional videos with that same false claim:

> *"There's no question that our best, strongest pain medicines are the opioids. But these are the same drugs that have a reputation for causing addiction and other terrible things. Now, in fact, the rate of addiction amongst pain patients who are treated by doctors is much less than one percent. They don't wear out, they go on working, they do not have serious medical side effects."*[41]

171. A sales representative told a reporter: *"We were directed to lie. Why mince words about it? Greed took hold and overruled everything. They saw that potential for billions of dollars and just went after it."*[42]

172. Most of all, the SACKLERS cared about money. Millions of dollars were not

---

[37] *1998-09-28 email from Richard Sackler.*

[38] *2000-03-26, Peter Healy, Opening the Medicine Chest: PURDUE Pharma prepares to raise its profile, #24865.1.*

[39] *2003-12-23 GAO Report, pg. 19 (increase from 771 reps in 1999 to 1,066 in 2001).*

[40] *Barry Meier, Pain Killer (1 ed. 2003) at 99.*

[41] *"I Got My Life Back" video, transcript.*

[42] *2017-10-16, Christopher Glazek, "The Secretive Family Making Billions From The Opioid Crisis," Esquire Magazine (quoting PURDUE sales representative Shelby Sherman).*

enough. They wanted billions. They cared more about money than about patients, or their employees, or the truth. In 1999, when employee Michael Friedman reported to Richard Sackler that PURDUE was making more than $20,000,000 per week, Richard replied immediately, at midnight, that the sales were *"not so great."* *"After all, if we are to do 900M this year, we should be running at 75M/month. So it looks like this month could be 80 or 90M. Blah, humbug. Yawn. Where was I?"*[43]

173. To make more money, the SACKLERS considered whether they could sell OxyContin in some countries as an uncontrolled drug. Staff reported to RICHARD SACKLER that selling OxyContin as *"non-narcotic,"* without the safeguards that protect patients from addictive drugs, would provide *"a vast increase of the market potential."*[44] The inventor of OxyContin, Robert Kaiko, wrote to Richard to oppose this dangerous idea. Mr. Kaiko wrote that he was *"very concerned"* about the danger of selling OxyContin without strict controls. Mr. Kaiko warned: *"I don't believe we have a sufficiently strong case to argue that OxyContin has minimal or no abuse liability."* To the contrary, Mr. Kaiko wrote, *"oxycodone containing products are still among the most abused opioids in the U.S."* Mr. Kaiko predicted: *"If OxyContin is uncontrolled, ... it is highly likely that it will eventually be abused."*[45] Richard responded: *"How substantially would it improve your sales?"*[46]

174. In the late 1990s, Defendants, RICHARD S. SACKLER, JONATHAN D. SACKLER, and KATHE A. SACKLER, participated in an unlawful attempt to deceive European drug regulators into classifying Oxycontin as totally uncontrolled, i.e., capable of being obtained without a prescription, despite the fact that all of these family members were

---

[43] *1999-06-17 email from Michael Friedman, #228728.1.*
[44] *1997-02-27 email from Walter Wimmer.*

[45] *1997-02-27 email from Robert Kaiko.*
[46] *1997-03-02 email from Richard Sackler.*

well aware by then of the abuse liability of the drug in the United States.

175.     That prescription opioids would lead to addiction and, in particular, that Oxycontin could be, and was being, abused has been known to PURDUE and the SACKLERS since at least the summer of 1999.

176.     In the summer of 1999, a PURDUE sales representative wrote to the President of PURDUE reporting widespread abuse of Oxycontin. As a result of that memo, a secretary at PURDUE, Maureen Sara, was given the task of performing research on the internet to learn more about the nature and scope of the abuse and to learn about how recreational drug users were misusing Oxycotin.

177.     In order to find out this information, Ms. Sara began to visit drug-user internet "news groups" or "chat rooms" on a daily basis. Two groups in particular that she visited were *alt.drugs* and *alt.drugs.hard*. In the late summer and early fall of 1999, for a period of time, Ms. Sara would forward screen shots from these news groups to Howard Udell, the General Counsel of PURDUE.

178.     In October or November of 1999, Ms. Sara prepared a memo summarizing her research into the abuse of Oxycontin. The memo described how users would remove the coating on the Oxycontin pills, crush them, cook them, and snort or shoot them. Ms. Sara sent the memo containing the details of Oxycontin abuse by drug users not only to the President of PURDUE and to its General Counsel, but also to PURDUE's then-medical director, and directly to members of the SACKLER FAMILIES involved in the management the company, including, RICHARD SACKLER, JONATHAN SACKLER and KATHE SACKLER.

179.     In 2000, the SACKLERS were warned that a reporter was *"sniffing about the*

*OxyContin abuse story."*[47] The SACKLERS put the threat on the agenda for the next Board meeting and began covering their tracks. They planned a response that *"deflects attention away from the company owners."*[48]

180. In January 2001, RICHARD SACKLER received a plea for help from a PURDUE sales representative. The sales rep described a community meeting at a local high school, organized by mothers whose children overdosed on OxyContin and died.

> *"Statements were made that OxyContin sales were at the expense of dead children and the only difference between heroin and OxyContin is that you can get OxyContin from a doctor."*[49]

181. The next month, a federal prosecutor reported 59 deaths from OxyContin in a single state.[50] The SACKLERS knew that the reports underestimated the destruction. Richard Sackler wrote to PURDUE executives: *"This is not too bad. It could have been far worse."*[51] The next week, on February 14, a mother wrote a letter to PURDUE:[52]

> *"My son was only 28 years old when he died from Oxycontin on New Year's Day. We all miss him very much, his wife especially on Valentines' Day. Why would a company make a product that strong (80 and 160 mg) when they know they will kill young people? My son had a bad back and could have taken Motrin but his Dr. started him on Vicodin, then Oxycontin then Oxycontin SR. Now he is dead!"*

A PURDUE staff member noted: *"I see a liability issue here. Any suggestions?"*[53]

182. That same month, RICHARD SACKLER wrote down his solution to the

---

[47] *2000-11-30 email from Michael Friedman.*
[48] *2000-12-01 email from Mortimer D. Sackler. Defendant Mortimer Sackler's father, the late Mortimer D. Sackler, was also involved in PURDUE Pharma during his lifetime.*
[49] *2001-01-26 email from Joseph Coggins.*
[50] *2001-02-08 email from Mortimer Sacker.*
[51] *2001-02-08 email from Richard Sackler.*
[52] *2001-02-14 email to Robin Hogen.*
[53] *2001-02-14 email from James Heins.*

overwhelming evidence of overdose and death: blame and stigmatize people who become addicted to opioids. Sackler wrote in a confidential email: *"we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."*[54] Richard followed that strategy for the rest of his career: collect millions from selling addictive drugs, and blame the terrible consequences on the people who became addicted. By their misconduct, the SACKLERS have hammered Kentucky families in every way possible. And the stigma they used as a weapon made the crisis worse.

183.    Not long after the mother's February 14 letter, the SACKLERS achieved a long- sought goal: the front page of the *New York Times* reported that *"OxyContin's sales have hit $1 billion, more than even Viagra's."* The same article noted that *"OxyContin has been a factor in the deaths of at least 120 people, and medical examiners are still counting."*[55]

184.    When Time magazine published an article about Oxycontin deaths in New England, PURDUE employees told RICHARD SACKLER they were concerned. Richard responded with a message to his staff. He wrote that *Time*'s coverage of people who lost their lives to OxyContin was not *"balanced,"* and the deaths were the fault of *"the drug addicts,"* instead of PURDUE. *"We intend to stay the course and speak out for people in pain – who far outnumber the drug addicts abusing our product."*[56]

185.    That spring, PURDUE executives met with the U.S. Drug Enforcement Agency ("DEA"). A senior DEA official sat across from RICHARD SACKLER. Before the meeting ended, she leaned over the table and told Richard: *"People are dying. Do you understand*

---

[54]  *2001-02-01 email from Richard Sackler.*
[55]  *2001-03-05 article in New York Times.*
[56]  *2001-01-08 letter from Richard Sackler.*

*that?*"[57]

186.    In 2001, Defendant, KATHE A. SACKLER, attended a talk given by the chief medical officer of Sikorsky Aircraft, in which the speaker expressed grave concern about the risks associated with Oxycontin; instead of acknowledging this fact to the medical officer, she remained silent and returned to PURDUE headquarters, where employees were directed to find ways to undercut and deflect the Sikorsky medical officer's concerns.

187.    Defendants, PURDUE, RICHARD S. SACKLER, JONATHAN D. SACKLER and KATHE A. SACKLER, were all aware of the risks and abuse potential and reality of Oxycontin long before PURDUE acknowledged the same to the government, the healthcare community or the public. In sworn testimony before the U.S. House of Representatives, in 2001, PURDUE president Michael Friedman, in the presence of PURDUE general counsel, Howard R. Udell, swore that the first the companies knew of the widespread abuse of Oxycontin was in the year 2000. This of course, was patently inconsistent with what the members of the Sackler Families knew. Notwithstanding, no member of the Sackler Families at any time tried to correct the false narrative promulgated thus far and wide about the abuse liability of Oxycontin, nor corrected the false statement about when PURDUE became aware of the problem with the drug.

188.    As PURDUE kept pushing opioids and people kept dying, the company was engulfed in a wave of investigations by state attorneys general, the DEA, and the U.S. Department of Justice.

189.    In 2003, RICHARD SACKLER left his position as President of PURDUE. After a few more years of investigation, JONATHAN, KATHE, and MORTIMER SACKLER

---

[57] *2001 meeting described in Pain Killer: A "Wonder" Drug's Trail of Addiction and Death by Barry Meier, pg. 158 (2003). The DEA official was Laura Nagel, head of the DEA Office of Diversion Control.*

resigned from their positions as Vice Presidents.[58] But those moves were for show. The SACKLERS kept control of the company. Their family owned PURDUE. They controlled the Board. They paid themselves the profits. And, as alleged in detail below, they continued to direct PURDUE's deceptive marketing campaign.

190.    In the period around 1999-2003, PURDUE developed a method to cause company emails to self-destruct at a pre-determined time; this was an attempt to create a system where potentially incriminating documents would automatically self-destruct, even after receipt by unrelated third parties. Defendants. RICHARD S. SACKLER, JONATHAN D. SACKLER and KATHE A. SACKLER, all were directly aware and supportive of this project.

191.    By 2006, prosecutors found damning evidence that PURDUE intentionally deceived doctors and patients about its opioids. The SACKLERS voted that their first drug company, the PURDUE FREDERICK COMPANY, should plead guilty to a felony for misbranding OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause adverse events and side effects than other pain medications. The SACKLERS also voted on the Board that three PURDUE executives (Michael Friedman, Paul Goldenheim, and Howard Udell) — but no member of the Sackler family — should plead guilty as individuals.[59]

192.    Defendants, RICHARD S. SACKLER, JONATHAN D. SACKLER, MORTIMER D.A. SACKLER, KATHE A. SACKLER, ILENE SACKLER LEFCOURT, BEVERLY SACKLER, and THERESA SACKLER, were aware since at least 1999 of potential liability for PURDUE, and those acting in concert with PURDUE because of the

---

[58] *2018-09-05 declaration of Jonathan Sackler; 2018-09-08 declaration of Kathe Sackler; 2018-09-06 declaration of Mortimer Sackler.*
[59] *2006-10-25 Board minutes; 2006-10-25 agreement.*

addictive nature of Oxycontin. With the intention of shielding from creditors the proceeds of their wrongdoing, the SACKLER DEFENDANTS have stripped PURDUE and the PURDUE related entities each and every year of hundreds of millions of dollars of profits from the sale of Oxycontin and other opioid-containing medications, including a generic form of Oxycontin sold by Defendant, RHODES PHARMA. All such transfers were and are fraudulent within the meaning of applicable fraudulent transfer statutes and case law; all such transfers unjustly enriched the recipients; and all such transferred funds should be clawed back from the SACKLER DEFENDANTS in order to satisfy the opioid related liabilities of the companies from which they were transferred.

### b. In 2007, PURDUE Directors Decided to Plead Guilty to a Felony, Pay Nearly $700 Million, and Promise Never to Deceive Doctors and Patients Again

193.    PURDUE's directors and CEOs are liable for PURDUE's deadly deception for reasons that go beyond their controlling positions in the companies. They were on notice of PURDUE's problems, and were obligated to address them, because of their role in previous investigations into PURDUE's deception.

194.    From 2001 to 2007, PPI and PPLP were investigated by 26 states and the U.S. Department of Justice. In 2007, the directors of PPI decided that PFC would pay nearly $700 million and plead guilty to a felony crime for misleading doctors and patients about opioids. (PFC is another corporate entity controlled by the same people, and which shared the same headquarters and facilities as PPLP). The company admitted that its supervisors and employees, *"with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."*

195.    In May 2007, the SACKLERS voted again to have their company plead guilty

and enter a series of agreements that PURDUE would never deceive doctors and patients about opioids again. The PURDUE FREDERICK COMPANY confessed to a felony and effectively went out of business.[60] The SACKLERS continued their opioid business in two other companies: PPI and PPLP.

196.    The SACKLERS voted to admit in an Agreed Statement Of Facts that, for more than six years, supervisors and employees *intentionally* deceived doctors about OxyContin: *"Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, certain PURDUE supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."*[61]

197.    To remove any doubt, the SACKLERS voted to enter into a plea agreement that stated: *"PURDUE is pleading guilty as described above because PURDUE is in fact guilty."*[62] Those intentional violations of the law happened while RICHARD SACKLER was CEO; Jonathan, Kathe, and Mortimer were Vice Presidents; and Richard, Jonathan, Kathe, Mortimer, Ilene, Beverly, and Theresa Sackler were all on the Board.

198.    The SACKLERS also voted for PURDUE to enter a Corporate Integrity Agreement with the U.S. government. The agreement required the SACKLERS to ensure that PURDUE did not deceive doctors and patients again. The SACKLERS promised to comply with rules that prohibit deception about PURDUE opioids. They were required to complete hours of training to ensure that they understood the rules. They were required to report any deception. Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler each

---

[60]  *2007-05-03 Board minutes.*
[61]  *2007-05-09 Agreed Statement of Facts, paragraph 20, available at https://www.documentcloud.org/documents/279028- PURDUE-guilty-plea.*
[62]  *2007-05-09 Plea Agreement.*

certified in writing to the government that he or she had read and understood the rules and would obey them.[63]

199.    The 2007 criminal convictions warned the directors against deception in the strongest terms. Michael Friedman - the CEO of PPI, PPLP, and PFC - pleaded guilty to criminal charges that he let PURDUE deceive doctors and patients about its opioids. PURDUE's top lawyer Howard Udell and PURDUE's chief medical officer Paul Goldenheim also pleaded guilty to that same crime.

200.    The directors were forced to select a new CEO. Director/Defendant RICHARD SACKLER testified that the 2007 felony conviction came after years of investigation that involved retraining "everybody" in the company.

201.    The directors also decided that PPI and PPLP would agree to a Consent Judgment in a suit brought by the Commonwealth of Massachusetts in this Court. That Judgment ordered that PPI and PPLP "shall not make any written or oral claim that is false, misleading, or deceptive" in the promotion or marketing of OxyContin. The Judgment further required that PPI and PPLP provide "fair balance" regarding risks and benefits in all promotion of OxyContin — including about the risk of addiction. The Judgment further required that PPI and PPLP establish, implement, and follow an abuse and diversion detection program to identify high-prescribing doctors who show signs of inappropriate prescribing, stop promoting drugs to them, and report them to the authorities. The directors decided that PPI and PPLP would agree to that commitment for a 10-year period, from 2007 until 2017.

202.    The directors also decided that PPLP would agree to a detailed Corporate

---

[63]  *2007-05-09 Plea Agreement; 2007-05-04 Associate General Counsel's Certificate.*

Integrity Agreement with the U.S. government. The Agreement required PURDUE to appoint a Compliance Officer who would "be a member of senior management of Purdue," "make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors," and "be authorized to report on such matters to the Board of Directors at any time."

203. The Corporate Integrity Agreement was built on the idea that the directors would ensure that PURDUE never deceive doctors and patients again.

204. The Corporate Integrity Agreement included the directors and CEO as "Covered Persons" from 2007 through 2012. All Covered Persons were required to comply with rules that prohibit deception about PURDUE's opioids. The directors and CEO were required to undergo hours of training to ensure that they understood the rules. The directors and CEO were required to report all violations of the rules. The directors and CEO were warned that they could face consequences if they failed to comply with the rules. The directors and CEO certified that they had read and understood the rules and would comply with them.

205. The directors were acutely aware of their obligations under the Corporate Integrity Agreement because, in 2009, PURDUE had to report to the Inspector General of the U.S. Department of Health and Human Services that it had not immediately trained a new director on the Agreement. PURDUE reported: "a new Director was appointed to Purdue's Board of Directors, without timely notice to either Corporate Compliance or the Office of General Counsel, as otherwise required by policy, resulting in failure to timely launch the training assignment to this new Board member." PURDUE assured the U.S. government that it had trained the new director: "Relevant personnel were reminded of existing policy to notify Corporate Compliance and the Office of General Counsel of changes to the Board of Directors. In both instances, these individuals completed their training assignments within 1

day of Corporate Compliance learning of this issue." PURDUE promised the government that the director's training had addressed "the proper methods of promoting, marketing, selling, and disseminating information about Purdue's products," so PURDUE would never deceive doctors and patients again.

### c. The PURDUE Directors and CEOs had Many Chances To Stop The Deception

206.    Every year since the 2007 guilty plea, Consent Judgment, and Corporate Integrity Agreement, PURDUE's directors and CEO received warning signs about PURDUE's ongoing misconduct and opportunities to stop it.

207.    PURDUE's CEO and directors knew or should have known about these warnings and many others. Indeed, the 2007 settlement agreement approved by the directors required PURDUE to *"continue to review news media stories addressing the abuse or diversion of OxyContin and undertake appropriate measures as reasonable under the circumstances to address abuse and diversion so identified."* PURDUE's records show that the directors and CEO in fact received numerous warnings that PURDUE's drugs caused addiction and death.

### (i) 2007

208.    **In July 2007,** staff told the SACKLERS that more than 5,000 cases of adverse events had been reported to PURDUE in just the first three months of 2007. Staff also told the SACKLERS that PURDUE received 572 Reports of Concern about abuse and diversion of PURDUE opioids during Q2 2007 — including, upon information and belief, several reports in Kentucky. Staff reported to the SACKLERS that they completed only 21 field inquiries in response.   Staff also told the SACKLERS that they received more than 100 calls to PURDUE's compliance hotline during the quarter, which was a "significant increase," but

PURDUE did not report any of the hotline calls or Reports of Concern to the FDA, DEA, Department of Justice, or state authorities.[64]

209.    PURDUE's self-interested failure to report abuse and diversion would continue, quarter after quarter, even though the 2007 Judgment required PURDUE to report "potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities." Instead of reporting dangerous prescribers, or even directing sales reps to stop visiting them, the SACKLERS chose to keep pushing opioids to whoever prescribed the most.

210.    Staff also reported to the SACKLERS that they continued to mail out thousands of deceptive marketing materials, including 12,528 publications in the first half of 2007. The single most-distributed material was volume #1 of PURDUE's "*Focused and Customized Education Topic Selections in Pain Management*" (FACETS).[65]  In FACETS, PURDUE falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead improves patients' "quality of life" - just as RICHARD SACKLER had been saying since the 1990s.

211.    In the same material, PURDUE also falsely told doctors and patients that signs of addiction are actually "*pseudoaddiction,*" and that doctors should respond by prescribing more opioids.[66]  Staff told the SACKLERS that another of the publications they had sent most often to doctors was "*Complexities in Caring for People in Pain.*"[67]  In it, PURDUE repeated again its false claim that warning signs of addiction are really "*pseudoaddiction*" that should be treated with more opioids. [68]

---

[64] *2007-07-15 Board report, pgs. 33, 41, 54.*
[65] *2007-07-15 Board report, pg. 34.*
[66] *2007-08 FACETS Vol. 1, pgs. 51-53.*
[67] *2007-07-15 Board report, pg. 34.*
[68] *2007 Complexities of Caring for People in Pain, pg. 2.*

212. At the same time, staff also reported to the SACKLERS that PURDUE was making more money than expected. A few months earlier, they had projected a profit of $407,000,000; now they expected more than $600,000,000.[69]

213. Staff reported to the SACKLERS that "sales effort" was a key reason that profits were high.[70] Staff told the SACKLERS that PURDUE employed 301 sales reps to promote opioids and that sales reps were the largest group of PURDUE employees by far. In comparison, PURDUE employed only 34 people in drug discovery.[71]

214. From the 2007 convictions until today, the SACKLERS ordered PURDUE to hire hundreds of sales reps to carry out their deceptive sales campaign.[72]



*AGO graphic based on PURDUE documents*

---

[69] *2007-07-15 Board report, pg. 46.*

[70] *2007-07-15 Board report, pg. 46.*

[71] *2007-07-15 Board report, pg. 52.*

[72] *2007-07-15 Board report, pg. 52; 2007-10-15 Board report, pg. 58; 2008-01-15 Board report, pg. 22; 2008-10-15 Board report, pg. 26; 2009-04-16 Board report, pg. 28; 2009-07-30 Board report, pg. 19; 2009-10-22 Board report, pg. 21, PDD9316101599; 2010-02-01 Board report, pg. 4, PPLPC012000252778; 2010-04-21 Board report, pg. 20; 2010-07-27 Board report, pg. 27; 2010-10-25 Board report, pg. 26; 2011-01-24 Board report, pg. 35; 2011-05-02 Board report, pg. 36; 2011-08-03 Board report, pg. 42; 2011-11-09 Board report, pg. 41; 2012-01-25 Board report, pg. 48; 2012-04-30 Board report, pg. 33; 2012-07-23 Board report, pg. 44; 2012-11-01 Board report, pg. 54; 2013-01-28 Board report, pg. 56; 2013-05-13 Board report, pg. 62; 2013-07-23 Board report, pg. 59,; 2013-11-01 Board report, pg. 55; 2014-02-04 Board report, pg. 47; 2015-04-30 Sales & Promotion strategic plan, slide 9; 2015-10-15 commercial budget review, slide 28; 2016-05-11 10 year plan Sales and Promotions expenses, slide 3; 2016-10-11 commercial budget proposal, slide 12; 2017-06-22 executive committee pre- read, slide 28; 2017-03-23 executive committee pre-read, slide 26; 2017-06-22 executive committee pre-read, slide 28; 2017-11 Board budget, slide 51; 2017-11 Board budget, slide 51; 2018-02-07 email from Craig Landau.*

215.     The impact of PURDUE's sales reps in Kentucky was direct and profound.

216.     **In August**, Mr. Udell was still serving as PURDUE's top lawyer, even after his criminal conviction. He wrote to Richard, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler: *"Over the last week there have been numerous news stories across the nation reporting on the Associated Press's analysis of DEA data showing very large increases in the use of opioids analgesics (particularly OxyContin) between the years 1997 and 2005. Many of these articles have suggested that this increase is a negative development suggesting overpromotion and increasing abuse and diversion of these products."*[73]

217.     **In October**, staff told the SACKLERS that PURDUE received 284 Reports of Concern about abuse and diversion of PURDUE's opioids in Q3 2007, and they conducted only 46 field inquiries in response. Staff reported to the SACKLERS that they received 39 tips to PURDUE's compliance hotline during the quarter, but PURDUE did not report any of them to the authorities.[74] Several of the troubling reports came from Kentucky.

218.     Staff told the SACKLERS that PURDUE had hired more sales reps and now employed 304. They also reported to the SACKLERS that PURDUE was succeeding at promoting its highest doses of opioids: *"OxyContin 80mg is at Rx levels not seen in over 2 years."*[75]

219.     In preparation for an upcoming Board meeting, RICHARD SACKLER instructed staff to give him the spreadsheets underlying their sales analysis, so that he could do his own calculations.[76]

---

[73]  *2007-08-30 email from Howard Udell.*

[74]  *2007-10-15 Board report, pgs. 36, 60.*

[75]  *2007-10-15 Board report, pgs. 4, 58.*

[76]  *2007-10-28 email from Richard Sackler.*

220.     The spreadsheets showed that, in 2007, PURDUE expected to collect more than half its total revenue from sales of 80mg OxyContin — its most powerful, most profitable, and most dangerous pill.[77]

221.     **In November,** the SACKLERS voted to spend $86,900,000 to employ sales reps in 2008 and another $1,000,000 to buy them laptops. The SACKLERS also voted for a resolution regarding salary increases and bonus targets for the reps.[78] Every time the SACKLERS voted to spend tens of millions of dollars on sales reps, they knew and intended that they were sending reps to promote opioids in Kentucky.

**(ii) 2008**

222.     **In 2008,** more Americans died from opioid overdoses than ever before.

223.     **In January 2008,** staff told the SACKLERS that PURDUE still employed 304 sales reps and they were succeeding at the goal of promoting higher doses of opioids: *"OxyContin 80mg continues to grow."* Staff told the SACKLERS that, in 2007, PURDUE's net sales were just over $1 billion, almost *"DOUBLE"* what the company had planned. OxyContin was more than 90% of those sales.[79]

224.     Staff also told the SACKLERS that PURDUE received 689 Reports of Concern about abuse and diversion of PURDUE's opioids in Q4 2007, and they conducted only 21 field inquiries in response. Staff also reported to the SACKLERS that they received 83 tips to PURDUE's compliance hotline during the quarter, but PURDUE did not report any of them to the authorities.[80]

225.     The SACKLERS wanted more details on tactics for pushing sales. RICHARD

---

[77] *2007-10-28 attachment to email from Edward Mahony.*
[78] *2007-11-01 Board minutes; 2008 budget submission, pg. 20.*
[79] *2008-01-15 Board report, pgs. 4, 22, 24.*
[80] *2008-01-15 Board report, pg. 16, 24.*

SACKLER wrote to Russell Gasdia, Vice President of Sales and Marketing (hereinafter "Sales VP"), demanding information about PURDUE's opioid savings cards. Richard asked Gasdia how long the opioid savings cards lasted, how much savings they offered a patient, and whether there had been any changes since he had last been briefed on the opioid savings card scheme. Richard sent Gasdia a detailed hypothetical scenario to make sure he understood the sales tactic down to the smallest details.[81] Staff followed up with a presentation about opioid savings cards to the SACKLERS at the next Board meeting.[82]

226. Meanwhile, when staff proposed a plan to get pharmacies to increase their inventory of OxyContin from 2 bottles to 3 bottles, Richard Sackler demanded to know why they couldn't get up to 4 bottles or more.[83]

227. The SACKLERS made the fundamental decision to hire a sales force, and then to expand it. At PURDUE, hiring more sales reps was not a matter for middle management. Selling opioids door-to-door, in visits to doctor's offices and hospitals, was the core business of the company. The SACKLERS themselves made the decisions about how big the sales force would be and what it would do.

228. **In February**, the SACKLERS used their power on the Board of Directors to order PURDUE to "begin expanding the sales force by an additional 100 sales representatives beginning effective as of April 1, 2008."[84]

---

[81] *2008-01-30 emails from Richard Sackler.*

[82] *2008-02-09 email from John Stewart (opioid savings cards "were singled-out for presentation since they are an extraordinary item in the budget and there is good data showing a positive impact on OxyContin utilization").*

[83] *2008-02-19 email from Richard Sackler.*

[84] *2008-02-08 Board minutes. The SACKLERS had long experience controlling the company's sales force. They voted to direct PURDUE to hire 50 more sales reps in 1998, and directed the company to prepare for a 100-rep expansion in 2007. 1998-04-27 Board minutes, #618527.1; 2007-04-26 Board minutes.*

**PURDUE PHARMA INC.**

**Minutes of a Meeting
of the Board of Directors**

**February 8, 2008**

RESOLVED that the Partnership be and it hereby is authorized and directed to begin expanding the sales force by an additional 100 sales representatives beginning effective as of April 1, 2008 at an additional cost in 2008 of $12.5 million, and in connection with the addition of such 100 sales representatives, to add 12 District Managers, 2 Regional Managers, 2 regional administrators, 2 trainers and 1 marketing/convention manager starting July 1, 2008; and further

229.     The SACKLERS knew and intended that, because of their orders, more sales reps would promote opioids to prescribers in Kentucky. In preparation for the SACKLERS' vote, staff told them that adding 100 sales reps would allow PURDUE to make 12,000 more sales visits to prescribers every month.[85]

230.     PURDUE managers determined that two sales reps hired in the 2008 expansion generated so many additional opioid prescriptions that they were among PURDUE's top performers. The company rewarded them with bonuses and all-expense-paid trips to tropical islands and used them as examples to motivate other reps to sell more opioids.[86]

231.     The SACKLERS also knew and intended that the sales reps would push higher doses of PURDUE's opioids. That same month, RICHARD SACKLER directed PURDUE management to *"measure our performance by Rx's by strength, giving higher measures to higher strengths."*[87]     He copied Jonathan and Mortimer Sackler on the instruction. The SACKLERS knew higher doses put patients at higher risk. As far back as the 1990s, Jonathan and Kathe Sackler knew that patients frequently suffer harm when "high doses of an opioid are

---

[85] *2007-10-26 Sales & Marketing presentation.*

[86] *2018-02-18 deposition of Catherine Yates Sypek pg. 120; 2018-03-01 deposition of Timothy Quinn pg. 99.*

[87] *2008-02-13 email from Richard Sackler.*

used for long periods of time."[88]

232.    On Valentine's Day, the SACKLERS voted to pay former CEO and criminal convict Michael Friedman $3,000,000.[89]  It was one of several multi-million-dollar payments to the convicted executives to maintain their loyalty and protect the Sackler family.

233.    By 2008, PURDUE was working on a crush-proof reformulation of OxyContin to extend PURDUE's patent monopoly.[90] The SACKLERS learned that another company was planning clinical research to test whether crush-proof opioids are safer for patients.[91]

234.    MORTIMER SACKLER suggested that PURDUE conduct similar studies to find out whether reformulated OxyContin was really safer *before* selling it to millions of patients. He wrote to RICHARD SACKLER: *"PURDUE should be leading the charge on this type of research and should be generating the research to support our formulation. Why are we playing catch up ...? Shouldn't we have studies like this ...?"*[92] The SACKLERS decided not to do the research because they wanted the profits from a new product, regardless of whether the deaths continued. Richard didn't want a paper trail, so he instructed Mortimer to call him, and CEO John Stewart met with his staff to plan how to phrase a carefully worded reply.[93] Later that month, Stewart wrote to Richard that reformulating OxyContin *"will not stop patients from the simple act of taking too many pills."*[94]

---

[88] *1997-03-12 memo from John Stewart.*

[89] *2008-02-14 Board minutes.*

[90] *2007-10-26 Sales & Marketing presentation, pg. 2.*

[91] *2008-02-07 email from Robert Kaiko.*

[92] *2008-02-12 email from Mortimer Sackler.*

[93] *2008-02-12 email from Richard Sackler ("My sentiments exactly the first time I read it. But you should read it again. If you do and ask yourself what it means, I think you may come to a very different conclusion, as I now have ... We should talk about it. Give me a call at home."); 2008-02-13 email from John Stewart.*

[94] *2008-02-22 email from John Stewart. Five years later, PURDUE published two studies about the crush-proof formulation. Neither concluded the crush-proof tablets lowered the risks of addiction, overdose and death associated with OxyContin use. One was a single-session research study conducted*

235.　Meanwhile, staff gave JONATHAN, KATHE, MORTIMER and RICHARD SACKLER projections indicating that OxyContin sales could plateau.[95] Mortimer demanded answers to a series of questions about why sales would not grow.[96] Richard chimed in at 8:30 p.m. to instruct the staff to find answers "before tomorrow."[97] Staff emailed among themselves about how the SACKLERS' demands were unrealistic and harmful and then decided it was safer to discuss the problem by phone.[98]

236.　**In March**, RICHARD SACKLER dug into PURDUE's strategy for selling more OxyContin. He directed sales and marketing staff to turn over thousands of pieces of data about sales trends, including data to distinguish the kilograms of active drug from the number of prescriptions, so he could analyze higher doses.[99] Staff delivered the data early Sunday morning; Richard responded with detailed instructions for new data that he wanted that same day.[100] An employee sent Richard the additional data only a few hours later and pleaded with Richard: *"I have done as much as I can."* The employee explained that he needed to attend to family visiting from out of town.[101] Richard responded by calling him at

---

by three full-time PURDUE employees and a paid PURDUE consultant to assess "the attractiveness" of the crush-proof tablets to recreational drug users. Thirty recreational opioid users were interviewed by two researchers. "This study did not include safety, pharmacokinetic, or efficacy evaluations, and no drugs were administered." Participants' answers to "open-ended questions" indicated that the crush-proof tablets "might be less attractive to recreational opioid abusers" than original OxyContin. The study concluded that "among the available opioid products that we included in this study, recreational opioid users judged [crush-proof OxyContin tablets] to be the least attractive, the least valuable and the least desirable, with the least likelihood for tampering and the lowest street value." In the second study, by the same PURDUE authors, 29 volunteers snorted OxyContin (original and crush-proof), oxycodone, and a placebo over a seven-day treatment phase and rated the drugs. The study concluded that "reformulated OxyContin has a reduced abuse potential compared to the original formulation upon intranasal administration." PURDUE amended its OxyContin label to reference these studies in 2013.

[95] 2008-02-26 email from Edward Mahony.
[96] 2008-02-26 email from Mortimer Sackler.
[97] 2008-02-26 email from Richard Sackler.
[98] 2008-02-26 email from John Stewart.

[99] 2008-03-09 email from David Rosen.
[100] 2008-03-09 email from Richard Sackler.
[101] 2008-03-09 email from David Rosen.

home, insisting that the sales forecast was too low, and threatening that he would have the Board reject it.[102] On Monday, staff emailed among themselves to prepare for meeting with Richard, highlighting that Richard was looking for results that could only be achieved by hiring more sales reps. Meanwhile, Richard met with John Stewart to discuss his analysis of the weekend's data and new graphs Richard had made.[103]

237. Sales VP Russell Gasdia was struggling to handle the pressure. When RICHARD SACKLER sent Gasdia a list of seven sales questions to answer on a Saturday (and copied Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler), Gasdia wrote to John Stewart: *"John, I know it is tricky, but Dr. Richard has to back off somewhat. He is pulling people in all directions, creating a lot of extra work and increasing pressure and stress. I will draft a response but he is not realistic in his expectations and it is very difficult to get him to understand."*[104]

238. RICHARD SACKLER did not back off. Instead, he pushed staff to sell more of the highest doses of opioids and get more pills in each prescription. That same Saturday night, Richard sent Gasdia yet another set of instructions, directing him to identify tactics for *"exceeding 2007 Rx numbers on an adjusted basis (adjusted for strength and average number of tablets per Rx)."*[105] The very next day, Gasdia was writing up plans for how adding sales reps, opioid savings cards, and promoting more intermediate doses of OxyContin could help

---

[102] *2008-03-09 email from David Rosen. A month earlier, when an employee did not answer a call from Richard Sackler during a Sunday morning church service, Richard immediately contacted the CEO to complain. 2008-02-17 email from Mike Innaurato. Richard then wrote that he expected answers from four different sales staff members the next day (President's Day) even though PURDUE was closed. 2008-02-17 email from Richard Sackler. See also 2008-11-02 email from Mike Innaurato.*
[103] *2008-03-10 emails from David Rosen and John Stewart.*
[104] *2008-03-08 email from Russell Gasdia.*
[105] *2008-03-08 email from Richard Sackler.*

increase sales.[106]

239.     RICHARD SACKLER followed through on his weekend threat that he would have the Board reject the sales plan. Two days later, Richard circulated his own sales analysis to the Board, ordered the Secretary to *"put this high in the Board agenda,"* and proposed that he and MORTIMER SACKLER oversee a redo of the annual plan as well as the 5-year plan for PURDUE's opioids.[107]

240.     At the same time, JONATHAN, KATHE, and MORTIMER SACKLER were also pushing staff about sales. Staff told those three SACKLERS that they would use opioid savings cards to meet the challenge of keeping OxyContin scripts at the same level in 2008 as in 2007, "in spite of all the pressures."[108] Kathe demanded that staff identify the "pressures" and provide "quantification of their negative impact on projected sales."[109]

241.     **In April**, staff told the SACKLERS that PURDUE employed 304 sales reps. Staff reported to the SACKLERS that the reps had obtained data showing which pharmacies stocked higher strengths of OxyContin, which helped them convince area doctors to prescribe the highest doses. Staff also told the SACKLERS that PURDUE received 853 Reports of Concern about abuse and diversion of PURDUE opioids in Q1 2008, and they had conducted only 17 field inquiries in response. Staff also reported to the SACKLERS that they received 83 tips to PURDUE's compliance hotline during the quarter, but did not report any of them to the authorities.[110]

242.     On April 18, RICHARD SACKLER sent KATHE, ILENE, DAVID,

---

[106] *2008-03-09 email from Russell Gasdia.*

[107] *2008-03-10 email from Richard Sackler.*

[108] *2008-03-09 email from Edward Mahony.*

[109] *2008-03-11 email from Kathe Sackler.*

[110] *2008-03-15 Board report, pgs. 17, 23, 24, 27.*

JONATHAN, and MORTIMER SACKLER a secret memo about how to keep money flowing

to their family. Richard wrote that PURDUE's business posed a *"dangerous concentration of*

*risk."* After the criminal investigations that almost reached the SACKLERS, Richard wrote

that it was crucial to install a CEO who would be loyal to the family: *"People who will shift*

*their loyalties rapidly under stress and temptation can become a liability from the owners'*

*viewpoint."* Richard recommended John Stewart for CEO because of his loyalty.  Richard also

proposed that the family should either sell PURDUE in 2008 or, if they could not find a buyer,

milk the profits out of the business and *"distribute more free cash flow"* to themselves.[111]

243.  That month, the SACKLERS voted to have PURDUE pay their family
$50,000,000.

244.  From the 2007 convictions until 2018, the SACKLERS voted dozens of times

to pay out PURDUE's opioid profits to their family - in total ***more than four billion dollars***.[112]

---

[111]  *2008-04-18 email and attached memo from Richard Sackler.*

[112]  *2008-04-18 Board minutes; 2008-06-27 Board minutes; 2008-09-25 Board minutes; 2008-11-06 Board minutes; 2009-03-05 Board minutes; 2009-06-26 Board minutes; 2009-09-23 Board minutes; 2010-02-04 Board minutes; 2010-04-01 Board minutes; 2010-09-10 Board minutes; 2010-12-02 Board minutes; 2011-04-06 Board minutes; 2011-06-24 Board minutes; 2011-09-01 Board minutes; 2012-07-27 Board report, pg. 44; 2012-03-05 email from Edward Mahony; 2013-11-01 Board report, pg. 3; 2014-12-03 November flash report, slide 8; 2015-06-05 mid-year strategic review, slide 55; 2017-09-14 10 year plan spreadsheet, page "CF – Internal".*



*AGO graphic based on PURDUE's internal Board documents*

245.    When the SACKLERS directed PURDUE to pay their family, they knew and intended that they were paying themselves from opioid sales in Kentucky. PURDUE and the SACKLERS tracked revenue from Kentucky.

246.    On April 18, the SACKLERS voted to increase the 2008 budget for Sales and Promotion to $155,802,000.[113] Then, RICHARD SACKLER sent Sales VP Russell Gasdia a series of questions about PURDUE's efforts to get patients to take higher doses and stay on opioids for longer times. Richard wanted to know: how many PURDUE patients had insurance that would let them take unlimited quantities of PURDUE opioids; how many patients were limited to 60 tablets per month; and how many patients had any limit on the number of tablets or dose or number of tablets per day. He demanded that sales staff be assigned to answer his

---

[113] *2008-04-18 Board minutes.*

questions "by tomorrow morning."[114] When the sales staff pleaded for a few more hours to collect the data, Richard agreed to give them until the end of the day.[115]

247. **In May,** staff sent the SACKLERS more ideas about ways to promote PURDUE's opioids. The proposal matched the SACKLERS' own plan, which Richard had written out as CEO: deflect blame from PURDUE's addictive drugs by stigmatizing people who become addicted. *"KEY MESSAGES THAT WORK"* included this dangerous lie: *"It's not addiction, it's abuse. It's about personal responsibility."*[116]

248. **In June,** the SACKLERS voted to appoint John Stewart as President and CEO of PPI and PPLP. The appointment followed through on RICHARD SACKLER's suggestion in his secret memo that the SACKLERS should put a premium on loyalty to the family. On the same day, the SACKLERS voted to pay their family $250,000,000.[117] The payment followed Richard Sackler's suggestion in the memo to *"distribute more free cash flow"* to themselves.

249. Meanwhile, RICHARD SACKLER asked sales staff for more information about PURDUE's opioid savings cards.[118] Staff reported to RICHARD, JONATHAN, KATHE, and MORTIMER SACKLER that 67,951 patients had used PURDUE's opioid savings cards, and that the cards provided a discount on a patient's first five prescriptions.[119]

250. After five prescriptions, many patients would face significant withdrawal symptoms if they tried to stop taking opioids. Staff told RICHARD, JONATHAN, KATHE, and MORTIMER SACKLER that 27% of patients (more than 18,000 people) had used the

---

[114] *2008-04-22 email from Richard Sackler.*

[115] *2008-04-22 email from Richard Sackler.*

[116] *2008-05-16 email from Pamela Taylor; 2008-04-16 Executive Committee notes; 2008-04-16 presentation by Luntz, Maslansky Strategic Research.*

[117] *2008-06-27 Board minutes.*

[118] *2008-06-14 email from Richard Sackler.*

[119] *2008-06-16 email from Russell Gasdia.*

cards for all five prescriptions.[120]

251.    **In July**, PURDUE's Fleet Department reported to the SACKLERS that PURDUE had bought one hundred new Pontiac Vibes for the expanded sales force. Staff also told the SACKLERS that PURDUE received 890 Reports of Concern regarding abuse and diversion of PURDUE's opioids in Q2 2008 and had conducted only 25 field inquiries in response. Staff reported to the SACKLERS that they received 93 tips to PURDUE's compliance hotline during the quarter, but did not report any of them to the authorities.[121]

252.    **In September**, the SACKLERS voted to pay their family $199,012,182.[122]

253.    **In October**, staff told the SACKLERS that surveillance data monitored by PURDUE indicated a "wide geographic dispersion" of abuse and diversion of OxyContin "throughout the United States." Staff told the SACKLERS that "availability of the product" and "prescribing practices" were key factors driving abuse and diversion of OxyContin." On the same day, staff told the SACKLERS that PURDUE had begun a new "Toppers Club sales contest" for sales reps to win bonuses, based on how much a rep increased OxyContin use in her territory and how much the rep increased the broader prescribing of opioids — the same "availability of product" and "prescribing practices" factors that worsen the risk of diversion and abuse. In the same report, staff told the SACKLERS that they received 163 tips to PURDUE's compliance hotline during Q3 2008, but did not report any of them to the authorities.[123]

254.    Staff also told the SACKLERS that the Board-ordered sales force expansion

---

[120] *2008-06-16 email from Russell Gasdia.*

[121] *2008-07-15 Board report, pgs. 21, 28, 30.*

[122] *2008-09-25 Board minutes.*

[123] *2008-10-15 Board report, pgs. 19, 24, 28.*

had been implemented and Purdue now employed 414 sales reps.[124] The SACKLERS' decision to expand the sales force caused the effect they intended in Kentucky. During Q3 2008, the number of sales visits to Kentucky prescribers increased.

255. **In November**, the SACKLERS turned to expanding the sales force again. Purdue's 2009 budget identified expanding the sales force as the #1 sales and marketing objective.[125] The SACKLERS voted to spend $112,400,000 on sales reps.[126] Staff told the SACKLERS that their decision would pay an average sales rep salary of $89,708 and bonus of $43,470, and the sales reps would visit prescribers 518,359 times.[127]

256. That same month, the SACKLERS voted to pay their family $325,000,000.[128] They also voted to pay $5,000,000 to Howard Udell — their lawyer and convicted criminal.[129] Like their Valentine's Day payment to Friedman, the SACKLERS spent millions to keep the loyalty of people who knew the truth.

**(iii) 2009**

257. **In 2009**, the American Journal of Public Health published an article about PURDUE's opioid marketing entitled, *"The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy."* The article detailed PURDUE's use of sales representatives, targeting of high-prescribers, and deception about addiction. That same year, CDC reported that deaths from opioids had recently tripled.

258. **In March**, the SACKLERS voted to pay PURDUE sales reps and sales

---

[124] *2008-10-15 Board report, pg. 26.*
[125] *2008-11 budget submission, pg. 10.*
[126] *2008-11-06 Board minutes; 2008-11 budget submission (Field Operations $112.4M).*
[127] *2008-11 budget submission, pg. 104-106.*
[128] *2008-11-06 Board minutes.*
[129] *2008-11-21 Board minutes.*

managers bonuses of 103 percent of PURDUE's target because they sold so many opioids in 2008. The SACKLERS also voted to increase the base pay of sales staff for 2009. On the same day, the SACKLERS voted to pay their family $200,000,000.[130]

259.   **In April**, staff told the SACKLERS that PURDUE employed 412 sales reps and had made dramatic progress promoting higher doses: *"for the first time since January 2008, OxyContin 80mg strength tablets exceeded the 40mg strength."*[131]  The SACKLERS had a detailed conversation with Sales VP Russell Gasdia about the staffing of the sales force, how many sales reps the company should employ, and how many prescribers each rep would visit each year.[132] The SACKLERS told sales executives to hire a new staff member who would contact prescribers electronically and would promote PURDUE opioids through the deceptive website *Partners Against Pain*.[133]

260.   Staff told the SACKLERS that they received 122 tips to PURDUE's compliance hotline during Q1 2009, and revealed one of them to an outside monitor. Staff reported to the SACKLERS that the compliance problems included improper use of OxyContin marketing materials and opioid savings cards.[134]

261.   **In May**, staff told the SACKLERS that PURDUE had violated its Corporate Integrity Agreement with the U.S. government by failing to supervise its sales reps.[135] Because sales reps lobbying doctors poses a high risk of misconduct (no witnesses, and the rep is paid to increase opioid sales), the United States required that PURDUE managers supervise

---

[130] *2009-03-05 Board minutes, Board report, pgs. 5, 28.*
[131] *2009-04-16 Board report, pgs. 5, 28.*
[132] *2009-04-21 email from Russell Gasdia. 2009-04-30 email from Russell Gasdia.*
[133] *2009-04-30 email from Russell Gasdia.*
[134] *2009-04-16 Board report, pgs. 24-25.*
[135] *2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 6.*

sales reps in person at least 5 days each year.[136] PURDUE management disregarded that obligation and did not even set up a system to track it.[137] Even though PURDUE executives had ignored the requirement and not monitored it, they responded to the violation by firing three employees in the field and letting all the executives at headquarters keep their jobs.[138]

262.   **In June**, RICHARD SACKLER asked sales staff how a competing drug company had increased sales: *"What is happening???"*[139]   Staff replied that it was all about sales reps:

> *"They have 500 reps actively promoting to top decile MDs ... Their messaging is 'we are not OxyContin,' alluding to not having the 'baggage' that comes with OxyContin.*
>
> *Interestingly, their share is highest with MDs we have not called on due to our downsizing and up until last year, having half as many reps. Where we are competing head to head, we decrease their share by about 50%."*[140]

263.   A few days later, staff reported to the SACKLERS that PURDUE had expanded its sales force at the Board's direction: *"As approved in the 2009 Budget, 50 New Sales Territories have been created."* Staff told the SACKLERS the expansion was focused on the most prolific opioid prescribers, because *"there are a significant number of the top prescribers"* that PURDUE had not been able to visit with its smaller force of sales reps.[141] Later that month, the SACKLERS voted to pay their family $162,000,000.[142]

---

[136] *Purdue Corporate Integrity Agreement section III.K.*

[137] *2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 6 ("Compliance was not monitoring against the 'five full days' requirement").*

[138] *2009-07-30 Board report, pg. 16.*

[139] *2009-06-12 email from Richard Sackler.*

[140] *2009-06-13 email from Russell Gasdia.*

[141] *2009-06-16 email from Pamela Taylor; 2009-05-20 Executive Committee notes.*

[142] *2009-06-26 Board minutes.*

264.    **In July**, staff told the SACKLERS that PURDUE employed 429 sales reps.[143] Richard Sackler told staff that he was not satisfied with OxyContin sales and demanded a plan to "boost" them. He asked for the topic to be added to the agenda for the Board.[144]

265.    **In August**, RICHARD SACKLER convened a meeting of Board members and staff about *"all the efforts Sales and Marketing is doing and planning to do to reverse the decline in OxyContin tablets market."* He emphasized that $200,000,000 in profit was at stake.[145] At the meeting, staff told the SACKLERS that the 80mg OxyContin pill was far-and-away PURDUE's best performing drug. PURDUE sold many more kilograms of active ingredient in the 80mg dose than any other dose (about 1,000 kilograms: literally a ton of oxycodone).[146]

266.    Staff also reported to the SACKLERS about their newest OxyContin sales campaign, with the slogan: *Options*.[147] The *Options* campaign set the pattern that PURDUE would follow for years: pushing doctors and patients up the ladder to higher doses. To make it easy for sales reps to promote higher doses, the campaign materials emphasized the *"range of tablet strengths,"* provided a picture of each dose, and said: *"You can adjust your patient's dose every 1 to 2 days."* Staff told the SACKLERS that they would advertise the *Options* campaign in medical journals reaching 245,000 doctors.[148]

---

[143] *2009-07-30 Board report, pg. 19.*

[144] *2009-07-20 email from Richard Sackler.*

[145] *2009-08-12 email from Richard Sackler; see also 2009-08-10 email from John Stewart ("Richard has asked me about this at least 5 times over the past few weeks").*

[146] *2009-08-19 Board slides, slide 7.*

[147] *2009-08-12 email from Russell Gasdia.*

[148] *2009-08-19 Board slides, slides 12, 16; Options marketing materials.*



## Through a wide range of tablet strengths, OxyContin® provides options to meet the individual therapeutic needs of your appropriate patient

- Q12h dosing with as few as 2 tablets per day
- When converting from other opioids, the 7 OxyContin® Tablet strengths enable you to closely approximate the calculated conversion dose
- OxyContin® is a single-entity opioid
- You can adjust your patient's dose every 1 to 2 days, if needed, because steady-state plasma concentrations are approximated within 24 to 36 hours

267.     Staff also reported to the SACKLERS that more than 160,000 patients had used PURDUE's opioid savings cards, more than doubling the result reported to the SACKLERS the summer before.[149]  Staff also told the SACKLERS that they would advertise OxyContin using a special television network: thousands of doctors would be given free digital video recorders for their home televisions, in exchange for watching advertisements for drugs.[150]

268.     Immediately after meeting with sales staff, RICHARD SACKLER asked for the raw data underlying their presentation. When staff had not responded within five minutes, he asked again.[151]

---

[149] *2009-08-19 Board slides, slide 12. Compare with 67,951 in June 2008. 2008-06-16 email from Russell Gasdia.*
[150] *2009-08-19 Board slides, slide 19. PURDUE spent approximately $100 for each doctor who watched the advertisement, but it made the money back when the doctors prescribed PURDUE's opioids. 2009-04-27 email from Lindsay Wolf.*

[151] *2009-08-19 emails from Richard Sackler.*

269.    **In September,** the SACKLERS voted to pay their family $173,000,000.[152] But MORTIMER SACKLER was concerned that staff were not selling PURDUE's opioids aggressively enough. He demanded to know why staff predicted a decline in OxyContin sales when he believed the market should grow.[153]

270.    **In October,** staff told the SACKLERS that PURDUE had expanded its sales force by 50 territories and now employed 475 sales reps.[154] RICHARD SACKLER directed staff to send him weekly reports on OxyContin sales.[155] No one in the company received reports that often, so staff were not sure how to reply.[156] Staff considered telling Richard that there were no weekly reports, but they decided to make a new report just for him instead.[157] The CEO also instructed the Sales Department to report to the SACKLERS with more explanation about its activities.[158]

271.    That same month, the SACKLERS and staff discussed federal sunshine legislation that would create a public database to disclose drug companies' payments to doctors. PURDUE was paying many doctors to promote its opioids - including doctors in Kentucky - but the payments could often be kept secret. Some of the SACKLERS were concerned that doctors would be "much less willing" to work for PURDUE if the payments

[152] *2009-09-23 Board minutes.*

[153] *2009-09-28 email from Mortimer Sackler.*

[154] *2009-10-22 Board report, pgs. 4, 21.*

[155] *2009-10-08 email from Richard Sackler.*

[156] *2009-10-08 email from Robert Barmore.*

[157] *2009-10-08 email from David Rosen ("Hi, guys ... Someone needs to alert Dr. Richard that we no longer do a weekly report. Can either one of you help ...); 2009-10-08 email from Dipti Jinwala ("we have not been providing the OxyContin weekly report since May 09"); 2009-10-08 email from Richard Sackler ("I'd like to have the weekly updates."); 2009-10-08 email from David Rosen, ("If we do as dr. richard requests, we will be adding work and providing him near worthless data"); 2009-10-08 email from Russell Gasdia ("Tell her not to respond."); 2009-10-08 email from John Stewart; 2009-10-09 email from Rob Barmore ("For the record, my concerns regarding workload and being able to meet demands of all the reporting, primary research, ad hocs while maintaining quality and reasonable levels of group morale remain.").*

[158] *2009-10-20 email from John Stewart.*

were disclosed.[159]

272. **In November,** the SACKLERS voted to spend $121,628,000 to employ sales reps in 2010. Kathe and Richard Sackler were designated to review the sales projections.[160] They also voted to pay disgraced former employee Howard Udell up to another $1,000,000, and to pay $2,700,000 to settle personal injury claims by people harmed by PURDUE's opioids.[161]

273. At the Board meeting that month, KATHE and RICHARD SACKLER asked staff to *"identify specific programs that Sales and Marketing will implement to profitably grow the OER [extended-release oxycodone] market and OxyContin in light of competition; provide analytics around why/how the proposed increase in share-of-voice translates into sales and profitability growth; clarify the situation with respect to OxyContin being used by 35% of new patients, but only retaining 30% of ongoing patients;"* and give the SACKLERS a copy of a report from McKinsey on tactics to increase OxyContin sales.[162] The McKinsey report instructed sales reps to maximize profits by "emphasizing [the] broad range of doses" - which was code for pushing the doses that were highest and most profitable.[163]

274. At the same meeting, RICHARD SACKLER also asked staff, *"What are OxyContin's clinical advantages vs. Opana ER, MS Contin, Kadian, Exalgo, Avinza, Nucynta and Duragesic? How are these differences communicated?"* In response, staff reported to all the SACKLERS a list of purported advantages of OxyContin over competing products,

---

[159] 2009-10-19 email from John Stewart.
[160] 2009-11-03 Board minutes; 2009-11 budget submission, pg. 12.
[161] 2009-11-20 Board minutes; 2009-11-25 Board minutes.
[162] 2009-11-02 budget presentation; 2009-12-22 email from Edward Mahony ("a list of questions raised at the November Board meeting and answers or actions on each").
[163] 2009-10-26 steering committee meeting presentation by McKinsey, slide 19.

including that OxyContin purportedly reduces pain faster, has less variability in blood levels, and works for more pain conditions than competing drugs.[164] These were all improper, unfair, and deceptive claims that PURDUE had admitted were prohibited.

275.    RICHARD SACKLER also asked staff why PURDUE's operating margin in 2010 was less than in 2009. Staff responded to all the SACKLERS that one of the biggest reasons for the reduced margin was the cost of the expanded sales force that SACKLERS had ordered.[165]

276.    **In December**, KATHE and RICHARD SACKLER met with sales staff to review plans for 2010. Staff warned the two SACKLERS that, although OxyContin sales were at record-breaking levels (nearly $3 billion per year), the decade-long rise in the total kilograms of oxycodone prescribed in America was beginning to flatten.[166] Higher doses contain more of that active ingredient and are more profitable to PURDUE.

**(iv) 2010**

277.    **In 2010**, Time magazine published a story about PURDUE's opioids entitled, *"The New Drug Crisis: Addiction by Prescription."* It reported on a Massachusetts patient who had become addicted to OxyContin at age 13. Overdoses were the leading cause of accidental death in 15 states.

278.    **In January 2010**, RICHARD SACKLER started the year by asking sales staff for new customized reports.[167] Staff complained to each other until Sales VP Russell Gasdia asked CEO John Stewart to intervene: *"Can you help with this? It seems like every week we*

---

[164] *2009-11-02 budget presentation.*
[165] *2009-11-02 budget presentation.*
[166] *2009-12-03 email from Mike Innaurato, PPLPC012000247640, attachment PPLPC012000247642.*

[167] *2010-01-05 email from Richard Sackler.*

*get one off requests from Dr. Richard.*"[168] Neither Stewart nor anyone else could keep Richard out of sales.[169] Days later, Richard was writing to the sales employee on Saturday morning, ordering that his need to review the sales plan was *"urgent"* and should be satisfied *"this weekend."*[170]

279. **In February**, PURDUE's Sales and Marketing Department told the SACKLERS that a key objective for 2010 would be to *"Meet or exceed total prescriber call targets of 545,000"* visits to prescribers to promote PURDUE opioids. For the next four years or more, a key objective for the sales employees was to meet a quota of sales visits, and the SACKLERS tracked their performance. The target rose from 545,000 prescriber visits in 2010, to 712,000 visits in 2011, 752,417 visits in 2012, and 744,777 visits in 2013.[171]

280. To achieve the target for sales visits, staff told the SACKLERS that another sales force expansion ordered by the Board had been implemented and PURDUE employed 490 sales reps.[172] That expansion was having the intended effect in Kentucky.

281. Staff also told the SACKLERS that McKinsey estimated that new tactics by PURDUE sales reps would generate $200,000,000 to $400,000,000 more sales of OxyContin, and that sales reps had been practicing the new tactics in front of management.[173] McKinsey had reported to PURDUE on opportunities to increase prescriptions by convincing doctors that opioids provide *"freedom"* and *"peace of mind"* and give patients *"the best possible chance to live a full and active life."* McKinsey also suggested sales *"drivers"* based on the ideas that

---

[168] *2010-01-05 email from Russell Gasdia.*
[169] *2010-01-08 email from John Stewart ("PS You are not alone in receiving requests for extraordinary analyses and reports.").*
[170] *2010-01-16, email from Richard Sackler.*
[171] *2010-02-01 Board report, pg. 23; 2011-05-02 Board report, pg. 3; 2012-04-30 Board report, pg. 3; 2013-05-13 Board report, pg. 7.*
[172] *2010-02-01 Board report, pgs. 4, 19.*
[173] *2010-02-09 email from Pamela Taylor; 2010-01-20 Executive Committee notes.*

opioids reduce stress and make patients more optimistic and less isolated.[174]  In fact, becoming addicted to opioids makes patients more stressed, more isolated, and less likely to survive.

282.    The SACKLERS voted to spend $226,000,000 on Sales and Promotion in 2010, and to pay their family $236,650,000.[175]

283.    **In March**, RICHARD SACKLER instructed sales staff to send him monthly reports on sales of OxyContin and its competitors. They complied within ten minutes.[176] The report showed that PURDUE was selling more pills of its 80mg OxyContin (the highest dose) than any other dose, and that the highest dose pills were responsible for the greatest share of PURDUE's revenue by far.[177]

284.    Staff also told the SACKLERS that a key selling point for OxyContin compared to a competitor's product was that OxyContin could be used by patients who had not taken opioids before.[178] Deceptively promoting opioids for *opioid-naive* patients who had not taken them before was one of the ways PURDUE put patients at risk.

285.    **In April**, the SACKLERS voted to pay their family another $141,000,000.[179] Meanwhile, staff told the SACKLERS that they were pushing back against the "threat" of public health rules that would limit high doses of opioids. They told the SACKLERS that PURDUE would oppose precautions that asked doctors to consult with specialists before prescribing the highest doses.[180]

286.    That same month (April 2010), staff gave the SACKLERS one of many

---

[174] *2009-09-11 McKinsey presentation, slide 22.*
[175] *2010-02-04 Board minutes.*
[176] *2010-03-15 emails from Richard Sackler and Mike Innaurato.*
[177] *2010-03-11 January 2010 OxyContin monthly report, slides 10, 15.*
[178] *2010-03-17 Executive Committee notes.*
[179] *2010-04-01 Board minutes.*
[180] *2010-04-21 Board report, pg. 16.*

detailed reports on sales reps' visits to prescribers. As with every reference to "the SACKLERS" before July 2012, that includes BEVERLY, ILENE, JONATHAN, KATHE, MORTIMER, RICHARD and THERESA SACKLER.

287.    By the spring of 2010, PURDUE's directors and CEO had been told that PURDUE could not get product liability insurance to cover OxyContin.

288.    The SACKLERS required each rep to visit an average of 7.5 prescribers per day. In April 2010, staff reported that they were falling short. During Q1 2010, reps had averaged only 7.0 visits per day.[181]   Staff promised to try harder. The SACKLERS continued to set a target for daily sales visits for every sales rep, and they tracked the results, quarter by quarter, for at least the next four years. The results were always close to 7 visits per day.



*AGO graphic based on Purdue's internal Board documents*

---

[181] *2010-04-21 Board report, pg. 4.*

289.    The SACKLERS also set targets for the total number of sales visits by the entire sales force per quarter - huge numbers that were always more than a hundred thousand visits. Meeting those targets was a top priority for the entire company. For Q1 2010, the target was to visit prescribers 127,376 times. Staff told the SACKLERS that PURDUE employed 489 sales reps and that, during Q1 2010, they achieved the goal.[182] As with the daily visits per rep, the SACKLERS tracked the total number of sales visits per quarter, every quarter, for at least the next four years.



*AGO graphic based on Purdue's internal Board documents*

---

[182] *2010-04-21 Board report, pgs. 4, 20. They exceeded the goal and visited prescribers 133,561 times.*

290. During every quarter, sales reps visited prescribers in Kentucky. Indeed, they visited every month, every week, and almost every day.

291. The SACKLERS also tracked the cost of the sales visits. In April 2010, staff reported to the SACKLERS that each visit to a prescriber cost PURDUE $219, and they were working to lower the cost to a target of $201.[183]

292. **In June 2010**, staff gave the SACKLERS an updated 10-year plan for growing PURDUE's opioid sales. According to the plan, the SACKLERS expected PURDUE to pay their family at least $700,000,000 each year from 2010 through 2020. Beginning on page one, staff emphasized that selling as many opioids as the SACKLERS wanted "will require significant sales force support" so the plan detailed the "optimization" of sales visits and the number of reps they would require. Sales VP Gasdia wrote to the SACKLERS that they planned for each rep to visit prescribers 1,540 times per year, so that 500 reps could make 770,000 visits at a cost of $212 per visit. He proposed to grow the sales force to 1,050 sales reps by 2015. To reach the SACKLERS' expectations, Gasdia projected that PURDUE would convince doctors to switch patients from Tylenol to PURDUE's soon-to-be-released Butrans opioid, and Butrans would become a billion- dollar drug.[184]

293. **In July**, RICHARD SACKLER emailed staff just before the July 4th holiday weekend to demand more details about sales and marketing. Richard directed them to send to the Board plans for "the marketing program" and "the sales program," with instructions to "get this out before the weekend."[185] A despondent staff member wrote to the CEO: *"Are you*

---

[183] *2010-04-21 Board report, pg. 4.*

[184] *2010-06-24 PURDUE Pharma 2010 10-Year Plan, pgs. 1-15, Key Assumptions pg. 6.*
[185] *2010-07-01 email from Richard Sackler.*

*expecting us to provide the marketing plan by tomorrow?"*[186] Staff came close to telling Richard Sackler no. Instead, they negotiated an extension and promised to provide full details about sales and marketing at the July Board meeting in Bermuda.[187] To enforce the deal, Kathe Sackler ordered staff to circulate materials before the meeting.[188]

294.     By the SACKLERS' choice, sitting on the Board of PURDUE Pharma Inc. was a globe- trotting endeavor. The SACKLERS held Board meetings for their U.S. drug company in a castle in Ireland, and in Bermuda, London, Portugal, Switzerland, New York, and Connecticut.[189]

295.     In Bermuda, the SACKLERS focused on sales tactics again. Staff presented plans for selling PURDUE's new Butrans opioid. Staff reported that sales reps would try to switch patients to opioids from NSAIDs like ibuprofen and explained tactics for convincing doctors that patients needed the new drug. Staff told the SACKLERS that they had identified 82,092 prescribers to target with the Butrans sales campaign. Staff reported that they planned to add 125 sales reps and increase the number of prescriber visits by 30%.[190]

296.     Emails between staff and the SACKLERS show that "the Board" (the SACKLERS and at that point three other directors) responded with dozens of questions and orders about the sales campaign. The Board asked staff to determine whether sales would increase if they gave doctors free samples of opioids. The Board ordered staff to provide forecasts focused on higher doses of opioids.[191] The Board demanded details about tactics

[186] *2010-07-01 email from Russell Gasdia.*

[187] *2010-07-06 email from John Stewart.*

[188] *2010-07-09 email from Kathe Sackler.*

[189] *#618541.1 (Ireland 1998-06-25); (Bermuda 2010-07-22); #618564.1 (London 1998-11-20); (Portugal 1995-06-24); #2938358.1 (New York 2003-03-04); #618062.1 (Switzerland 1996-06-28); (Connecticut 2007-05-03).*

[190] *2010-07-22 Butrans Commercial Strategy Plan Board Presentation, slides 17, 66, 81; 2010-06-01 email from William Mallin.*

[191] *2010-07-22 questions during Board meeting ("month by month sales forecast, decompose by*

PURDUE sales staff used to influence doctors that PURDUE viewed as "key opinion leaders," who could influence other doctors to prescribe more opioids: *"Provide the Board with more information on the strategy/tactics with respect to KOL's, how they are identified, how do we plan to interact with them, how do we see them helping build appropriate utilization of Butrans - and any other relevant information that will/could influence the prescribing of the product."*[192]

297.    The Board pushed staff about whether they were describing the benefits of opioids aggressively enough. PURDUE was not legally allowed to say that Butrans was effective for 7 days, because the evidence did not show that, but the Board wanted to know why PURDUE didn't claim 7 days of effectiveness in its marketing.[193]

298.    PURDUE was not legally allowed to say that Butrans was effective for osteoarthritis ("OA"), because the clinical trials testing Butrans for patients with osteoarthritis had failed, but the Board wanted to know if sales reps could sell more by remaining silent about the failed trial: *"What can be said in response to a prescriber who asks directly or indirectly, 'can this product be prescribed for my patient with OA?' In responding are we required to specifically mention the failed trials in OA?"*[194]

299.    At the July 2010 Board meeting in Bermuda, the SACKLERS and other Board members asked staff about opioid sales generated by doctors who were suspected of diversion and abuse, which PURDUE had collected on a list code-named *Region Zero*. Staff assured the

---

*strengths, show price and units as well by strength, show kg of Buprenorphine by strength").*

[192] *2010-07-22 questions during Board meeting.*

[193] *2010-07-22 questions during Board meeting ("Why is there no reference to efficacy data in the marketing materials? … a specific reference or statement to Butrans providing efficacy for 7 days seems to be the desired statement … we may not have data that supports efficacy at that specific time point.").*

[194] *2010-07-22 questions during Board meeting.*

Board that PURDUE tracked prescriptions by *Region Zero* doctors, including the exact prescriptions, units, and dollars from each prescriber.[195] Staff then sent the data on those prescriptions to the Board. Staff gave the Board a list of the specific problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each provided to PURDUE.[196]

300.    The reports of inappropriate prescribing that staff reported to the Board were accurate. No one knew more about prescribing of PURDUE opioids than PURDUE.

301.    At that same Board meeting in Bermuda, the SACKLERS voted to expand the sales force by 125 more sales reps. They ordered that the hiring begin in September 2010 and be completed before the National Sales Meeting in January 2011. They also directed PURDUE to hire 18 more managers to supervise the reps.[197]

302.    The SACKLERS knew and intended that, because of their vote, more sales reps would promote opioids to prescribers in Kentucky.

303.    At the same meeting, the SACKLERS voted to pay $10,000,000 to settle lawsuits by people injured by OxyContin.

304.    Later that month, staff told the SACKLERS that PURDUE employed 491 sales reps and that, during Q2 2010, they visited prescribers 135,824 times.[198]

305.    Meanwhile, staff told the SACKLERS that PURDUE had paid their family

---

[195] 2010-07-22 questions during Board meeting.

[196] 2010-08-16 email from William Mallin, PPLPC012000283162; 2010-08-11 Region Zero prescribers.

[197] *2010-07-22 Board minutes ("After discussion, and on motion duly made and seconded, it was unanimously decided ... that the Partnership be and it is hereby authorized and directed to approve the following sales force expansion ...").*

[198] *2010-07-27 Board report, pgs. 5, 27. Staff told the SACKLERS that the target for visits was 142,657; that reps visited 7.0 prescribers per day, on average, compared to the target of 7.5; that the average cost of a visit was $219; and that they were still working to lower the cost to $201.*

$389,000,000 in the first six months of 2010.[199]

306.  **In August**, the SACKLERS continued to focus on the sales force. That month, they decided not to acquire a new insomnia drug because of the risk that promoting it could distract sales reps from selling PURDUE's opioids. RICHARD SACKLER concluded that "loss of focus" in sales reps' meetings with prescribers was too great a risk, and the SACKLERS decided not to go through with the deal.[200]

307.  A few days later, the SACKLERS discussed abuse of OxyContin. Staff told them that the most common way of abusing oxycodone, by far, was swallowing it - which a crush-proof coating on OxyContin did not affect. Staff also reported to the SACKLERS that data from prescription monitoring programs showed far higher rates of "doctor-shopping" for OxyContin prescriptions than for any other opioid.[201] The prescription monitoring program identifies "doctor-shopping" when a patient gets opioids from multiple prescribers - an indication that the patient is at risk of addiction, overdose, and death.

308.  **In September**, staff reported to the SACKLERS about the Board's July 2010 decision to hire more sales reps. Staff said they were working to implement the decision, adding 125 sales territories.[202] Staff also told the SACKLERS that 82% of prescriptions for OxyContin were to patients who were already on the drug — a key ingredient in PURDUE's plans to keep patients on opioids longer.[203]

309.  The SACKLERS voted to pay their family $240,000,000.[204]

310.  **In October**, staff told the SACKLERS that PURDUE employed 506 sales reps

[199] 2010-07-27 Board report, pg. 18.

[200] 2010-08-14 email from Richard Sackler.

[201] 2010-08-16 email from Stuart Baker; 2010-08-19 presentation by Paul Coplan, slides 7, 31.

[202] 2010-09-15 Executive Committee notes.

[203] 2010-09-15 presentation by Russell Gasdia, slide 10.

[204] 2010-09-10 Board minutes.

and, during Q3 2010, they visited prescribers 141,116 times.[205]

311.    Meanwhile, staff told the SACKLERS that PURDUE had paid their family $629,000,000 in the first nine months of 2010.[206] The SACKLERS voted to pay another $12,000,000 to settle claims of more patients injured by OxyContin.[207]

312.    **In November**, staff warned the SACKLERS that doctors were not prescribing PURDUE's highest dose and most profitable opioids as much as the company had expected, so it might be necessary to cut the family's quarter-end payout from $320,000,000 to $260,000,000 and distribute it in two parts: one in early December and one closer to the end of the month.[208] MORTIMER SACKLER objected to the decrease and the division into two payments, and he demanded answers from staff: *"Why are you BOTH reducing the amount of the distribution and delaying it and splitting it in two?"* *"Just a few weeks ago you agreed to distribute the full 320 [million dollars] in November."*[209]

313.    Staff also told the SACKLERS that the expansion of the sales force that the SACKLERS had ordered was being implemented, including 125 new sales territories.[210] The SACKLERS voted to spend $158,086,000 to employ sales reps in 2011.[211]

314.    Staff also reported to the SACKLERS that drug company leaders can be punished for breaking the law and "owners, officers, and managers will especially face even more serious scrutiny in the future."[212]

---

[205] *2010-10-25 Board report, pgs. 3, 26. Staff told the SACKLERS the target was 144,414; reps visited 6.8 prescribers per day, on average, compared to the target of 7.5; each sales rep visit to a prescriber cost PURDUE $219; and they were working to lower the cost to $201.*

[206] *2010-10-25 Board report, pg. 15.*

[207] *2010-04-01 Board minutes, PKY183212854; draft meeting materials.*

[208] *2010-11-23 email from Edward Mahony.*

[209] *2010-11-23 and 2010-11-24 emails from Mortimer Sackler.*

[210] *2010-11-10 Executive Committee notes.*

[211] *2010-11-03 Board minutes, 2011 budget, PKY183212865; 2010-11 budget submission, pg. 18.*

[212] *2010-11-10 Executive Committee notes; 2010-11-10 Slideshow presentation by Bert Weinstein,*

315. **In December,** the SACKLERS voted to pay their family $260,000,000.[213]

**(v) 2011**

316. **In 2011,** the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for "educating healthcare providers about prescription drug abuse … so they will not over-prescribe[.]" The CDC announced that prescription opioid overdoses had reached epidemic levels and called out PURDUE's opioids by name.

317. That same year, Fortune magazine interviewed PURDUE's executives, including Alan Must, who was listed as Vice President of PPI in its official filings. Fortune published a story about Purdue, the Sackler family, and evidence that the company made money off addiction. Mr. Must admitted that the company was *"well aware"* of concerns about its conduct: *"We are well aware of detractors. For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."*

318. **In January 2011,** RICHARD SACKLER met with sales reps for several days at the Butrans Launch Meeting and discussed how they would promote PURDUE's newest opioid.[214] Richard quickly followed up with sales management to demand a briefing on how the sales visits were going in the field:

> *"I'd like a briefing on the field experience and intelligence regarding Butrans. How are we doing, are we encountering the resistance that we expected and how well are we overcoming it, and are the responses similar to, better, or worse than when we marketed OxyContin® tablets?"*[215]

---

slide 7.
[213] 2010-12-02 Board minutes.

[214] 2011-01-21 email from Russell Gasdia.
[215] 2011-01-30 email from Richard Sackler.

319. Richard's interventions into sales tactics made employees nervous. When Richard followed up to ask for information "tomorrow," CEO John Stewart tried to slow things down, warning staff that Richard's requests would be "never-ending."[216]

320. Two hours after sending his request, Richard ordered Sales VP Russell Gasdia to call him, on a Sunday morning, on his cell phone.[217] Richard wanted to discuss "the resistance" and how PURDUE's sales reps were "overcoming" it right away.

321. RICHARD SACKLER kept pushing for more sales. After one week of prescriptions doubled PURDUE's forecast, Richard wrote to the sales staff: *"I had hoped for better results."*[218] In a follow-up message, Richard asked staff to tell him the ratio of prescriptions per sales representative visit to a prescriber, divided out by the prescribers' specialties. He asked for a Board discussion of the barriers that sales reps were encountering during promotion.[219] After trying to answer Richard's questions and getting another dissatisfied response, sales staff wrote to the CEO to ask him to intervene.[220] In a later message, Richard wrote to the staff again: *"What do I have to do to get a weekly report on Butrans sales without having to ask for it?"*[221] One exasperated staff member begged another to respond.[222] The CEO announced that, from then on, staff would send a sales report to the SACKLERS every week.[223] When staff sent the first weekly report, Richard responded immediately: *"What else more can we do to energize the sales and grow at a faster rate?"*[224]

---

[216] 2011-01-31 email from John Stewart.
[217] 2011-01-30 email from Richard Sackler.
[218] 2011-02-15 email from Richard Sackler.
[219] 2011-02-25 email from Richard Sackler.
[220] 2011-02-28 email from Russell Gasdia.
[221] 2011-03-08 email from Richard Sackler.
[222] 2011-03-09 email from Mike Innaurato.
[223] 2011-03-09 email from John Stewart.
[224] 2011-03-16 email from Richard Sackler.

The next week, Richard wrote to the sales staff to ask about the performance of a specific sales rep.[225]

322. MORTIMER SACKLER jumped in, asking staff for more information about sales. When two days passed without an answer, Mortimer insisted: *"ANY ANSWER TO THIS YET?"*[226] Staff rushed to prepare answers to share with all the SACKLERS.[227]

323. The people who worked for the SACKLERS knew their appetite for sales was extreme. When the launch of PURDUE's Butrans opioid was on track to beat every drug in its class, RICHARD SACKLER asked sales staff: *"Do you share my disappointment?"*[228] Sales VP Russell Gasdia replied privately to the CEO: *"As far as his disappointment, I do not share that."*[229]

324. Throughout that spring of 2011, the SACKLERS kept up a drumbeat of aggressive sales tactics, multi-million-dollar payouts, and disregard for the law. In January, the SACKLERS voted to pay the legal expenses of specific individuals if they were defendants or witnesses in investigations of PURDUE, including several sales executives and John Crowley, Executive Director of Controlled Substances Act Compliance.[230] The SACKLERS knew these employees were aware of misconduct because they had directed it. In September 2009, a PURDUE sales manager had emailed Crowley that PURDUE was promoting opioids to an illegal pill mill: *"I feel very certain this is an organized drug ring,"* and *"Shouldn't the DEA be contacted about this?"* PURDUE sat on the information and did not report it to the authorities *for more than two years*, until after the pill mill doctor had already been arrested

---

[225] *2011-03-22 email from Richard Sackler.*

[226] *2011-04-05 and 2011-04-08 emails from Mortimer Sackler.*

[227] *2011-04-08 email from Russell Gasdia.*

[228] 2011-03-09 email from Richard Sackler.

[229] 2001-03-10 email from Russell Gasdia.

[230] *2011-01-20 Board minutes.*

and the SACKLERS had arranged for lawyers in case Crowley was questioned.[231]

325.    **In January 2011**, staff reported to the SACKLERS that a key initiative in Q4 2010 had been the expansion of the sales force. Staff told the SACKLERS that PURDUE employed 590 sales reps and, during Q4 2010, they visited prescribers 125,712 times.[232]

326.    Staff told the SACKLERS that PURDUE paid their family $889,000,000 in 2010. But staff reported that PURDUE's revenue was still hundreds of millions of dollars less than expected because doctors were prescribing less of PURDUE's highest dose opioids.[233] Staff told the SACKLERS that sales of the highest doses continued to fall below expectations, and the gap had cost the company $120,000,000 in the month of December 2010 alone.[234] The SACKLERS faced the prospect that, if doctors did not prescribe more of the highest doses, their payouts would shrink.

327.    **In February**, staff reported to the SACKLERS that law enforcement was increasingly concerned about lawbreaking by drug companies and the resulting "danger to public safety."[235] Staff also told the SACKLERS that PURDUE was receiving a rising volume of hotline calls and other compliance matters, reaching an all-time high during Q4 2010.  Staff reported to the SACKLERS that sales reps had engaged in improper promotion of PURDUE opioids, but the company had decided not to report the violations to the government. Staff also reported to the SACKLERS about the risks of OxyContin, including that 83% of patients in substance abuse treatment centers began abusing opioids by swallowing pills, and that it took,

---

[231] 2016-07-10 "More than 1 Million OxyContin Pills Ended up in the Hands of Criminals and Addicts. What the Drugmaker Knew," by Harriet Ryan, Lisa Girion, and Scott Glover, Los Angeles Times.

[232] 2011-01-24 Board report, pgs. 4, 5, 35. Staff told the Sacklers that, at the Board's direction, Purdue had hired 74 more sales reps and planned to hire 51 more. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 125,553 visits; and that reps visited 6.2 prescribers per day, on average, compared to a target of 7.5; and that each visit cost Purdue $219. They were still working to lower the cost to $201.

[233] 2011-01-24 Board report, pg. 22.

[234] 2011-01-21 email from Sharon Salwan.

[235] 2001-02-03 Board meeting materials, slide 48.

on average, 20 months for a patient to get treatment. Staff reported to the SACKLERS that PURDUE tracked to individual zip codes the correlation between poison control calls for OxyContin overdose, pharmacy thefts, and prescribers PURDUE suspected of abuse and diversion in *Region Zero*.[236]

328.    Staff even gave the SACKLERS a map correlating dangerous prescribers in Kentucky with reports of oxycodone poisonings, burglaries, and robberies.[237]



*Map presented to the PURDUE Board in 2011*

329.    **In March,** staff reported to the SACKLERS on OxyContin sales and again focused on revenue from doctors in *Region Zero* — prescribers that PURDUE suspected of improper prescribing but that PURDUE had not reported to the authorities. Staff told the SACKLERS that if *Region Zero* doctors stopped prescribing opioids, PURDUE would lose

---

[236] *2011-02-03 presentation by Bert Weinstein, slides 22-24, 86, 94-95.*
[237] *2011-02-03 presentation by Bert Weinstein, slide 95.*

almost 10% of its sales.[238]

330.   **In April**, the SACKLERS met with Sales VP Russell Gasdia to talk about sales. He told them that OxyContin was the best-selling painkiller in America, with more than three billion dollars in annual sales —almost double the second-place drug.[239] The SACKLERS voted to pay their family $189,700,000.[240]

331.   **In May**, in response to the SACKLERS' repeated requests, staff sent Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler a report on the sales tactics reps were using to push Butrans. The first tactic reported to these SACKLERS was focusing on a select "core" of physicians that PURDUE calculated would be most susceptible to sales reps lobbying to prescribe more opioids.[241]   PURDUE sales reps repeatedly reported concerns that certain doctors wrote inappropriate prescriptions, but PURDUE ordered the reps to keep promoting opioids to these doctors anyway. Dozens of their patients overdosed and died.

332.   The second tactic staff reported to RICHARD, JONATHAN, KATHE, MORTIMER, and THERESA SACKLER in the May 25, 2011 email was *"positioning of Butrans for specific patient types."*[242] In Kentucky, promotion for *"specific patient types"* meant pushing opioids for elderly patients with arthritis. Upon information and belief, sales reps recorded in their notes that they urged Kentucky doctors to prescribe opioids for elderly patients more than a thousand times in 2011. Upon information and belief, the reps even went to pharmacies to ask Kentucky pharmacists to encourage doctors to prescribe opioids for the elderly.

---

[238] *2011-03-01 2011 OxyContin Tablets Sales Trends and Projections.*
[239] *2011-04-14 Board presentation.*
[240] *2011-04-06 Board minutes.*
[241] *2011-05-25 email from Russell Gasdia.*
[242] *2011-05-25 email from Russell Gasdia.*

333. A third tactic reported to these five SACKLERS was getting prescribers to commit to put specific patients on opioids.[243] Upon information and belief, in Kentucky, sales reps recorded in their notes that they asked doctors to commit to prescribe opioids more than a thousand times in 2011. Upon information and belief, Kentucky sales reps repeatedly asked prescribers to commit to prescribe opioids without disclosing significant risks.

334. JONATHAN SACKLER was not satisfied that these tactics would be enough to boost sales. He wrote to John Stewart: *"this is starting to look ugly. Let's talk."*[244] Stewart and the sales team scrambled to put together a response and set up a meeting with Jonathan for the following week.[245]

335. That same month, staff reported to the SACKLERS that PURDUE had hired 47 more sales reps according to the SACKLERS' orders. Staff told the SACKLERS that PURDUE employed 639 sales reps and, during Q1 2011, they visited prescribers 173,647 times.[246]

336. Meanwhile, the SACKLERS voted to pay $10,000,000 to try to settle a lawsuit by the Attorney General of Kentucky regarding PURDUE's marketing of OxyContin.[247]

337. The SACKLERS were on notice that PURDUE's unfair and deceptive marketing raised serious concerns. Staff also told the SACKLERS that they had received another 88 calls to PURDUE's compliance hotline, but not reported any of them to the

---

[243] *2011-05-25 email from Russell Gasdia.*

[244] *2011-05-25 email from Jonathan Sackler.*

[245] *2011-05-25 email from John Stewart.*

[246] *2011-05-02 Board report, pgs. 5, 6, 36. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 168,210 visits; and that reps visited 6.66 prescribers per day, on average, compared to a target of 7.0.*

[247] *2011-05-20 Board minutes.*

authorities.[248]

338.    **In June**, staff reported to the SACKLERS that PURDUE's opioid sales were hundreds of millions of dollars less than expected and that a prime reason was that doctors were not prescribing enough of the highest doses.[249] The headline presented at the Board meeting read: *"40 and 80mg tablet prescriptions have decreased significantly. The 10mg and 20mg tablet prescriptions initially increased, but given their lower value not enough to offset the higher strength decline."* Staff told the SACKLERS: *"As a result of the change in prescriptions by strength, OxyContin brand Kgs dispensed are below mid 2010 levels."* Staff reported to the SACKLERS that PURDUE would rely on sales rep visits and paid physician spokespersons to maintain demand. For a *"Super Core"* of *"Very High Potential"* opioid prescribers, PURDUE would order its sales reps to make sales visits *every week.*[250]

339.    The SACKLERS immediately pushed to find ways to increase sales. RICHARD SACKLER asked Sales VP Russell Gasdia to include him in a meeting with District Managers who were the day-to-day supervisors of the sales reps. Then, having missed the meeting, he engaged Gasdia again by email. Gasdia told Richard that PURDUE had hired 147 new sales reps at the Board's direction. Gasdia told Richard that PURDUE instructed the sales reps to focus on converting patients who had never been on opioids or patients taking *"low dose Vicodin, Percocet, or tramadol"* — all patients for whom PURDUE's opioids posed an increase in risk.[251]

340.    Gasdia told RICHARD SACKLER (again) that PURDUE instructed sales reps to focus on the few highest-prescribing doctors in their territory and visit them over and over.

[248] *2011-05-20 compliance report.*
[249] *2011-05-12 Executive Committee notes.*
[250] *2011-06-21 Mid-Year Update.*
[251] *2011-06-16 email from Russell Gasdia.*

Gasdia also told Richard that staff had initiated performance enhancement plans for sales reps who were not generating enough opioid prescriptions.

341.    In response to Gasdia's message about the sales reps, RICHARD SACKLER wrote back six minutes later and asked to meet with Gasdia without delay.[252] Gasdia scrambled to schedule a meeting about sales tactics with Richard for first thing the next morning.[253] Richard would not wait until the morning and instructed Gasdia to call him that same day.[254]

342.    RICHARD SACKLER continued the correspondence that day, criticizing PURDUE's managers for allowing sales reps to target *"non-high potential prescribers."* *"How can our managers have allowed this to happen?"*[255] Richard insisted that sales reps push the doctors who prescribed the most drugs.

343.    To make sure his orders were followed, RICHARD SACKLER demanded to be sent into the field with the sales reps.[256] Richard wanted a week shadowing PURDUE sales reps, two reps per day. In horror, Gasdia appealed to PURDUE's Chief Compliance Officer, warning that Richard Sackler promoting opioids was *"a potential compliance risk."*[257] Compliance replied: *"LOL."*[258] To make sure the SACKLERS' involvement in marketing stayed secret, staff instructed: *"Richard needs to be mum and be anonymous."*

---

[252] *2011-06-16 email from Richard Sackler.*

[253] *2011-06-16 email from Russell Gasdia.*

[254] *2011-06-16 email from Richard Sackler.*

[255] *2011-06-16 email from Richard Sackler.*

[256] *2011-06-16 email from Richard Sackler.*

[257] *2011-06-16 email from Russell Gasdia ("Based on our discussions, perhaps you could sit down with JS on your thoughts. Also, I haven't spoken to him about RS going to field with reps. Perhaps you could also say something to JS and indicate I came to you for counsel as I saw this as a potential compliance risk?").*

[258] *2011-06-16 email from Bert Weinstein.*

To: Gasdia, Russell[Russell.Gasdia@pharma.com]
From: Weinstein, Bert
Sent: Thur 6/18/2011 7:47:14 PM
Subject: Re: Feedback from District Manager Advisory Council - FYI

LOL - I told him you raised concerns with me. We agreed Richard needs to be mum and be anonymous

---

From: Gasdia, Russell
To: Weinstein, Bert
Sent: Thu Jun 16 17:08:15 2011
Subject: Fw: Feedback from District Manager Advisory Council - FYI

I spoke to John and he said Stuart cleared Dr Richard observing calls with reps. I told him I spoke with you and you have concerns...he said he'd speak with you.

---

From: Sackler, Dr Richard
To: Gasdia, Russell
Cc: JHS (US)
Sent: Thu Jun 16 16:45:56 2011
Subject: Re: Feedback from District Manager Advisory Council - FYI

Russ,
One more thing.  Who have you chosen for me to go to the field with the week after the budget meetings?  Where are they?  Can we conveniently do two reps each day especially if I travel to get to the right place as I probably should do.

PURDUE internal emails

344. A slew of executives, including the CEO, got involved in planning Richard Sackler's sales visits. All of them were worried. One wrote:

> *"About 5 last night, John [Stewart, the CEO] was walking by my office – I yelled out to stop him – and said that you had mentioned to me that Richard wanted to go into the field, and that you had raised concerns with me. John seemed angry, and asked if I had concerns. I told him could be issues and Richard could be out on a limb if he spoke about product at all or got into conversations with HCPs, or identified himself, especially with FDA Bad Ad possibilities. John agreed Richard would have to be mum throughout, and not identify himself other than as a home office person."[259]*

345. RICHARD SACKLER indeed went into the field to promote opioids to doctors alongside a sales rep. When he returned, Richard argued to the Vice President of Sales that a legally- required warning about PURDUE's opioids wasn't needed. He asserted that the

---

[259] 2011-07-17 email from Bert Weinstein.

warning *"implies a danger of untoward reactions and hazards that simply aren't there."*
Richard insisted there should be *"less threatening"* ways to describe PURDUE opioids.[260]

346.    Meanwhile, the SACKLERS voted to pay their family $200,000,000.[261]

347.    A few days later, sales and marketing staff scrambled to prepare responses to questions from the SACKLERS. MORTIMER SACKLER asked about launching a generic version of OxyContin to *"capture more cost sensitive patients."* KATHE SACKLER recommended looking at the characteristics of patients who had switched to OxyContin to see if PURDUE could identify more patients to convert. JONATHAN SACKLER wanted to study changes in market share for opioids, focusing on dose strength.[262]

348.    At the same time, sales staff were organizing more ways for RICHARD SACKLER to oversee their work in the field. Gasdia proposed to Richard:

> *"In addition to field contacts with representatives, you may want to consider attending one of the upcoming conventions where we will be attending. At each of the ones listed below, we will have a promotional booth for OxyContin & Butrans. In addition, we are sponsoring educational programs for Butrans and OxyContin in the form of a 'Product Theater.'*
>
> *This would provide you the opportunity to be on the convention floor, observing numerous presentations being provided by our representatives and see a wide range of interactions over the course of a day. In addition, we can arrange for one-on-one meetings with key opinion leaders who are attending, many of them are approved consultants/advisors for us and you can have some open conversations regarding the market, perceptions around Butrans and OxyContin. Finally, you could observe the Product Theaters we are implementing."*[263]

349.    **In July,** staff assured the SACKLERS that PURDUE prohibited sales reps from

---

[260] *2011-07-20 email from Richard Sackler.*
[261] *2011-06-24 Board minutes.*
[262] *2011-06-28 email from Edward Mahony.*

[263] *2011-07-26 email from Russell Gasdia.*

writing their sales pitches to prescribers in email.[264]

350. **In August**, staff told the SACKLERS that PURDUE employed 640 sales reps and, during Q2 2011, they visited prescribers 189,650 times.[265]

351. Meanwhile, staff reported to the SACKLERS that, in the first seven months of 2011, PURDUE paid the family $411,000,000.[266]

352. **In September**, RICHARD SACKLER directed staff to study a savings card program for a widely-used cholesterol medication (not an addictive narcotic) to learn how PURDUE could use it for opioids.[267]

353. That same month, the SACKLERS voted to pay their family $140,800,000 more.[268]

354. **In November**, staff told the SACKLERS that PURDUE still employed 640 sales reps and, during Q3 2011, they visited prescribers 189,698 times.[269] Looking ahead, the SACKLERS voted to spend $162,682,000 to employ sales reps in 2012.[270]

355. Meanwhile, staff told the SACKLERS that, in the first nine months of 2011, PURDUE paid their family $551,000,000.[271]

**(vi) 2012**

356. **In January 2012**, JONATHAN SACKLER started the year pressing Sales VP

---

[264] *2011-07-21 Board meeting presentation.*

[265] *2011-08-03 Board report, pgs. 6, 42. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 187,950 visits; and that reps visited 7.2 prescribers per day, on average, compared to a target of 7.0.*

[266] *2011-08-03 Board report, pg. 29.*

[267] *2001-09-28 email from Richard Sackler.*

[268] *2011-09-01 Board minutes.*

[269] *2011-11-09 Board report, pgs. 5, 41. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 189,525 visits; and that reps visited 7.2 prescribers per day, on average, compared to a target of 7.0.*

[270] *2011-11-18 Board minutes, 2012 budget; 2012 budget submission, pg. 22.*

[271] *2011-11-09 Board report, pg. 26.*

Russell Gasdia for weekly updates on sales.[272] A few days later, RICHARD SACKLER jumped into the weeds with the sales staff, this time about advertising. Richard noticed that online ads appeared indiscriminately on web pages with content associated with the ad regardless of whether the association was positive or negative.[273] Staff assured Richard that, when PURDUE bought online advertising for opioids, it specified that the ads appear only on pages expressing positive views toward opioids, and would not appear with articles *"about how useless or damaging or dangerous is our product that we are trying to promote."*[274]

357.    That same month, staff told the SACKLERS that PURDUE employed 632 sales reps and, during Q4 2011, they visited prescribers 165,994 times.[275]

358.    The SACKLERS were not satisfied with the sales effort.

359.    **In February**, staff reported to the SACKLERS that prescriptions had dropped, and that a decrease in sales rep visits to prescribers was a major driver of the decline. Staff asked the SACKLERS to be patient, because reps had missed work for December holidays and the company's mandatory National Sales Meeting in January.[276] MORTIMER SACKLER was not pleased. He suggested that, *"in future years we should not plan the national sales meeting so close following the winter break as it extends the period of time since the doctor last saw our rep."* Mortimer wrote: *"Wouldn't it be better to have the reps get back to work for January and back in front of doctors."*[277] Mortimer was agitated by the thought of doctors going too many days without a sales rep visiting to promote PURDUE opioids. If PURDUE

---

[272] *2012-01-09 email from Jonathan Sackler.*
[273] *2012-01-22 email from Richard Sackler.*
[274] *2012-01-26 email from Russell Gasdia.*
[275] *2012-01-25 Board report, pgs. 7, 48. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 166,315 visits; and that reps visited 7.03 prescribers per day, on average, achieving the target of 7.0.*
[276] *2012-02-07 email from Russell Gasdia.*
[277] *2012-02-07 email from Mortimer Sackler.*

rescheduled its meeting, *"At least then the doctors will have gotten at least one reminder visit from our reps in the last month whereas now they might go two months without seeing one of our reps??"* Staff replied to Mortimer, arguing for *"balance."*[278] RICHARD SACKLER replied within minutes that, since the National Sales Meeting prevented sales reps from visiting doctors, *"Maybe the thing to have done was not have the meeting at all."*[279] PURDUE's compliance officer forwarded the exchange to his staff, commenting: *"Oh dear."*[280]

360.    Meanwhile, RICHARD SACKLER interrupted sales staff many times a day, often in a hurry: *"I had hoped you would have updated this," "Will I have it by noon?" "get to this ASAP."*[281] Staff advised each other: *"avoid as much e mail with dr. r as you can."*[282] Sales VP Gasdia wrote to the CEO in exasperation: *"I'm not sure what we can do about Dr. Richard."*[283]

361.    Throughout the spring, the SACKLERS pressed staff to promote PURDUE's opioids more aggressively. In February, Gasdia wrote to sales staff that the Board of Directors ("BOD") was not satisfied with the money coming in: *"Things are not good at the BOD level."*[284] When sales dropped for one week on account of the Presidents' Day holiday, RICHARD SACKLER wrote to sales management: *"This is bad."*[285] Gasdia forwarded Richard's message to his colleagues, asking how they could *"create a greater sense of*

---

[278] *2012-02-08 email from Russell Gasdia.*
[279] *2012-02-08 email from Richard Sackler.*
[280] *2012-02-08 email from Bert Weinstein.*
[281] *2012-02-02 and 2012-02-03 emails from Richard Sackler; see also 2012-02-22 emails from Richard Sackler.*
[282] *2012-01-09 email from William Mallin.*
[283] *2012-02-01 email from Russell Gasdia.*
[284] *2012-02-07 email from Russell Gasdia.*
[285] *2012-02-07 email from Richard Sackler.*

*urgency at the regional management and district management level."*[286]

362. Gasdia pleaded with the CEO to defend him against Richard Sackler's micromanagement of sales: *"Anything you can do to reduce the direct contact of Richard into the organization is appreciated."*[287] A week later, Richard wrote to sales management again to criticize them for U.S. sales being *"among the worst"* in the world.[288]

363. **In March**, staff sent the SACKLERS a revised 2012 budget that cut the proposed payout to their family from $472,500,000 to $418,200,000.[289]

364. On one Saturday morning, RICHARD SACKLER wrote to marketing staff, demanding monthly data for all extended release pain medications for the past twelve years and an immediate meeting that Monday night.[290] Gasdia and Stewart stood by helpless, writing: *"Do let us know how this goes."*[291] Later that month, staff created for Richard a historical summary of key events determining OxyContin sales. Eleven of the key events in sales history were changes in the size of the PURDUE sales force — all known to Richard because the SACKLERS had ordered them.[292]

365. A few days later, staff sent RICHARD SACKLER an assessment of recently-improved opioid sales. Staff told Richard that the increase in prescriptions was caused by tactics that PURDUE taught sales reps: pushing opioids for elderly patients with arthritis ("proper patient selection") and encouraging doctors to use higher doses of opioids ("quick titration").[293] In the coming months, PURDUE would study, document, and expand the use of

---

[286] *2012-02-07 email from Russell Gasdia.*
[287] *2012-02-07 email from Russell Gasdia.*
[288] *2012-02-10 email from Richard Sackler.*
[289] *2012-03-05 email from Edward Mahony.*
[290] *2012-03-17 email from Richard Sackler.*
[291] *2012-03-18 email from Russell Gasdia.*
[292] *2012-03-28 presentation.*
[293] *2012-03-28 email from David Rosen.*

higher doses to increase sales — a tactic that helped to kill people in Kentucky.

366.    RICHARD SACKLER wrote that he was not satisfied with a report on sales and instructed Gasdia to discuss it with him within a day.[294] Gasdia scrambled to schedule the meeting.[295] Then Richard raised the stakes and asked Gasdia to address both Butrans sales tactics and a decline in OxyContin sales and propose corrective actions.[296] John Stewart suggested that Richard's frustrations could be linked to dosing: he encouraged Gasdia to tell Richard that patients on lower doses seemed to stop taking opioids sooner, and that much of the profit that PURDUE had lost had been from doctors backing off the highest dose of OxyContin (80mg).[297]

367.    RICHARD SACKLER was not satisfied. Days later, after sales did not increase, staff told him that they were starting quantitative research to determine why patients stay on opioids, so they could find ways to sell more opioids at higher doses for longer.[298]

368.    **In April**, staff told the SACKLERS that PURDUE employed 630 sales reps and, during Q1 2012, they visited prescribers 179,554 times.[299] Meanwhile, RICHARD SACKLER kept pushing the staff to increase sales. When the mandatory weekly report to the SACKLERS showed that sales reps achieved 9,021 prescriptions in a week, Richard asked Sales VP Russell Gasdia for a commitment that the reps would get weekly prescriptions to 10,000: "Are you committed to breaking 10K/wk Rx's this month?"[300] A colleague replied

---

[294] *2012-04-12 email from Richard Sackler.*
[295] *2012-04-12 email from Russell Gasdia.*
[296] *2012-04-15 email from Richard Sackler.*
[297] *2012-04-16 email from John Stewart.*
[298] *2012-04-20 email from David Rosen.*
[299] *2012-04-30 Board report, pgs. 6, 33. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 171,024 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.*
[300] *2012-04-11 email from Richard Sackler.*

incredulously to Gasdia: *"Is there any question of your commitment?"*[301] Even for people who worked in sales, Richard's conviction that sales reps should just make doctors prescribe opioids seemed crazy.

369.    Gasdia tried to assure RICHARD SACKLER that they were selling opioids aggressively: *"Windell and the sales force, as well as Mike and the marketing team (initiatives being implemented) are focused and committed to accelerating the growth trend ... everyone in the commercial organization is focused on exceeding the annual forecast."*[302] Richard wanted more. Richard wanted to know what tactics sales staff would use to get more prescriptions, and he wanted to talk about it right away. First he wrote: *"give me the table of weekly Rx plan and the actual. Then show how you plan to make up the current shortfall."*[303] Then he asked for a meeting within 24 hours.[304] Then Richard didn't want to wait that long: *"Can we meet in person today?"*[305] On Friday the 13th, sales and marketing staff met with Richard to review how they would sell more opioids.[306]

370.    On May 3rd, 2012, The American Pain Foundation's website carried a statement saying its board had voted to dissolve the organization because it couldn't stay "operational." The American Pain Foundation, which described itself as the nation's largest organization for pain patients, had been the focus of a <u>December investigation</u> by ProPublica in The Washington Post that detailed its close ties to drugmakers. <u>The group had received 90 percent of its $5 million</u> in funding in 2010 from the drug and medical-device industry, ProPublica found, and its guides for patients, journalists and policymakers had played down the risks

---

[301] *2012-04-11 email from David Rosen.*
[302] *2012-04-12 email from Russell Gasdia.*
[303] *2012-04-12 email from Richard Sackler.*
[304] *2012-04-12 email from Richard Sackler.*
[305] *2012-04-12 email from Richard Sackler.*
[306] *2012-04-12 email from Russell Gasdia; 2012-04-13 invitation from Donna Condon.*

associated with opioid painkillers while exaggerating the benefits.[307]

371.    In May of 2012, the U.S. Senate launched an investigation into whether Purdue was deceiving doctors and patients about opioids. In a letter to the CEO of PPI and PPLP, the Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers."[308] The Senate letter warned PURDUE specifically of the danger of patients taking higher doses: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses." The Senate letter also warned about PURDUE misleading doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness." The Senate even put the directors and CEO on notice that they specifically were under scrutiny, demanding that PURDUE' produce to investigators a set of "presentations, reports, and communications to PURDUE's management team or board of directors from 2007 to the present."

372.    **In May**, notwithstanding the governmental scrutiny, PURDUE executives emphasized to the managers overseeing, upon information and belief, the Kentucky sales reps that the SACKLERS were tracking their efforts, and that RICHARD SACKLER required weekly reports.[309] Staff gave the only reply that was acceptable at PURDUE: *"All our efforts are focused on attaining the objective"* of increased opioid prescriptions that the SACKLERS

---

[307] *https://www.propublica.org/article/senate-panel-investigates-drug-company-ties-to-pain-groups*
[308] *https://www.propublica.org/article/senate-panel-investigates-drug-company-ties-to-pain-groups*
[309] *2012-05-15 email from Mike Innaurato.*

set.[310]

373.    **In June**, the SACKLERS discussed sales and marketing again.[311] Staff reported to the SACKLERS that they had added 120,000 sales visits to drive sales of OxyContin.[312]

374.    Staff also told the SACKLERS that they expanded the opioid savings cards, because PURDUE's latest data showed opioid savings cards led to 60% more patients remaining on OxyContin longer than 90 days. The SACKLERS reviewed the results of PURDUE's confidential studies showing that opioid savings cards kept more patients on opioids for 90 day, 120 days, 150 days, 180 days, 210 days, 240 days — even an entire year.[313]



*PURDUE internal analysis about keeping patients on opioids longer.*

375.    Keeping patients on opioids for these lengths of time was especially dangerous for the patients and especially profitable for PURDUE.

---

[310] *2012-05-15 email from Gary Lewandowski.*

[311] *2012-05-29 email from John Stewart.*

[312] *2012-06-18 Mid Year Sales and Marketing Board Update, slide 10.*

[313] *2012-06-18 Mid Year Sales and Marketing Board Update, slides 11-12.*

376.     Staff also told the SACKLERS that (as they had in 2009) they were again targeting prescribers for OxyContin promotion through a special television network.[314] PURDUE selected physician targets to see the television program. The video featured a doctor paid by PURDUE to promote opioids, and encouraged prescribers to use opioid savings cards.[315]

377.     **In July**, DAVID SACKLER (RICHARD SACKLER's son) took a seat on the Board. For events after July 2012, this Complaint includes David in "the SACKLERS."

378.     At one point, staff calculated that PURDUE was spending more than $9,000,000 per year to buy food for doctors who prescribe opioids.[316]

379.     Staff also told the SACKLERS that PURDUE employed 633 sales reps and, during Q2 2012, they visited prescribers 183,636 times.[317]

380.     **In August,** the SACKLERS voted to direct PURDUE to recruit an additional marketing executive and make candidates available to meet with members of the Board.[318]

381.     **In November,** staff told the SACKLERS the confidential results of a study of 57,000 patients that PURDUE performed explicitly to determine how opioid dose *"influences patient length of therapy."* The results showed that patients on the highest doses *"are the most persistent."* The *"Recommended Actions"* presented to the SACKLERS included *"additional workshops for the sales force"* and *"specific direction"* to the sales representatives about using higher doses to keep patients on drugs longer. Staff told the SACKLERS that encouraging

---

[314] *2012-06-18 Mid Year Sales and Marketing Board Update, slide 10.*
[315] *Video: "A Treatment Plan for Moderate to Severe Low Back Pain That Includes Converting to an Extended- Release Opioid Analgesic".*
[316] *2014-06-16 budget information ($9,119,250; food budget for each sales rep: $18,000).*
[317] *2012-07-23 Board report, pgs. 6, 44; 2012-07 Marketing and Sales report. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 190,662 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.*
[318] *2012-08-16 Board minutes.*

higher doses *"is a focal point of our promotion,"* and that sales reps would *"emphasize the importance"* of increasing patients' opioid doses, as soon as 3 days after starting treatment.[319]

382. That same month, the SACKLERS voted to set PURDUE's budget for Sales and Promotion for 2013 at $312,563,000.[320] Staff told the SACKLERS that PURDUE employed 622 sales reps and, during Q3 2012, they visited prescribers 180,723 times.[321]

**(vii) 2013**

383. **In January 2013**, in what was becoming a yearly ritual, RICHARD SACKLER questioned staff about the drop in opioid prescriptions caused by PURDUE sales reps taking time off for the holidays. Richard wasn't satisfied: *"Really don't understand why this happens. What about refills last week? Was our share up or down?"*[322] Staff assured Richard that doctors were *"sensitive"* to sales rep visits and, as soon as the reps got back into action, they would *"boost"* opioid prescriptions again.[323]

384. Staff told the SACKLERS that they continued to reinforce the *Individualize The Dose* campaign, which the SACKLERS knew and intended would promote higher doses. Staff also told the SACKLERS that sales reps would place greater emphasis on the opioid savings cards, which the SACKLERS knew and intended would keep patients on opioids longer. Staff reported to the SACKLERS that PURDUE had conducted a sensitivity analysis on the opioid savings cards to maximize their impact and, as a result, had increased the dollar value and set the program period to be *15 months* long. Staff also reported to the SACKLERS that PURDUE

---

[319] *2012-11-01 Board report, pgs. 18, 30.*
[320] *2012-11-16 Board minutes, 2013 budget.*
[321] *2012-11-01 Board report, pgs. 15, 54. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 199,466 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1*
[322] *2013-01-07 email from RICHARD SACKLER.*
[323] *2013-01-07 email from David Rosen.*

had created promotional materials to support these tactics and had distributed them to the sales force. Staff also told the SACKLERS that PURDUE showed an opioid promotional video to 5,250 physicians on the Physician's Television Network.[324] The video urged doctors to give patients PURDUE's opioid savings cards.[325]

385.    That same month, staff told the SACKLERS that PURDUE employed 609 sales reps and, during Q4 2012, they visited prescribers 153,890 times.[326]

386.    **In February**, the SACKLERS met with staff about tactics for promoting PURDUE's opioids. They discussed research on what influences prescriptions, how doctors had responded to PURDUE's increased promotion, and sales force promotion themes.[327] On the same day, the SACKLERS voted to award bonuses and salary increases to executives, including those involved in marketing PURDUE's opioids.[328]

387.    **In March**, staff reported to the SACKLERS on the devastation caused by prescription opioids. Staff told the SACKLERS that drug overdose deaths had more than tripled since 1990 — the period during which PURDUE had made OxyContin the best-selling painkiller. Staff told the SACKLERS that tens of thousands of deaths were only the *"tip of the iceberg."* Staff reported that, for every death, there were more than a hundred people suffering from prescription opioid dependence or abuse.[329]

388.    **In May**, staff reported to the SACKLERS again that they were successfully using opioid savings cards to get patients to *"remain on therapy longer."* Staff told the

---

[324] *2013-01-28 Board report, pgs. 12-14.*

[325] *Butrans promotional video.*

[326] *2013-01-28 Board report, pgs. 10, 56. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 191,264 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.*

[327] *2013-01-30 email from William Mallin.*

[328] *2013-02-13 Board minutes.*

[329] *2013-03-21 Board presentation.*

SACKLERS that they were using direct mail and email, as well as sales visits, to push the opioid savings cards.[330]

389.    Staff reported to the SACKLERS that, despite these sales efforts, they were not achieving the goals of getting enough patients on higher doses of opioids and getting doctors to prescribe more pills in each prescription. Staff told them that *"there is an 'unfavorable' mix of prescriptions across strengths,"* and PURDUE was losing tens of millions of dollars in revenue because sales of the highest doses (60mg and 80mg) were too low. Staff told the SACKLERS that there was also a second problem: *"lower average tablet counts per prescription."* Because doctors were not prescribing enough pills during each patient visit, PURDUE was losing tens of millions of dollars in revenue. Staff promised the SACKLERS: *"A deeper analysis is underway to determine the cause of the decline in the 30mg, 60mg, and 80mg tablet strengths, as well as the lower than budgeted average tablets per prescription. Once the analysis is complete, we will have a better sense of what tactics to implement to address both issues."*[331]

390.    The SACKLERS met with Sales VP Russell Gasdia about the strategy for selling high doses. Gasdia told the SACKLERS that *"Titration up to higher strengths, especially the 40mg and 80mg strengths is declining."* He analyzed the *"Causes of OxyContin's Decline in Higher Strengths,"* and how PURDUE would reverse that decline. He told the SACKLERS that PURDUE's #1 tactic to sell higher doses was sending sales reps to visit prescribers. The #2 tactic was a marketing campaign designed to promote high doses — PURDUE's *Individualize The Dose* campaign. After that, Gasdia told the SACKLERS, came

---

[330]  *2013-05-13 Board report, pg. 18.*
[331] *2013-05-13 Board report, pg. 8.*

opioid savings cards. After that, special focus on the most prolific opioid prescribers.[332]

391. Gasdia told the SACKLERS that the staff would develop even more tactics to sell higher doses. They were using PURDUE's data on thousands of doctors and patients to learn what made people willing to use high doses of opioids. They had started a study of physician characteristics and a *"patient level analysis to determine what patient characteristics"* were associated with *"higher dose volume."*[333]

392. That same month, staff told the SACKLERS that PURDUE employed 637 sales reps and, during Q1 2013, they visited prescribers 155,354 times.[334]

393. **In July**, the SACKLERS discussed *"threats"* to their business from data on long-term opioid use, as public health authorities reacted to the danger of keeping patients on opioids for longer periods of time.[335] Meanwhile, staff sent the SACKLERS a *"Flash Report"* that OxyContin sales had dropped $96,400,000 from the year before. Staff explained to the SACKLERS that insufficient volume of sales rep visits to promote OxyContin to prescribers was an important reason for the dropping sales. Staff told the SACKLERS that they would increase the number of sales visits and had hired McKinsey to study how to get doctors to prescribe more OxyContin.[336]

394. Staff also reported to the SACKLERS that key priorities were to reverse *"the decline in higher strengths"* of PURDUE opioids, and the decline in *"tablets per Rx,"* which were reducing PURDUE's profit. They told the SACKLERS that PURDUE staff were

---

[332] *2013-05 Board presentation by Russell Gasdia.*

[333] *2013-05 Board presentation by Russell Gasdia.*

[334] *2013-05-13 Board report, pgs. 12, 62. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 172,788 visits; and that reps visited 6.8 prescribers per day, on average, compared to a target of 7.1. Staff assured the SACKLERS that "call productivity is expected to increase towards the targeted goal throughout 2013."*

[335] *2013-07-24 Communications and External Affairs Committee minutes.*

[336] *2013-07-05 email from Edward Mahony.*

studying ways to fight these trends, and McKinsey would analyze the data down to the level of individual physicians.[337]

395. MORTIMER SACKLER asked for more detail on what was being done to increase sales.[338] Staff told the SACKLERS that McKinsey would analyze whether sales reps were targeting the prescribers who were most susceptible to increasing opioid use. Staff told the SACKLERS that McKinsey would study whether PURDUE could use incentive compensation to push reps to generate more prescriptions. Making the sales reps' income depend on increasing prescriptions could be a powerful lever. Staff told the SACKLERS that McKinsey would study using "patient pushback" to get doctors to prescribe more opioids: when doctors hesitated to prescribe PURDUE opioids, PURDUE could get patients to lobby for the drugs. Staff told the SACKLERS that McKinsey would also study techniques for keeping patients on opioids longer, including the need for sales reps "to make a lot of calls on physicians with a high number of continuing patients."[339]

396. Staff also reported to the SACKLERS that they had trained PURDUE's sales reps to use new sales materials designed to get patients on higher doses of opioids for longer periods. Staff told the SACKLERS that PURDUE employed 634 sales reps and, during Q2 2013, they visited prescribers 177,773 times.[340] Staff assured the SACKLERS that they were trying to achieve even more sales visits by monitoring the reps.[341]

397. Before the month ended, the SACKLERS met to discuss a report on sales tactics that McKinsey had prepared for them: *Identifying Granular Growth Opportunities for*

---

[337] 2013-07-23 Board report, pg. 25.

[338] 2013-07-06 email from Mortimer Sackler.

[339] 2013-07-07 email from John Stewart.

[340] 2013-07-23 Board report, pgs. 11, 12, 59. Staff told the SACKLERS that the sales rep visits compared to a target for the quarter of 191,184 visits; and that reps visited 6.9 prescribers per day, on average, compared to a target of 7.1.

[341] 2013-07-23 Board report, pgs. 10-11.

*OxyContin: First Board Update*. McKinsey confirmed that PURDUE's sales visits generated opioid prescriptions. They urged the SACKLERS to demand more sales visits from sales reps, increasing each rep's annual quota from 1,400 towards 1,700. McKinsey also advised the SACKLERS to control the sales reps' target lists more strictly, to make reps visit doctors who give the biggest payoff. Based on a review of data, McKinsey also suggested that the SACKLERS should have staff emphasize opioid savings cards in neighborhoods with high concentration of Walgreens pharmacies. To allow even more targeted promotion of high doses, McKinsey asked the SACKLERS to obtain *"prescriber level milligram dosing data"* so they could analyze the doses prescribed by individual doctors.[342]

398.     Days later, staff told the SACKLERS that PURDUE paid their family $42,000,000.[343]

399.     **In August**, the SACKLERS met to discuss a new McKinsey report on sales tactics: *Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates*. McKinsey recommended that the SACKLERS immediately order a series of actions to increase sales. McKinsey urged the SACKLERS to direct sales reps to the most prolific opioid prescribers. The consultants told the SACKLERS that prescribers in the more prolific group write *"25 times as many OxyContin scripts"* as less prolific prescribers. They also reported to the SACKLERS that sales rep visits to these prolific prescribers cause them to prescribe even more opioids: if PURDUE ordered reps to focus on the most prolific prescribers, it could increase sales.[344]

400.     **In 2013**, the Los Angeles Times revealed that PURDUE had been compiling a

---

[342] 2013-07-18 *Identifying Granular Growth Opportunities for OxyContin: First Board Update.*
[343] 2013-08-06 *email from Edward Mahony.*
[344] 2013-08-08 *Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates.*

list for the past decade of 1,800 doctors suspected of recklessly prescribing its opioids, but PURDUE had reported only 8% of them to authorities. PURDUE's attorney Robin Abrams gave multiple interviews to the newspaper. Abrams is listed in official filings as a Vice President of PPI and is the same lawyer who signed PURDUE's 2007 settlement agreement. In 2013, she admitted that PURDUE' had the list, and said PURDUE would not agree to disclose it to authorities because: *"I don't really want to open up an opportunity for folks come in here and start looking and second-guessing."*

401.     McKinsey also recommended that the SACKLERS fight back against steps that the DEA, the U.S. Department of Justice, and others were taking to stop illegal drug sales. Two months earlier, the Walgreens pharmacy company admitted that it broke the law by filling illegitimate prescriptions, and it agreed to new safeguards to stop illegal prescribing.[345] McKinsey told the SACKLERS that *"deep examination of PURDUE's available pharmacy purchasing data shows that Walgreens has reduced its units by 18%."* Even worse for the SACKLERS, the new safeguards were hurting sales of the highest doses: *"the Walgreens data also shows a significant impact on higher OxyContin dosages"* — specifically the 80mg dose. McKinsey urged the SACKLERS to lobby Walgreens' leaders to loosen up. For the longer term, McKinsey advised the SACKLERS to develop a *"direct-to-patient mail order"* business for PURDUE opioids, so they could sell the high doses without pharmacies getting in the way.[346]

402.     Further, McKinsey advised the SACKLERS that they should use their power on the Board to insist on increasing sales, with monthly accountability: *"Establish a revenue*

---

[345] *2013 Walgreens agreement, https://www.justice.gov/sites/default/files/usao-sdfl/legacy/2013/06/19/130611-01.WalgreensMOA%26Addendum.pdf.*

[346] *2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates.*

*growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."* McKinsey knew what the SACKLERS were looking for: they reported that *"the value at stake is significant - hundreds of millions, not tens of millions."* The consultants urged the SACKLERS to make *"a clear go-no go decision to 'Turbocharge the Sales Engine.'"*[347]

403. **In September and October**, the SACKLERS met again to discuss implementation of the sales tactics McKinsey had recommended. The SACKLERS discussed DEA efforts to stop illegal dispensing of opioids at CVS and Walgreens and how PURDUE could get around the new safeguards by shifting to mail-order pharmacies, specialty pharmacies, or PURDUE distributing opioids to patients directly.[348] Meanwhile, McKinsey kept reporting to PURDUE on tactics to get more patients on higher doses of opioids.[349] McKinsey found that PURDUE could drive opioid prescriptions higher by targeting the highest-prescribing doctors and sending sales reps to visit each prolific prescriber dozens of times per year.

404. **In October**, MORTIMER SACKLER pressed for more information on dosing and *"the breakdown of OxyContin market share by strength."*[350] Staff told the SACKLERS that *"the high dose prescriptions are declining,"* and *"there are fewer patients titrating to the higher strengths from the lower ones."*[351] In response to the SACKLERS' insistent questions, staff explained that sales of the highest doses were not keeping up with the SACKLERS' expectations because some pharmacies had implemented *"good faith dispensing"* policies to

---

[347] *2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates.*
[348] *2013-09-12 Board agenda; 2013-10-03 Board agenda.*
[349] *2013-08-22 email from Russell Gasdia, PPLPC012000437344 (McKinsey interim report).*
[350] *2013-10-28 email from Mortimer Sackler.*
[351] *2013-10-28 email from David Rosen.*

double-check prescriptions that looked illegal and some prescribers were under pressure from the DEA.[352] Staff promised to increase the budget for promoting OxyContin by $50,000,000, and get sales reps to generate more prescriptions with a new initiative to be presented to the SACKLERS the following week.[353]

405.    At the end of the month, the SACKLERS met to discuss PURDUE's budget for sales and marketing for 2014.[354] Looking back at sales tactics used in 2013, staff told the SACKLERS that a relationship marketing program targeting Boston had increased opioid prescriptions by 959%.[355] Staff told the SACKLERS (again) that PURDUE's opioid savings cards kept patients on opioids longer.[356] Looking ahead at 2014, staff reported to the SACKLERS that doctors shifting away from high doses and towards fewer pills per prescription could cost PURDUE hundreds of millions of dollars in lost sales.[357] To fight against that threat, staff told the SACKLERS that they would increase the sales visits by each rep to 7.3 visits per day and visit prescribers 758,164 times in the year.[358]

406.    **In November**, RICHARD SACKLER complained that he was getting too much information about the dangers of PURDUE opioids. Richard had set up a Google alert to send him news about OxyContin, and he objected to a PURDUE Vice President: *"Why are all the alerts about negatives and not one about the positives of OxyContin tablets?"*[359] Staff immediately offered to replace Richard's alert with a service that provided more flattering

---

[352] 2013-10-28 email from David Rosen.

[353] 2013-10-23 email from Edward Mahony.

[354] 2013-10-28 email from Russell Gasdia; Sales & Marketing Board presentation.

[355] 2013-10-29 Analgesic Market Update presentation to the Board.

[356] 2013-10-29 OxyContin 2014 Budget Proposal to the Board.

[357] 2013-10-29 Sales & Marketing presentation to the Board.

[358] 2013-10-29 Sales Force 2014 Objectives presented to the Board.

[359] 2013-11-18 email from RICHARD SACKLER.

stories.[360]

407.    Staff reported to the SACKLERS that a key initiative during Q3 2013 was for sales reps to encourage doctors to prescribe OxyContin to elderly patients on Medicare.[361] In Kentucky, during 2013, upon information and belief, sales reps reported to PURDUE that they were pushing opioids for elderly patients. The sales reps did not disclose to doctors in Kentucky that elderly patients faced greater risks of drug interactions, injuries, falls, and suffocating to death.

408.    Staff also reported to the SACKLERS that another key initiative during Q3 2013 was for sales reps to promote OxyContin for patients who had never taken opioids before.[362] In Kentucky during 2013, PURDUE sales reps did not disclose to doctors that *opioid naive* patients faced greater risks of overdose and death.

409.    Staff also told the SACKLERS that analysis conducted in July 2013 showed that opioid savings cards earned the SACKLERS more money by keeping patients on opioids longer; specifically, more patients stayed on OxyContin longer than 60 days. Staff reported to the SACKLERS that PURDUE was pushing opioid savings cards in sales rep visits, through email to tens of thousands of health care providers, and online.[363] In Kentucky, during 2013, sales reps reported to PURDUE that they were promoting opioid savings cards to prescribers. The sales reps did not tell doctors in Kentucky that savings cards led patients to stay on opioids longer than 60 days, or that staying on opioids longer increased the risk of addiction and death.

410.    Staff reported to the SACKLERS that PURDUE paid their family $399,920,000

---

[360] *2013-11-18 email from Raul Damas.*

[361] *2013-11-01 Board report, pg. 15.*

[362] *2013-11-01 Board report, pg. 14.*

[363] *2013-11-01 Board report, pgs. 15-16, 24-25.*

during January-September 2013. But staff told the SACKLERS that, from January to September 2013, PURDUE lost hundreds of millions of dollars in profits because some prescribers were shifting away from higher doses of PURDUE opioids.[364]

411.  Staff told the SACKLERS that, in Q4 2013, sales reps would increase the number of visits to prescribers.[365]

412.  Staff also reported to the SACKLERS that a key initiative in 2013 was to train sales reps to keep patients on Butrans opioids longer. They told the SACKLERS that, at the same time as the initiative to keep patients on opioids longer, PURDUE launched a new high dose of its Butrans opioid; sales reps began promoting the new high dose to physicians using new sales materials; and initial orders were double the company's forecasts. Staff reported to the SACKLERS that marketing and sales activities generated 266,842 additional prescriptions and highlighted that opioid savings cards generate especially "high returns" by keeping patients on opioids longer.[366] Staff reported to the SACKLERS that PURDUE had sent more than 880,000 emails to health care professionals to promote its Butrans opioid, and posted online advertising seen more than 5 million times for Butrans and nearly 4 million times for OxyContin. They told the SACKLERS that hundreds of thousands of communications to prescribers nationwide presented the same "key selling messages" designed to get more patients on OxyContin at higher doses for longer periods of time, and specifically promoted PURDUE's opioid savings cards.[367]

413.  Staff reported to the SACKLERS that they were working with McKinsey to study ways to sell more OxyContin. Staff also reported that they had direct access to physician

---

[364] 2013-11-01 Board report, pgs. 3, 6.
[365] 2013-11-01 Board report, pg. 11.
[366] 2013-11-01 Board report, pgs. 11-13, 27.
[367] 2013-11-01 Board report, pgs. 14, 16.

level data to analyze prescriptions by individual doctors. Staff gave the SACKLERS the latest results regarding how opioid savings cards led to patients staying on OxyContin longer.[368]

414.     Staff also reported results from PURDUE's marketing through the "OxyContin Physicians Television Network."[369] PURDUE had selected doctors in nine Massachusetts communities as targets for that scheme.[370] Staff told the SACKLERS that it increased opioid prescriptions.[371]

415.     Staff also told the SACKLERS that they would begin reviews of sales reps according to their sales ranking, with a focus on the bottom ten percent. Staff reported to the SACKLERS that PURDUE employed 637 sales reps and, during Q3 2013, they visited prescribers 179,640 times.[372]

416.     **In December**, staff told RICHARD SACKLER that Butrans sales were increasing, and they suspected the increase was caused by PURDUE's improved targeting, in which sales reps visited the most susceptible prolific prescribers.[373]

417.     Meanwhile, staff contacted RICHARD SACKLER because they were concerned that the company's *"internal documents"* could cause problems if investigations of the opioid crisis expanded.[374] Early the next year, staff told JONATHAN SACKLER about the same concern. Jonathan studied collections of news reports and asked staff to assure him that

---

[368] *2013-11-01 Board report, pgs. 20-23.*
[369] *2013-11-01 Board report, pgs. 23-24.*
[370] *Target list; video.*
[371] *2013-11-01 Board report, pgs. 23-*24.
[372] *2013-11-01 Board report, pgs. 11, 52, 55. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 196,845 visits; and that reps visited 6.9 prescribers per day, on average, compared to a target of 7.1.*

[373] *2013-12-04 email from David Rosen.*
[374] *2014-01-03 email from Burt Rosen ("I spoke to Richard just before the year end and raised concerns over our internal documents.").*

journalists covering the opioid epidemic were not focused on the SACKLERS.[375]

418.    PURDUE's attorney Robin Abrams and PURDUE's directors knew they had reason to fear scrutiny. The Commonwealth of Kentucky was prosecuting a lawsuit against PURDUE for deceiving doctors and patients about opioids. PURDUE's lawyers surveyed residents who could be on the jury. One-third knew someone who overdosed or was seriously hurt taking a PURDUE opioid, and 29 percent knew someone who died. PURDUE itself filed those statistics in court.

(viii) 2014

419.    In January 2014, staff reported to the SACKLERS on how PURDUE's program for complying with state and federal law compared to recent agreements between other drug companies and the government. Other companies had agreed that sales reps should not be paid bonuses based on increasing doctors' prescriptions, but PURDUE still paid reps for generating sales. Other companies disclosed to the public the money they spent to influence continuing medical education, but PURDUE did not. Other companies had adopted "claw-back" policies so that executives would forfeit bonuses they earned from misconduct; but PURDUE had not. The Boards of other companies passed resolutions each quarter certifying their oversight of the companies' compliance with the law; but the SACKLERS did not.[376]

420.    In February, staff sent the SACKLERS the final results from 2013.[377] Staff told the SACKLERS that net sales were hundreds of millions of dollars below budget because doctors were not prescribing enough of the highest doses of opioids and were including too

---

[375] 2014-01-02 email from Jonathan Sackler.
[376] 2014-01-16 quarterly compliance report to the Board.
[377] 2014-02-03 email from Edward Mahony.

few pills with each prescription, and sales reps were not visiting doctors enough.[378] Sales VP Russell Gasdia wrote privately to a friend: *"Our myopic focus on extended release opioids with abuse deterrent properties has not yielded the results people thought it would in the market. It's been hard to convince colleagues and the board that our success in this market is over."*[379]

421.    To get higher sales, staff told the SACKLERS that they had tightened the requirements for sales reps' pay: from now on, sales reps would lose bonus pay if they did not visit *"high value"* prescribers often enough.[380] Upon information, PURDUE identified *"high value"* doctors and managers ordered reps to keep promoting drugs to them even after reps warned PURDUE that the doctors were involved in diversion and abuse.[381]

422.    A few days later, staff told the SACKLERS that PURDUE's marketing had an immense effect in driving opioid prescriptions: according to PURDUE's analysis, its sales and marketing tactics generated an additional 560,036 prescriptions of OxyContin in 2012 and 2013. Nevertheless, staff reported to the SACKLERS that net sales for 2013 had been $377,000,000 less than budgeted. Staff again reported that PURDUE was losing hundreds of millions of dollars in expected profits because prescribers were shifting away from higher doses of PURDUE opioids and including fewer pills per prescription. Staff told the SACKLERS that a *"Key Initiative"* was to get patients to *"stay on therapy longer."*[382]

423.    Staff also told the SACKLERS that key sales priorities were again to encourage doctors to prescribe PURDUE opioids for elderly patients and patients who had not taken

---

[378]  *2014-01-30 memo from Edward Mahony.*

[379]  *2014-02-27 email from Russell Gasdia.*

[380]  *2014-01-30 memo from Edward Mahony.*

[381]  *2013 Q1 target list; 2013-12-23 email from Garry Hughes (with ZS target list).*

[382]  *2014-02-04 Board report, pgs. 3, 5, 9, 22.*

opioids before. Staff reported to SACKLERS again that sales reps were continuing the *Individualize The Dose* campaign.[383] As the SACKLERS knew, PURDUE designed that campaign to encourage higher doses.[384] Staff also told the SACKLERS that PURDUE's eMarketing campaign for OxyContin reached 84,250 health care providers during Q4 2013. Staff told the SACKLERS that they found increasing compliance concerns with PURDUE's speaker programs, in which the company paid doctors to promote PURDUE opioids to other doctors.[385]

424. Staff told the SACKLERS that PURDUE employed 632 sales reps and, during Q4 2013, they visited prescribers 176,227 times.[386]

425. That February report was the last of its kind. After Q4 2013, PURDUE abolished the detailed Quarterly Reports that had created a paper trail of targets for sales visits and been emailed among the Board and staff. In 2013, the City of Chicago served PURDUE with a subpoena seeking internal documents about PURDUE's marketing of opioids.[387] That provoked a flurry of activity, including discussion among the SACKLERS.[388] PURDUE fought the subpoena, and it was withdrawn.[389] For 2014, PURDUE decided to limit many of its official Board reports to numbers and graphs, and relay other information orally. But the SACKLERS continued to demand information about sales tactics, and their control of PURDUE's deceptive marketing did not change.

426. **In March and April,** staff told the SACKLERS that PURDUE was achieving

---

[383] *2014-02-04 Board report pgs. 13-14.*

[384] *2013-05-22 mid-year sales update, slides 4, 14.*

[385] *2014-02-04 Board report pgs. 15, 39-40.*

[386] *2014-02-04 Board report pgs. 9, 47. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 183,960 visits; and that reps hit the target of visiting 7.1 prescribers per day because managers reduced the target for visiting pharmacies to allow more visits to prescribers.*

[387] *2015-11-20 email from Robert Josephson; 2013-04-24 email from Burt Rosen.*

[388] *2013-05-07 Executive Committee agenda; 2013-05-03 Board agenda.*

[389] *2015-11-20 email from Robert Josephson.*

its goals of selling higher doses of OxyContin and more pills of OxyContin per prescription, but weekly prescriptions of PURDUE's Butrans opioid were below expectations because of a reduced number of sales rep visits promoting that opioid.[390] The SACKLERS had assumed prescriptions would fall, but staff were concerned that the effect could be greater than anticipated.[391]

427.    That same month, Richard and Jonathan's father, Raymond Sackler, sent David, Jonathan, and Richard a confidential memo about PURDUE's strategy, including specifically putting patients on high doses of opioids for long periods of time. The memo recounted that some physicians had argued that patients should not be given high doses of PURDUE opioids, or kept on PURDUE opioids for long periods of time, but PURDUE had defeated efforts to impose a maximum dose limit or a maximum duration of use. Raymond asked David, Jonathan, and Richard to talk with him about the report.[392]

428.    **In June**, the SACKLERS removed Russell Gasdia as Vice President of Sales and Marketing, and began pushing his replacement to sell more opioids faster.[393] Gasdia warned his replacement that Richard managed the sales operation intensely — *"there are times this becomes a tennis match with Dr. Richard."*[394] Sure enough, Richard told Gasdia's replacement that he would be given little time to show that he could increase opioid sales: *"it is very late in the day to rescue the failed launch"* of Butrans, which was not making as much money as Richard desired.[395] CEO Mark Timney tried to caution Richard that it was *"a little*

---

[390]  *2014-03-07 email from Edward Mahony; 2014-04-06 email from Edward Mahony.*
[391]  *2014-04-14 Q1 summary of results, slide 7. Staff told the Sacklers that Purdue employed 643 sales reps. 2014-04-14 headcount summary.*
[392]  *2014-05-05 email from Raymond Sackler; 2014-05-04 attached memo from Burt Rosen.*
[393]  *2014-06-10 email from RICHARD SACKLER.*
[394]  *2014-06-10 email from Russell Gasdia.*
[395]  *2014-06-10 email from Richard Sackler.*

*early"* to be attacking the new sales leader, since he'd been at PURDUE only two weeks.[396]

429.    That same month, staff sent the SACKLERS an *"Update on L.A. Times mitigation effort"* about tactics to discourage scrutiny of PURDUE's misconduct.[397] Staff wrote to the SACKLERS:

> *As you may recall, one of our efforts to mitigate the impact of a potential negative Los Angeles Times (LAT) story involved assisting a competing outlet in marginalizing the LAT's unbalanced coverage by reporting the facts before the LAT story ran. The following Orange County Register story, developed in close coordination with PURDUE, achieved this goal. This fact-based narrative robs the LAT account of its newsworthiness and contradicts many of the claims we expected that paper to make.*[398]

430.    Previously, in 2012, the *Los Angeles Times* had studied coroner's records and revealed that overdoses killed thousands of patients who were taking opioids prescribed by their doctors, refuting the SACKLERS' lie that patients who are prescribed opioids don't get addicted and die.[399] The next year, the *Los Angeles Times* revealed that PURDUE tracked illegal sales of OxyContin with a secret list of 1,800 doctors code-named *Region Zero*, but did not report them to the authorities.[400] The *"mitigation effort"* that the SACKLERS ordered was not designed to protect patients from overdoses or from illegal prescribers, but instead to protect the SACKLERS from reporters revealing the truth.

431.    **In July**, RICHARD SACKLER called staff to complain about studies that the FDA required for opioids and how they might undermine PURDUE's sales. He emphasized

---

[396]  *2014-06-10 email from Mark Timney.*

[397]  *2014-06-30 email from Raul Damas. A few weeks after receiving the mitigation update, RICHARD SACKLER demanded that the L.A. Times send him all the paper's correspondence with PURDUE. 2014-08-14 email from Scott Glover.*

[398]  *2014-06-30 email from Raul Damas. Years earlier, the SACKLERS had tried to influence the New York Times to be "less focused on OxyContin/PURDUE." 2011-04-22 email from John Stewart.*

[399]  *2012-11-11 "Legal drugs, deadly outcomes," by Scott Glover and Lisa Girion.*

[400]  2013-08-11 "OxyContin maker closely guards its list of suspect doctors," by Scott Glover and Lisa Girion.

that PURDUE Board members felt the requirements to conduct studies were unfair. Staff tried to reassure Richard that the studies would take "several years to complete, thereby keeping our critics somewhat at-bay during this time."[401]

432.     **In July** and again in **August, September,** and **October,** staff warned the SACKLERS that two of the greatest risks to PURDUE's business were *"Continued pressure against higher doses of opioids,"* and "Continued pressure against long term use of opioids."[402]

> **RISKS**
> i.     Continued pressure against higher doses of opioids,
> ii.     Continued pressure against long term use of opioids,

*Staff report to the Board on risks facing PURDUE's business*

433.     Staff told the SACKLERS that PURDUE's #1 opportunity to resist that pressure was by sending sales reps to visit prescribers; and, specifically, by targeting the most susceptible doctors, who could be convinced to be prolific prescribers, and visiting them many times.[403]

434.     **In September** 2014, KATHE SACKLER dialed in to a confidential call about *Project Tango*. *Project Tango* was a secret plan for PURDUE to expand into the business of selling drugs to treat opioid addiction. In their internal documents, Kathe and staff wrote down what PURDUE publicly denied for decades: that addictive opioids and opioid addiction are *"naturally linked."* They determined that PURDUE should expand across *"the pain and addiction spectrum,"* to become *"an end-to-end pain provider."* PURDUE illustrated the end-

---

[401] *2014-07-22 email from Todd Baumgartner.*
[402] *2014-07-01 Board Flash Report, slide 5; 2014-08-05 Board Flash Report, slide 6; 2014-09-05 Board Flash Report, slide 6; 2014-10-15 Board Flash Report, slide 7.*
[403] *2014-07-01 Board Flash Report, slide 5; 2014-08-05 Board Flash Report, slide 6; 2014-09-05 Board Flash Report, slide 6.*

to-end business model with a picture of a dark hole labeled *"Pain treatment"* that a patient could fall into — and *"Opioid addiction treatment"* waiting at the bottom.



PURDUE's secret "Project Tango" [404]

435.    KATHE SACKLER and the *Project Tango* team reviewed their findings that the *"market"* of people addicted to opioids, measured coldly in billions of dollars, had doubled from 2009 to 2014.

436.    Kathe and the staff found that the catastrophe provided an excellent compound annual growth rate ("CAGR"): *"Opioid addiction (other than heroin) has grown by ~20% CAGR from 2000 to 2010."*[405]

---

[404] *2014-09-10 email from Brian Meltzer; 2014-09-12 presentation. "ADF" refers to Abuse-Deterrent Formulation, the crush-resistant version of OxyContin, which is no less addictive.*

[405] *2014-09-10 presentation, slide 4. The Board discussed Project Tango in October 2014, but PURDUE redacted all 32 pages of those Board materials. 2014-10-01 Board meeting materials.*



*PURDUE's measure of the opioid addiction "market"*

437.     KATHE SACKLER and the staff revealed in their internal documents that PURDUE's tactic of blaming addiction on untrustworthy patients was a lie. Instead, the truth is that opioid addiction can happen to anyone who is prescribed opioids:

> ▪ *"This can happen to any-one – from a 50 year old woman with chronic lower back pain to a 18 year old boy with a sports injury, from the very wealthy to the very poor"*

*PURDUE's "Project Tango" patient and clinical rationale*

438.     Kathe and the staff concluded that millions of people who became addicted to opioids were the SACKLERS' next business opportunity. Staff wrote: *"It is an attractive market. Large unmet need for vulnerable, underserved and stigmatized patient population*

*suffering from substance abuse, dependence and addiction."* The team identified eight ways that PURDUE's experience getting patients *on* opioids could now be used to sell treatment for opioid addiction.[406]

439.     KATHE SACKLER instructed staff that *Project Tango* required their *"immediate attention."* She pressed staff to look into reports of children requiring hospitalization after swallowing buprenorphine — the active ingredient in both PURDUE's Butrans opioid and the opioid addiction treatment that the SACKLERS wanted to sell, through *Project Tango*, in a film that melts in your mouth.[407] Staff assured Kathe that children were overdosing on pills, not films, *"which is a positive for Tango."*[408]

440.     Staff presented KATHE SACKLER's work on *Project Tango* to the Board the following February in 2015. The plan was for a Joint Venture controlled by the SACKLERS to sell the addiction medication suboxone.[409]

441.     The *Tango* team mapped how patients could get addicted to opioids through prescription opioid analgesics such as PURDUE's OxyContin or heroin, and then become consumers of the new company's suboxone. The team noted the opportunity to capture customers: even after patients were done buying suboxone the first time, 40-60% would relapse and need it again.[410]

---

[406] *2014-09-10 presentation, slides 2, 4.*
[407] *2014-09-16 email from Kathe Sackler.*
[408] *2014-09-17 email from Mark Timney.*
[409] *2015-02-20 email from Stuart Baker.*

[410] *2015-02-24 Project Tango presentation.*



*PURDUE presentation explaining "Project Tango" patient flow*

442. The next month, *Project Tango* came to an end. KATHE, DAVID, JONATHAN, and MORTIMER SACKLER discussed the discontinuation of the project at their Business Development Committee meeting.[411] But the SACKLERS' efforts to sell addictive opioids continued.

443. **In October 2014**, staff sent the SACKLERS a Proposed Operating Plan and Budget to be approved by the Board for 2015.[412] Staff told the SACKLERS that a key tactic for 2015 would be to convert patients from short-acting opioids to OxyContin. Staff warned the SACKLERS that prescribers were shifting away from the highest doses of PURDUE's opioids, and toward fewer pills per prescription, and those shifts would cost PURDUE $99,000,000 a year. Staff told the SACKLERS that a key tactic to increase Butrans sales in 2015 would be for PURDUE sales reps to push doctors to *"titrate up"* to higher doses. Staff likewise told the SACKLERS that visits to doctors by sales reps would be a key tactic to

---

[411] *2015-03-03 email from Stuart Baker.*

[412] *2014-10-24 email from Edward Mahoney.*

launch PURDUE's new Hysingla opioid: the company would: *"Leverage PURDUE's existing, experienced sales force to drive uptake with target HCPs"* and *"Add additional contract sales force capacity at launch to drive uptake."*[413] Staff proposed that PURDUE employ 519 sales reps, paid an average salary of $81,300 plus a bonus of up to an additional $124,600 based on sales.[414]

444. Meanwhile, sales staff exchanged news reports of a lawsuit accusing PURDUE of deceptive marketing in Kentucky.[415] They quoted PURDUE's own attorney and Chief Financial Officer stating that the lawsuit was so significant and that the company faced claims of more than a billion dollars that *"would have a crippling effect on PURDUE's operations and jeopardize PURDUE's long-term viability."*[416] PURDUE's communications staff were delighted by the article, because it did not reveal the SACKLERS' role in the misconduct. *"I'm quite pleased with where we ended up. There's almost nothing on the SACKLERS and what is there is minimal and buried in the back."*[417]

445. **In November,** staff reported to the SACKLERS that their sales tactics were working, and the shift away from higher doses of OxyContin had slowed.[418]

446. **In December,** staff told the SACKLERS that PURDUE would pay their family $163,000,000 in 2014 and projected $350,000,000 in 2015.[419]

447. On New Year's Eve, RICHARD SACKLER told staff that he was starting a confidential sales and marketing project on opioid prices and instructed them to meet with him

[413] *2015 Commercial Budget Review, slides 31, 38, 51, 67.*

[414] *2015 Budget Submission, slides 13, 56.*

[415] *2014-10-20 email from John Axelson.*

[416] *2014-10-20 Bloomberg Businessweek report.*

[417] *2014-10-20 email from Raul Damas.*

[418] *2014-11 OxyContin Brand Strategy and Forecast for 2015 ("Strength mix shifting toward lower strengths has slowed with 40-80mg share going from 29% in the 10 Year Plan to 33% in the Budget").*

[419] *2014-12-03 email from Edward Mahoney; and slide 8.*

about it on January 2.[420]

(ix) 2015

448.    Early in the morning of **January 2nd**, staff began scrambling to collect sales data for RICHARD SACKLER.[421] They didn't move quickly enough. Days later, Richard demanded a meeting with sales staff to go over plans for selling the highest doses. Richard asked for an exhaustive examination to be completed within 5 days, including:

> *"unit projections by strength, mg by strength ...*
> *pricing expectations by strength ... individual*
> *strength's market totals and our share going backward*
> *to 2011 or 12 and then forward to 2019 or 2020 ... the*
> *same information for Hysingla ... [and] the history of*
> *OxyContin tablets from launch to the present."[422]*

449.    The CEO stepped in to say the work would take 3 weeks.[423] Richard let him know that wasn't a great response — *"That's longer than I had hoped for"* — and directed marketing staff to start sending him materials immediately.[424]

450.    That same month, the SACKLERS voted to evaluate employees' 2014 performance on a scorecard that assigned the greatest value to the volume of PURDUE opioid sales. Employees were expected to generate more than one-and-a-half billion dollars. The SACKLERS also voted to establish the company's scorecard for 2015: once again, the biggest factor determining employees' payout would be the total amount of PURDUE opioid sales.[425]

451.    **In April**, staff told the SACKLERS that sales of PURDUE's highest dose 80mg OxyContin were down 20% and that the average prescription had declined by eight pills

---

[420] *2014-12-31 email from Richard Sackler.*
[421] *2015-01-02 email from Saeed Motahari.*
[422] *2015-01-07 email from RICHARD SACKLER.*
[423] *2015-01-08 email from Mark Timney.*
[424] *2015-01-08 email from RICHARD SACKLER. Mark Timney had started as CEO a year earlier with the idea that he could "separate Board interaction from the organization" so the SACKLERS would stop directing sales staff. 2014-01-29 email from Mark Timney. That effort failed.*
[425] *2015-01-16 Board minutes.*

since 2011.

452.    **In August,** the New York Attorney General's Office entered into an Assurance of Discontinuance ("AOD") with PURDUE.[426] The subject matter of the AOD was narrow and focused on PURDUE's failure to identify instances of possible abuse, diversion, or inappropriate prescribing occurring at the prescriber offices that were visited by its sales representatives. The AOD also addressed PURDUE's support of an unbranded website, *"In the Face of Pain,"* which promoted opioid use and featured testimonials of persons paid by PURDUE (but not disclosed). As part of the AOD, PURDUE pledged to strengthen its oversight of its sales representatives, bolster its identification and response to signs of abuse, diversion, or inappropriate prescribing by removing prescribers from its sales call lists, and disclose its financial arrangements with individuals on its unbranded websites. The AOD, signed by Abrams (who served as Vice President and Associate General Counsel for both PPI and PPLP), recited New York's findings that PURDUE used misleading materials to promote its opioids and aggressively promoted its opioids to high-prescribing doctors who were later arrested for illegal prescribing.

453.    Even after PURDUE entered into an agreement with the State of New York to resolve an investigation of its opioid business and despite its pledges to improve its conduct, PURDUE continued to aggressively promote its drugs directly through in-person marketing visits to healthcare providers and facilities.

454.    The SACKLERS voted to expand the sales force by adding another 122 reps.[427] As with every reference to "the SACKLERS", after July 2012, that includes Beverly, David,

---

[426] http://www.ag.ny.gov/pdfs/ PURDUE-AOD-Executed.pdf
[427] *2015-04-21 Board materials ("It was decided to move forward with an expansion of the sales force by 122 reps"); 2015-05-04 Strategic Plan Update, slide 5; 2015-04-21 Board decision.*

Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

455.    Staff told the SACKLERS the additional reps would increase net sales of opioids by $59,000,000.[428]

456.    **In October,** PURDUE executives identified avoiding investigations of PURDUE's opioid marketing as a *"Key Activity"* in the company's Operational Plan.

457.    **In November,** the SACKLERS voted on the budget for PURDUE for 2016.[429] Staff warned the SACKLERS that public concern about opioids could get in the way of PURDUE's plans. Staff again told the SACKLERS that two of the most significant challenges to PURDUE's plans were doctors not prescribing enough of the highest strength opioids and including too few pills in each prescription. Staff told the SACKLERS that declining prescriptions of the highest doses and fewer pills per prescription would cost PURDUE $77,000,000.[430]

458.    Staff proposed to the SACKLERS that, for 2016, PURDUE would plan for prescribers to average 60 pills of PURDUE opioids per prescription. They told the SACKLERS that they would aim to make enough of those pills be high doses to make the average per pill 33 milligrams of oxycodone.[431] That way, PURDUE could hit its target for the total kilograms of oxycodone it wanted to sell.

459.    To make sure PURDUE hit the targets, staff told the SACKLERS that sales reps were visiting prescribers 21% more often than before. Staff told the SACKLERS that they had aggressively reviewed and terminated reps who failed to generate prescriptions. Staff reported to the SACKLERS that, in 2015 alone, PURDUE replaced 14% of its sales reps and

---

[428]  *2015-04-21 Board materials.*

[429]  *2015-11-21 email from Stuart Baker.*
[430]  *2015-11 budget for 2016, slides 16, 28, 44.*
[431]  *2015-11 budget for 2016, slide 41.*

20% of its District Managers for failing to create enough opioid sales.[432]

460. Looking ahead, staff told the SACKLERS that *"the 2016 investment strategy focuses on expanding the Sales Force."* They reported that the proposed budget for sales and promotion was $11,600,000 higher than 2015, *"primarily due to the Sales Force expansion."* The top priority for the sales reps would be to visit the highest-prescribing doctors again and again. Staff proposed to the SACKLERS that the #1 overall priority for 2016 would be to sell OxyContin through "disproportionate focus on key customers." They told the SACKLERS that sales reps would also target prescribers with the lowest levels of training, physician's assistants and nurse practitioners, because they were "the only growing segment" in the opioid market.[433] PURDUE executives expected that, each quarter, the sales reps would visit prescribers more than 200,000 times and would get 40,000 new patients onto PURDUE opioids.[434]

461. **In December**, staff prepared to address wide-ranging concerns raised by the SACKLERS. KATHE and MORTIMER SACKLER wanted staff to break out productivity data by indication versus prescriber specialty for each drug. RICHARD SACKLER sought details on how staff was calculating 2016 mg/tablet trends. JONATHAN SACKLER sought a follow-up briefing on how public health efforts to prevent opioid addiction would affect OxyContin sales.[435]

462. **In December**, PURDUE agreed to pay Kentucky $24 million over the next eight years as part of the settlement of a long-running lawsuit that accused the company of misleading the public about the addictiveness of the powerful prescription drug. Kentucky

---

[432] *2015-11 budget for 2016, slides 7, 39. PURDUE fired 107 sales reps in 2015.*

[433] *2015-11 budget for 2016, slides 24, 26, 49.*

[434] *2015-11-03 email from Zach Perlman, Executive Committee materials, slide 36.*

[435] *2015-12-09 email from Zach Perlman attaching Executive Committee presentation, slides 12-13.*

officials accused PURDUE of marketing the prescription painkiller as nonaddictive because it was a pill that, when swallowed, slowly released the drug over 12 hours. However, users soon discovered if they crushed the pill the drug lost its time release qualities and created an instant high. *"Purdue Pharma created havoc in Kentucky, and I am glad it will be held accountable,"* Attorney General Jack Conway was quoted as saying, at that time, in a news release. Conway further said: *"Purdue lit a fire of addiction with OxyContin that spread across this state, and Kentucky is still reeling from its effects."* The agreement said PURDUE will pay Kentucky $12 million followed by another $12 million over the next eight years. The court ordered the state to spend the money on addiction treatment programs[436] That same year, director RICHARD SACKLER was deposed under oath in a suit alleging that PURDUE deceived doctors and patients about its opioids.

463.    Before the year ended, the SACKLERS were invited to a *"Beneficiaries Meeting"* where PURDUE staff reported to Sackler family members about the company's efforts to sell opioids.[437]

(x) 2016

464.    **In 2016**, the SACKLERS met with the Board in January, March, April, June, August, October, November, and December.[438]

465.    **In March**, in response to adverse outcomes from prescription opioids, the CDC released the *Guideline for Prescribing Opioids for Chronic Pain* to try to stop dangerous opioid prescribing.[439] Several opioid prescribing practices were decreasing before the CDC

[436] *https://www.cbsnews.com/news/kentucky-settles-lawsuit-with-oxycontin-maker-for-24-million/*
[437] *2015-10-28 email from Stuart Baker; see also November 2013 Beneficiaries Meeting.*

[438] *2016-05-19 Executive Committee pre-read (Board schedule for 2016).*
[439] *https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm*

guideline, but the time of its release was associated with a greater decline. It was believed that the guidelines might be effective in changing prescribing practices.[440]

466.    **In April,** the SACKLERS considered exactly how much money was riding on their strategy of pushing higher doses of opioids. The month before, the U.S. Centers for Disease Control announced guidelines to try to slow the epidemic of opioid overdose and death. The CDC urged prescribers to avoid doses higher than 30mg of PURDUE's OxyContin twice per day. The CDC discouraged twice-a-day prescriptions of all three of PURDUE's most profitable strengths - 40mg, 60mg, and 80mg. Staff studied how much money PURDUE was making from its high dose strategy and told the SACKLERS that profits were at risk each year.[441]

467.    **In May,** RICHARD SACKLER told staff to circulate a *New York Times* story reporting that opioid prescriptions were dropping for the first time since PURDUE launched OxyContin twenty years earlier. The *Times* wrote: *"Experts say the drop is an important early signal that the long-running prescription opioid epidemic may be peaking, that doctors have begun heeding a drumbeat of warnings about the highly addictive nature of the drugs."* The only person quoted in favor of *more* opioid prescribing was a Massachusetts professor whose program at Tufts University was funded by the SACKLERS.[442]

468.    **In June,** the SACKLERS met to discuss a revised version of *Project Tango* - another try at profiting from the opioid crisis. This time, they considered a scheme to sell the overdose antidote NARCAN. The need for NARCAN to reverse overdoses was rising so fast

---

[440] https://annals.org/aim/fullarticle/2698111/opioid-prescribing-united-states-before-after-centers-disease-control-prevention
[441] 2016-04-13 Q1 2016 Commercial Update, slide 74.
[442] 2016-05-21 email from RICHARD SACKLER; 2016-05-20 "Opioid Prescriptions Drop for First Time in Two Decades," by Abby Goodnough and Sabrina Tavernise. The opioid advocate was Dr. Daniel B. Carr, director of Tufts Medical School's program on pain research education and policy.

that the SACKLERS calculated it could provide a growing source of revenue, tripling from 2016 to 2018.



*Board presentation showing potential sales from acquiring NARCAN*

469.    Like *Tango*, PURDUE's analysis of the market for NARCAN confirmed that they saw the opioid epidemic as a money-making opportunity and that the SACKLERS understood - in private, when no one was watching - how PURDUE's opioids put patients at risk. The SACKLERS identified a *"strategic fit"* because NARCAN is a *"complementary"* product to PURDUE opioids. They specifically identified patients on PURDUE's prescription opioids as the target market for NARCAN. Their plan called for studying *"long-term script users"* to *"better understand target end-patients"* for NARCAN. Likewise, they identified the same doctors who prescribed the most PURDUE opioids as the best market for selling the overdose antidote; they planned to *"leverage the current PURDUE sales force"* to *"drive direct promotion to targeted opioid prescribers."* Finally, they noted that PURDUE could profit from government efforts to use NARCAN to save lives, including specifically in Kentucky.[443]

470.    That same month, staff presented the 2016 Mid-Year Update. They warned the

---

[443] *2016-05-27 email from Stuart Baker; 2016-06 Board Book slides 46-49, 114. They planned to "Segment opioid patients to better understand target end-patients (e.g., long-term script users)."*

SACKLERS that shifts in the national discussion of opioids threatened their plans. The deception that PURDUE had used to conceal the risks of opioids was being exposed. Staff summarized the problems on a slide:[444]

| Critical Shifts in The National Discussion about Pain And Opioids | |
| --- | --- |
| **From** | **To** |
| Undertreatment of Pain | Opioid Epidemic |
| Abuse | Addiction |
| Criminal | Victim |
| FDA | CDC |
| Benefits Outweigh Risks | Lack of Long-Term Evidence |
| ADFs as Part of Solution | ADF Value Unproven |

*2016 Mid-Year Board Update*

471.    *First*, to convince doctors to prescribe dangerous opioids, PURDUE promoted its drugs as the solution to *"undertreatment of pain."* RICHARD SACKLER made sure that PURDUE bought the internet address *5thvitalsign.com* so it could promote pain as the *"fifth vital sign"* (along with temperature, blood pressure, pulse, and breathing rate) to expand the market for opioids.[445]  But now, staff reported to the SACKLERS, doctors and patients were starting to worry more about the epidemic of opioid addiction and death.[446]

472.    *Second*, to conceal the danger of addiction, PURDUE falsely blamed the terrible consequences of opioids on drug abuse. One of PURDUE's key messages argued:

---

[444] *2016-06-08 Mid-Year Update, slide 18. "ADF" on the slide refers to abuse-deterrent formulations of opioids, such as PURDUE's crush-resistant OxyContin, which do not prevent addiction.*

[445] *1999-06-14 email from RICHARD SACKLER.*
[446] *2016-06-08 Mid-Year Update, slide 18.*

*"It's not addiction, it's abuse."*[447]  But now, staff reported to the SACKLERS, doctors and patients were realizing that *addiction* was a true danger.[448]

473. *Third*, to avoid responsibility for PURDUE's dangerous drugs, the SACKLERS chose to stigmatize people who were hurt by opioids, calling them *"junkies"* and *"criminals."* RICHARD SACKLER wrote that PURDUE should *"hammer"* them in every way possible.[449] But now, staff reported to the SACKLERS, Americans were seeing through the stigma and recognizing that millions of families were victims of addictive drugs. Staff told the SACKLERS that nearly half of Americans reported that they knew someone who had been addicted to prescription opioids.[450]

474. *Fourth*, the SACKLERS had long sought to hide behind the approval of PURDUE's drugs by the FDA. But FDA approval could not protect the SACKLERS when their deceptive marketing led thousands of patients to become addicted and die. The U.S. Centers for Disease Control ("CDC") reported that opioids were, indeed, killing people. The CDC Director said: *"We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently."*[451]

475. **In July**, President Barack Obama signed into law the Comprehensive Addiction and Recovery Act (P.L. 114-198). The nation's first major federal addiction legislation in 40 years that authorized funding to fight the opioid epidemic through prevention, treatment, recovery, law enforcement, criminal justice reform, and overdose reversal.

476. Even in the face of mounting pressure, staff told the SACKLERS that the sales

---

[447] *2008-05-16 email from Pamela Taylor; 2008-04-16 Executive Committee notes; 2008-04-16 presentation by Luntz, Maslansky Strategic Research, slide 28.*
[448] *2016-06-08 Mid-Year Update, slide 18*
[449] *2001-02-01 email from RICHARD SACKLER ("we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals.").*
[450] *2016-06-08 Mid-Year Update, slides 18, 20.*
[451] *2016-03-15 briefing by CDC Director Tom Frieden.*

team was focusing on the doctors who prescribe the most opioids.[452]

477.    **In November**, staff prepared statements to the press denying the SACKLERS' involvement in PURDUE. Their draft claimed: *"Sackler family members hold no leadership roles in the companies owned by the family trust."*[453] That was a lie. SACKLER family members held the controlling majority of seats on the Board and, in fact, controlled the company. A staff member reviewing the draft knew what was up and commented with apparent sarcasm: *"Love the ... statement."*[454] Staff eventually told the press: *"Sackler family members hold no management positions."*[455]

478.    Some employees worried about the deception. When journalists asked follow-up questions about the SACKLERS, communications staff deliberated about whether to repeat the *"no management positions"* claim. They double-checked that PURDUE's top lawyers had ordered the statement. Then they arranged for one of the SACKLERS' foreign companies to issue it, so U.S. employees would not be blamed: *"The statement will come out of Singapore."*[456]

479.    **In December**, RICHARD, JONATHAN and MORTIMER SACKLER had a call with staff about another revised version of *Project Tango*. The new idea was to buy a company that treated opioid addiction with implantable drug pumps.[457] The business was *a "strategic fit,"* because PURDUE sold opioids and the new business treated the *"strategically adjacent indication of opioid dependence."*[458]

---

[452] *2016-06-08 Mid-Year Update, slide 26 ("Protect OxyContin share among high decile HCPs").*
[453] *2016-11-03 email from Robert Josephson.*
[454] *2016-11-03 email from Raul Damas ("Love the second statement" – it was the second of two statements in the draft).*
[455] *2016-11-28 email from Robert Josephson.*
[456] *2016-12-01 emails from Robert Josephson and Raul Damas.*
[457] *2016-12-22 email from Elliott Ruiz.*
[458] *2016-12-22 Braeburn Pharmaceuticals: Structuring Analysis, slide 3.*

480. Notwithstanding, the SACKLERS kept searching for a way to expand their business by selling both addictive opioids and treatment for opioid addiction.

**(xi) 2017**

481. **In 2017**, the SACKLERS met with the Board in February, March, April, June, July, August, October, November, and December.[459]

482. **In April**, the Trump Administration announced nearly $500 million in grants to all 50 states over several years through the 21st Century Cures Act.[460]

483. **In May 2017**, staff told the SACKLERS that an independent nonprofit had concluded that PURDUE's reformulation of OxyContin was not a cost-effective way to prevent opioid abuse.[461] THERESA SACKLER asked staff what they were doing to fight back to convince doctors and patients to keep using the drug.[462]

484. That same month, the SACKLERS were looking for a new CEO. Long-time employee Craig Landau wanted the job and prepared a business plan titled *"SACKLER PHARMA ENTERPRISE."* Landau was careful to acknowledge their power: he acknowledged that PURDUE operated with *"the Board of Directors serving as the 'de facto' CEO."* He proposed that PURDUE should take advantage of other companies' concerns about the opioid epidemic through an *"opioid consolidation strategy"* and become an even more dominant opioid seller *"as other companies abandon the space."*[463] The SACKLERS made him CEO a few weeks later.

485. **In June**, staff told the SACKLERS that getting doctors to prescribe high doses

---

[459] *2017 heavily redacted Board minutes; 2017-01-02 Governance Calendar.*

[460] *http://htnys.org/include/docs/2017_ha713_opiod_white_paper.pdf*

[461] *2017-05-06 email from Gail Cawkwell.*

[462] *2017-05-06 email from Theresa Sackler.*

[463] *2017-05-02 Landau presentation.*

of opioids and many pills per prescription were still key *"drivers"* of PURDUE's profit. PURDUE's management was concerned that the CDC's efforts to save lives by reducing doses and pill counts would force the company *"to adjust down our revenue expectations."*[464]

486.   Staff told the SACKLERS that PURDUE's opioid sales were being hurt by cultural trends such as the HBO documentary, *"Warning: This Drug May Kill You."*[465] HBO's film was a problem for PURDUE because it showed actual footage from PURDUE's misleading advertisements next to video of people who overdosed and died.[466]

487.   Staff felt the pressure of the opioid epidemic, even if the billionaire SACKLERS did not. In one presentation, staff came close to insubordination and told the SACKLERS: *"PURDUE Needs a New Approach."* Their suggestion for a new direction was: *"A New Narrative: Appropriate Use."*



488.   The SACKLERS led PURDUE so far into the darkness that employees proposed *"appropriate use"* of drugs to reinvent the company. Staff also suggested that the

---

[464] *2017-06 Board of Directors: PURDUE Mid-Year Pre-Read, slides 2, 152.*
[465] *2017-06 Board of Directors: PURDUE Mid-Year Pre-Read, slide 6.*

[466] *2017-05-01 "Warning: This Drug May Kill You Offers a Close-Up of the Opioid Epidemic"*

SACKLERS create a family foundation to help solve the opioid crisis.[467]

489. The SACKLERS did not redirect the company toward appropriate use or create the suggested family foundation. Instead, they decided to sell harder. For 2018, the SACKLERS approved a target for sales reps to visit prescribers 1,050,000 times - almost double the number of sales visits they had ordered during the heyday of OxyContin in 2010.[468]

490. **In October**, President Donald Trump declared the opioid crisis a national public health emergency.[469]

491. That same month, RICHARD SACKLER learned that insurance company Cigna had cut OxyContin from its list of covered drugs and replaced it with a drug from PURDUE's competitor, Collegium. Richard read that Collegium had agreed to encourage doctors to prescribe lower doses of opioids, and Collegium's contract with Cigna was designed so Collegium would earn *less* money if doctors prescribed high doses. Cigna announced that opioid companies influence dosing: *"While drug companies don't control prescriptions, they can help influence patient and doctor conversations by educating people about their medications."* Richard's first thought was revenge. He immediately suggested that PURDUE drop Cigna as the insurance provider for the company health plan.[470]

492. On October 17, BEVERLY SACKLER served her last day on the Board.[471] It was the beginning of the end for the Sackler family. A week later, the *New Yorker* published an article entitled *"The Family That Built an Empire of Pain."*[472] The story quoted a former

---

[467] *2017-06 Board of Directors: PURDUE Mid-Year Pre-Read, slides 36-38.*

[468] *2017-06 Board of Directors: PURDUE Mid-Year Pre-Read, slide 147.*

[469] *Press Release, The White House Office of the Press Sec'y, President Donald J. Trump Is Taking Action on Drug Addiction and the Opioid Crisis (Oct. 26, 2017), https://www.whitehouse.gov/the-press-office/2017/10/26/president-donald-j-trump-taking-action-drug-addiction-and-opioid-crisis.*

[470] *2017-10-07 email from RICHARD SACKLER.*

[471] *Declaration of Beverly Sackler dated September 5, 2018.*

[472] *2017-10-23 email from Robert Josephson.*

FDA Commissioner: *"the goal should have been to sell the least dose of the drug to the smallest number of patients."* The reporter concluded: *"PURDUE set out to do exactly the opposite."*[473]

493.　**In November,** JONATHAN SACKLER suggested that PURDUE launch yet another opioid.[474] Staff promised to present a plan for additional opioids at the next meeting of the Board.[475] At the Board meeting that month, the remaining Sackler Board members (RICHARD, DAVID, ILENE, JONATHAN, KATHE, MORTIMER, and THERESA SACKLER) voted to cut the sales force from 582 reps to 302 reps. They knew sales reps would continue to promote opioids in Kentucky. Staff even gave RICHARD, DAVID, ILENE, JONATHAN, KATHE, MORTIMER, and THERESA SACKLER a map of where the remaining sales reps worked, with Kentucky shaded to show that PURDUE would keep visiting prescribers there.[476]

[473] *2017-10-23 email from Robert Josephson.*
[474] *2017-11-21 email from Jonathan Sackler.*
[475] *2017-11-21 email from Craig Landau.*
[476] *2017-11 Board budget, slides 47, 51.*



*PURDUE internal map of planned sales rep territories for 2018*

### (xii) 2018

494.    Even after PURDUE made agreements with federal and state authorities, including, Kentucky State, and despite its pledges to improve its conduct, they continued to aggressively promote its drugs directly through in-person marketing visits to healthcare providers and facilities.

495.    **In January 2018**, RICHARD SACKLER received a patent for a drug to treat opioid addiction — his own version of *Project Tango*. Richard had applied for the patent in 2007. He assigned it to a different company controlled by the Sackler family, instead of PURDUE. Richard's patent application says opioids *are* addictive. The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of

treating addiction.[477]

496. In January, RICHARD SACKLER also met with PURDUE staff about the sales force again. They discussed plans to cut the force to 275 reps. In February, Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler decided to lay off 300 sales reps.[478]

497. **In February**, in response to investigations and litigation by the OAG and other state and local governments, PURDUE announced it would stop marketing opioids directly to prescribers.[479]

498. **By April**, staff were scared. RICHARD SACKLER was again asking questions about sales. Staff prepared a presentation for the Board of Directors ("BoD"). One employee suggested that they add more information about the company's problems. Another cautioned against that:

> *"I think we need to find a balance between being clear about what reality looks like - which I certainly support in [this] situation - and just giving so much bad news about the future that it just makes things look hopeless. Let's not give the BoD a reason to just walk away."*[480]

499. **On May 3** and again on **June 6 and 8**, all seven remaining SACKLERS attended meetings of the Board: RICHARD, DAVID, ILENE, JONATHAN, KATHE, MORTIMER, and THERESA SACKLER.[481]

500. **On June 12, 2018**, the Massachusetts Attorney General filed a lawsuit to hold

---

[477] 2018-01-09, U.S. Patent No. 9,861,628 ("a method of medication-assisted treatment for opioid addiction"); 2007- 08-29, international patent publication no. WO 2008/025791 Al.

[478] 2018-01-18 email from Jon Lowne; 2018 budget; 2018-02-07 email from Craig Landau; 2018-02-01 entirely redacted Board minutes.

[479] In February 2018, in response to investigations and litigation by the OAG and other state and local governments, Purdue announced it would stop marketing opioids directly to prescribers. http://www.purduepharma.com/news-media/2018/02/purdue-pharma-l-p-issues-statement-on-opioid-promotion/.

[480] 2018-04-10 email from Paul Medeiros.

[481] 2018-05-03 heavily redacted Board minutes (all present in person); 2018-06-06 heavily redacted Board minutes; 2018-06-08 heavily redacted Board minutes.

the SACKLERS as well as PURDUE accountable. Just as their employees predicted, the SACKLERS tried to run. RICHARD SACKLER was the first to go: he resigned from the Board in July. DAVID SACKLER quit in August. THERESA SACKLER served her last day in September.[482]

501. Upon information and belief, as of the date of this filing, Ilene, Jonathan, Kathe, and Mortimer remain on the Board of Directors of PURDUE.

### d. The PURDUE Directors, CEOs and Other Executives Directed the Deception

502. The directors and CEO knew about, allowed, and directed PURDUE's deception. They oversaw PURDUE's scheme to send sales representatives to visit doctors thousands of times. They oversaw PURDUE's scheme to hire top prescribers to promote its opioids. They oversaw PURDUE's effort to get more patients on higher doses of opioids for longer periods.

503. The directors and CEO of PPI controlled PPLP. The quarterly reports distributed to the directors and CEO of PPI demonstrated that the directors and CEO in fact controlled both PPI and PPLP. The reports do not distinguish between the companies but instead refer to "Purdue." The reports detail the activities that were undertaken by both companies in the areas "Finance," "Sales & Marketing," "Manufacturing & Supply Chain," "Quality," "Research & Development," "Discovery Research," "Licensing & Business Development," "Corporate Compliance," "External Affairs," "Health Policy," "Human Resources," and "Information Technology" — all of which were overseen by the directors and CEO of PPI. Indeed, the CEO of the two companies were the same.

504. The directors and CEO oversaw PURDUE's sales representatives.

---

[482] *2018-09-05 declaration of David Sackler; 2018-09-07 declaration of Theresa Sackler.*

Director/Defendant RICHARD SACKLER testified that the sales representatives were the main way that PURDUE promoted its opioids. He testified that the key to getting doctors to prescribe and keep prescribing PURDUE's opioids was regular visits from the sales force. The board tracked the exact number of sales representatives[483] and the exact number of visits they made to urge doctors to prescribe PURDUE's opioids[484]. The board knew which drugs were promoted[485]; how many visits sales representatives averaged per workday[486]; how much each visit cost Purdue[487]; and the company's plan for sales visits in each upcoming quarter[488]. The Board approved specific plans to hire new sales representatives, hire and promote new District and Regional managers, and create sales "territories" in which representatives would target doctors[489].

505.    The directors and CEO oversaw the tactics that sales representatives used to push opioids. A board report analyzed a PURDUE initiative to use iPads during sales visits, which increased the average length of the sales meeting with the doctor to "16.7 minutes in front of the customer."[490]

506.    The directors and CEO oversaw promotional claims that representatives presented to doctors during sales visits. They received reports, for example, that a "review of call notes" recorded by PURDUE's sales representatives "suggested potential comparative

---

[483] *Specific board reports presenting this information to the directors and CEO were sent in July, 2007, April 2010, July 2010, October 2010, January 2011, August 2011, November 2011, November 2012 and July 2013. Upon information and belief, Purdue produced these particular reports to the Attorney General of the Commonwealth of Massachusetts's Office because they include key words used in a document collection search. Upon information and belief, the Defendants possess additional quarterly reports and related documents which have not been received.*
[484] *April 2010, July 2010, October 2010, January 2011, August 2011, November 2011, November 2012 and July 2013.*
[485] *Id.*
[486] *Id.*
[487] *April 2010, July 2010, October 2010, January 2011*
[488] *April 2010, July 2010, October 2010, January 2011, August 2011, November 2011, November 2012 and July 2013*
[489] *January 2011*
[490] *Id.*

claims of superiority of Purdue products relative to competitors,"[491] and deceptive promotion of opioids as treatment for "minor pain,"[492] including hundreds of examples of deceptive marketing that required "extensive remedial actions."[493]

507. The directors and CEO oversaw PURDUE's research, including research that contradicted its marketing. The board received reports about studies of PURDUE's opioids in "opioid-naïve" patients and patients with osteoarthritis, down to the details of the strategy behind the studies and the enrollment of the first patients.[494]

508. The directors and the CEO oversaw PURDUE's improper response to signs of "abuse and diversion" by high-prescribing doctors. The board was told exactly how many "Reports Of Concern" PURDUE's sales representatives submitted to the company about doctors they visited to promote opioids (572 Reports Of Concern in the July 2007 board report); how many "field inquiries" PURDUE had decided to conduct in response to the reports (21 inquiries in response to 572 Reports Of Concern); and even that six Reports Of Concern were submitted in Massachusetts.[495]

509. The directors and CEO even monitored sales representatives' emails. PURDUE held thousands of face-to-face sales meetings with doctors, but the company prohibited its sales representatives from writing emails to doctors, which could create evidence of PURDUE's misconduct. When PURDUE found that some sales representatives had emailed doctors, the company conducted an "investigation" and reported to the board that sales representatives had been disciplined and that their emails would be discussed at the board

---

[491] *October 2010*
[492] *Id.*
[493] *Id.*
[494] *July 2007*
[495] *Id.*

meeting.[496]

510. The directors and CEO also oversaw PURDUE's strategy to pay high prescribers to promote PURDUE's opioids, like Walter Jacobs - the Massachusetts doctor who prescribed $3 million of opioids for Purdue before he lost his medical license. A report for the board listed the exact number of conferences and dinner meetings, with attendance figures, and assured the directors: "We are tracking the prescribing trends of these attendees following the programs and will report the results in future reports."[497] The board was told the amounts paid to certain doctors (for example, that a doctor was paid $29,000 in the first half of 2012), and they received detailed reports on the Return On Investment that PURDUE gained from paying doctors to promote its drugs. The board was told that PURDUE would allow a "spending limit for gifts" of $750 per doctor per year[498]; and that the directors should personally report when they gave money, meals, or gifts to doctors to promote PURDUE's drugs[499]. The board was told explicitly that paying doctors to promote opioids was "a high risk activity, in view of the potential for off-label or other improper promotional conduct by third parties during such activities."[500] When Congress required disclosure of drug company payments to doctors, the board was told there were "significant compliance implications" for PURDUE.[501]

511. The directors and CEO also oversaw PURDUE's strategy to push patients to higher doses of opioids - which are more dangerous, more addictive, and more profitable. The board routinely received reports on PURDUE's efforts to push patients to higher doses. A report alerted the board that "Net sales of the 40 and 80 mg strengths of OxyContin" had fallen

---

[496] *August 2011*
[497] *November 2011*
[498] *July 2007*
[499] *July 2013*
[500] *August 2011, November 2011*
[501] *April 2010*

below PURDUE's targets in the fall of 2010 and were $85 million below budget.[502] By summer, the board learned that income was $500 million below budget "mainly due to declining sales in 40 mg and 80 mg strengths."[503] By fall, the board reviewed an assessment that Purdue had lost more than $800 million in revenue because patients weren't taking enough 40 mg and 80 mg doses.[504] The board dug into the issue. Multiple reports to the board identified as a "threat" an initiative by public health authorities to save lives by requiring doctors to consult with pain specialists before prescribing opioid doses higher than 80mg/day.[505] The CEO and directors oversaw PURDUE's effort to push back against that public health "threat."[506] Executives were pleased to report to the directors in 2013 that "initiatives to validate increased total daily doses are having impact in the field."[507]

512.    The directors and CEO also oversaw PURDUE's scheme to use higher doses of opioids to keep patients on drugs for longer periods of time. The board received detailed reports of how many patients stayed on PURDUE's opioids for long periods (for example, longer than 35 days)[508], along with PURDUE's internal research showing that getting patients on higher doses keeps them on the drugs longer[509] - all of which puts patients at greater risk of addiction and death. The board received the confidential results of a study of 57,000 patients that PURDUE performed explicitly to determine how opioid dose "influences patient length of therapy."[510] The results showed that patients on the highest doses "are the most persistent." The "Recommended Actions" presented to the board included "additional workshops for the

---

[502] January 2011
[503] August 2011
[504] November 2011
[505] April 2010, July 2010, October 2010, November 2011
[506] Id.
[507] May 2013 email for board meeting in June 2013
[508] July 2013
[509] Id.
[510] November 2012

sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer.

513. The board was told in writing that encouraging higher doses "is a focal point of our promotion,"[511] and that sales representatives would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment.[512] The board even tracked specific sales materials, such as "two new patient profiles designed to improve patient identification and titration" – to get more opioid-naïve and elderly patients on higher doses of opioids for longer periods of time.[513] The board was told the exact research behind the sales strategy: higher doses would keep patients on drugs longer because PURDUE had found that "83% of patients who discontinued were never titrated to higher doses."[514] The directors and CEO knew or should have known that PURDUE's sales strategy was deceptive and that putting patients on opioids at higher doses and for longer periods increased the risk of addiction, overdose, and death.

514. The directors and CEO also oversaw PURDUE's strategy of using "savings cards" to get patients on PURDUE's opioids for longer periods. The board knew how many thousands of cards were used each quarter,[515] how the company calculated the Return On Investment[516], and that the explicit goal of the program was to hook patients to "remain on therapy longer."[517] The directors and CEO knew or should have known that Purdue's sales strategy was deceptive and that putting patients on opioids at higher doses and for longer periods increased the risk of addiction, overdose, and death.

---

[511] Id.
[512] Id.
[513] July 2013
[514] Id.
[515] November 2012, July 2013
[516] November 2012.
[517] July 2013

515.    The directors and CEO also oversaw PURDUE's strategy to target prescribers who did not have special training in opioids (primary care doctors, nurse practitioners, and physician assistants) because the "show the highest responsiveness" to PURDUE's sales push.[518] PURDUE continued this strategy even though the DEA had expressed concern that PURDUE was promoting opioids to clinicians who were not adequately trained in pain management. The directors and CEP also oversaw PURDUE's strategy to target elderly patients by promotion "targeted to HCPs that practice in the long term care setting"[519] even down to the details of advertising that "leverages images of older patients."[520] The directors and CEO knew or should have known that PURDUE's sales strategy was deceptive and that targeting primary care doctors and elderly patients increased the risk of addiction, overdose, and death.

516.    The directors and CEO also oversaw PURDUE's push to steer patients away from safer alternatives. They tracked the company's efforts to emphasize "the true risk and cost consequence of acetaminophen-related liver toxicity."[521] The board even oversaw PURDUE's deceptive website practices.[522]

517.    The directors and CEO also oversaw PURDUE's response to signs that patients were being harmed. Reports of harm cane in by the hundreds and even thousands. One board report explained that "in excess of 5,000 cases with alleged adverse events have already been received and processed by Drug Safety and the Litigation Support group" during a single quarter.[523]

---

[518] *Id.*
[519] *Id.*
[520] *Id.*
[521] *May 2013 email for board meeting in June 2013*
[522] *April 2010, July 2010, October 2010, January 2011*
[523] *July 2007*

518.     PURDUE documents show that each of the reports discussed above was sent to every individual on the board at the time. Specifically, Defendants, RICHARD S. SACKLER, JONATHAN D. SACKLER, MORTIMER, D.A. SACKLER, KATHE A. SACKLER, ILENE SACKLER LEFCOURT, BEVERLY SACKLER, THERESA SACKLER and STUART D. BAKER, were sent all of the reports discussed above in July 2007, April 2010, July 2010, October 2010, January 2011, August 2011, November 2011, November 2012 and July 2013. Defendant, DAVID A. SACKLER, was sent the board reports in November 2012 and July 2013.

**B.     _Actavis-Related Entities_**

519.     Defendant ALLERGAN USA. INC., at all relevant times, manufactured, promoted, sold and/or distributed prescription drugs, including opioids, in Plaintiff's community, throughout Kentucky and throughout the United States.

520.     ALLERGAN Plc, ACTAVIS Plc, ALLERGAN FINANCE, LLC f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC., ALLERGAN USA. INC. WATSON LABORATORIES, INC. ACTAVIS LLC, and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., shall collectively be referred to as "ACTAVIS".

521.     Any and all allegations against ACTAVIS in the Plaintiff's existing Complaint is expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall specifically include ALLERGAN Plc, ACTAVIS Plc, ALLERGAN FINANCE, LLC f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC., ALLERGAN USA. INC., WATSON LABORATORIES, INC. ACTAVIS LLC, ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., and their DEA registrant subsidiaries and affiliates.

## C.     *Other Manufacturers of Prescription Opioid Drugs*

### 1.     *Hikma/West-Ward Entities*

522.     Defendant HIKMA/WEST-WARD merged with Roxane Laboratories, Inc. after the latter's acquisition by Hikma Pharmaceuticals Plc, and manufactures, promotes, sells, and distributes—or at times relevant to this Complaint, manufactured, promoted, sold, and distributed—branded and generic opioid pharmaceutical products nationally and in the Plaintiff's community. Before its acquisition, Roxane Laboratories manufactured, promoted, sold, and distributed branded and generic opioid products nationally and in the Plaintiff's community.

523.     For profit sake, Defendant HIKMA/WEST-WARD took advantage of the lucrative market for chronic pain patients and developed a well-funded marketing scheme based on deceptive practices. Defendants spread their false and deceptive statements by marketing their branded opioids directly to physicians and their patients nationally and in Plaintiff's community.

524.     Defendant HIKMA/WEST-WARD, upon information and belief, engaged in deceptive marketing practices and made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy and/or treatment as safe and effective for long term use for high risk patients;

157

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that their opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through their own unbranded publications and on internet sites they sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid paid consultant doctors, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain and opioid addiction;

- Developing and disseminating scientific studies that deceptively concluded their opioids are safe and effective for the long-term treatment of chronic non-cancer pain and addiction and that their opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid paid consultant doctors that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain and addiction, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic noncancer pain and addiction nationally and in Plaintiff's community to prescribers through in-person detailing.

## 2. *Indivior Entity*

525.     Defendant INDIVIOR manufactures, markets and/or distributes opioid drugs in the United States, including, sublocade (generic name: buprenorphine) and suboxone (generic name: buprenorphine/naloxone), which are substitution products for opioid addiction.

526.     The Department of Justice recently filed a lawsuit alleging that the drugmakers improperly marketed the opioid addiction treatment Suboxone.[524] The lawsuit claimed that as the period of marketing exclusivity for the tablet form of Suboxone was coming to an end, Reckitt sought U.S. approval of a new patent-protected dissolvable strip version of the drug, which it claimed would be safer and less susceptible to abuse. The company marketed the strip as "safer" for patients and children than the tablets. However, the lawsuit alleges that the dissolvable strip version was inferior to the tablets as it could be more easily diverted for improper purposes and posed an increased risk to children who could put it in their mouths by accident.

527.     For profit sake, Defendant INDIVIOR took advantage of the lucrative market for chronic pain patients and opioid addiction treatment and developed a well-funded marketing scheme based on deceptive practices. Defendants spread their false and deceptive statements by marketing their branded opioids directly to physicians and their patients nationally and in Plaintiff's community.

528.     Defendant INDIVIOR, upon information and belief, engaged in deceptive

---

[524] *https://www.reuters.com/article/us-indivior-lawsuit/u-s-joins-lawsuits-against-indivior-reckitt-over-drug-suboxone-idUSKBN1KT2NW*

marketing practices and made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that their opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through their own unbranded publications and on internet sites they sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid paid consultant doctors, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid paid consultant doctors that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic noncancer pain nationally and in Plaintiff's community to prescribers through in-person detailing.

### 3.  *Mylan Entities*

529.    Defendant MYLAN launched a generic suboxone sublingual film, which is prescribed to treat opioid dependence. Its other generic, opioid-related products include: acetaminophen/codeine phosphate tablet; fentanyl transdermal patch; morphine sulfate extended release tablet; naloxone hydrochloride injection; and tramadol hydrochloride extended release tablet.

530.    Defendant MYLAN has received a Department of Justice subpoena into its opioid business according to a quarterly securities filing.[525] In the Securities and Exchange Commission document, Defendant MYLAN has described the DOJ subpoena as *"seeking information relating to opioids manufactured, marketed or sold by"* the company from the start of 2013 to the end of 2016. The subpoena comes as Defendant MYLAN's opioid sales are already under scrutiny from Sen. Claire McCaskill and as the United States suffers from an

---

[525] *https://www.fiercepharma.com/legal/mylan-discloses-department-justice-subpoena-for-opioid-sales*

addiction epidemic. Earlier this year, Sen. McCaskill set out to learn more about painkiller marketing practices from MYLAN and various other opioid manufacturers, including, Insys and Purdue. In announcing her investigation, Sen. McCaskill said she wants to learn whether the companies had a role in the United States' *"overutilization and overprescription"* of the powerful meds.

531. Defendant MYLAN produces 1% of the country's opioid painkillers, most of which are generic. It's the 17th largest opioid manufacturer in the country.

532. For profit sake, Defendant MYLAN took advantage of the lucrative market for chronic pain patients and developed a well-funded marketing scheme based on deceptive practices. Defendants spread their false and deceptive statements by marketing their branded opioids directly to physicians and their patients nationally and in Plaintiff's community.

533. Defendant MYLAN, upon information and belief, engaged in deceptive marketing practices and made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy and/or treatment as safe and effective for long term use for high risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that their opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through their

own unbranded publications and on internet sites they sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid paid consultant doctors, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain and opioid addiction;

- Developing and disseminating scientific studies that deceptively concluded their opioids are safe and effective for the long-term treatment of chronic non-cancer pain and addiction and that their opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid paid consultant doctors that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain and addiction, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic noncancer pain and addiction nationally and in Plaintiff's community to prescribers through in-person detailing.

4. **Amneal Entities**

534. Defendant AMNEAL, at all relevant times, manufactured, promoted, sold and/or distributed prescription drugs, including opioids, in Plaintiff's community, throughout Kentucky and throughout the United States. Defendant AMNEAL's opioid products include Acetaminophen/Codeine Phosphate USP Tablet, Buprenorphine & Naloxone Tablet, Hydrocodone/APAP Tablet, Hydrocodone/Ibuprofen Tablet, Morphine Sulfate ER Capsule, Oxycodone HCI ER Tablet, Oxycodone HCI USP Tablet, Oxycodone/APAP USP Tablet, Oxymorphone[526] HCI ER Tablet, Tramadol HCI USP Tablet, and Tramadol/APAP USP Tablet.

535. For profit sake, Defendant AMNEAL took advantage of the lucrative market for chronic pain patients and developed a well-funded marketing scheme based on deceptive practices. Defendants spread their false and deceptive statements by marketing their branded opioids directly to physicians and their patients nationally and in Plaintiff's community.

536. Defendant AMNEAL, upon information and belief, engaged in deceptive marketing practices and made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

---

[526] Oxymorphone is the active ingredient in Opana®, which in 2017 the FDA requested Endo remove from the market due to risks of abuse. https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy and/or treatment as safe and effective for long term use for high risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that their opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through their own unbranded publications and on internet sites they sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid paid consultant doctors, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain and opioid addiction;

- Developing and disseminating scientific studies that deceptively concluded their opioids are safe and effective for the long-term treatment of chronic non-cancer pain and addiction and that their opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid paid consultant doctors that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain and addiction, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic noncancer pain and addiction nationally and in Plaintiff's community to prescribers through in-person detailing.

5.    *Sandoz, Inc.*

537.    Defendant SANDOZ, at all relevant times, manufactured, promoted, sold and/or distributed prescription drugs, including opioids, in Plaintiff's community, throughout Kentucky and throughout the United States. Defendant SANDOZ'S opioid products include fentanyl transdermal patch, methadone hydrochloride tablet, acetaminophen/hydrocodone bitartrate tablet, acetaminophen/caffeine/dihydrocodeine bitartrate tablet, acetaminophen/ propoxyphene napsylate tablet, and oxycodone HCI USP tablet.

538.    For profit sake, Defendant SANDOZ took advantage of the lucrative market for chronic pain patients and developed a well-funded marketing scheme based on deceptive practices. Defendants spread their false and deceptive statements by marketing their branded opioids directly to physicians and their patients nationally and in Plaintiff's community.

539.    Defendant SANDOZ, upon information and belief, engaged in deceptive marketing practices and made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy and/or treatment as safe and effective for long term use for high risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that their opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through their own unbranded publications and on internet sites they sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid paid consultant doctors, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain and opioid addiction;

- Developing and disseminating scientific studies that deceptively concluded their opioids are safe and effective for the long-term treatment of chronic non-cancer pain and addiction and that their opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid paid consultant doctors that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and addiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain and addiction, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic noncancer pain and addiction nationally and in Plaintiff's community to prescribers through in-person detailing.

540.    Collectively, PURDUE, CEPHALON, JANSSEN, DEPOMED, ENDO, MALLINCKRODT, ACTAVIS, INSYS, HIKMA/WEST-WARD, INDIVIOR, MYLAN, AMNEAL and SANDOZ are referred to as "Manufacturer Defendants." Any and all allegations against the Manufacturing Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall include and specifically be asserted against PURDUE, CEPHALON, JANSSEN, DEPOMED, ENDO, MALLINCKRODT, ACTAVIS, INSYS, HIKMA/WEST-WARD, INDIVIOR, MYLAN, AMNEAL and SANDOZ and their DEA registered subsidiaries and affiliates.

### D.    *Additional Distributors of Prescription Drugs at Both the Wholesale and/or Retail Levels*

541.    The following Distributors of prescription drugs at both the wholesale and retail level, who, as described below, engaged in conduct similar to the Distributor Defendants named in the Original Complaint, but who were not yet identified, that, inter alia, also flooded Plaintiff's community with opioids, failed to detect suspicious orders, and failed to prevent diversion of these dangerous products and are being added through Plaintiff's Short Form Supplemental and Amended Complaint.

### 1.    *Cardinal Health 110, LLC*

542.    Defendant CARDINAL HEALTH through its various DEA registered subsidiaries and affiliated entities, including, Defendant CARDINAL HEALTH 110, LLC, is a

wholesaler of pharmaceutical drugs that distributes opioids throughout the country, including in Plaintiff's community.

543.     CARDINAL HEALTH is a distributor of wholesale brand, generic and specialty pharmaceuticals. At all relevant times, CARDINAL HEALTH distributed prescription opioids throughout the United States, including in Plaintiff's community.

544.     As referred to herein, the conduct of CARDINAL HEALTH, as hereinafter set forth, shall be deemed to include and encompass the conduct of any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns, and any of its officers, directors, employees, agents, representatives, and other persons acting on its behalf.

545.     Defendant CARDINAL HEALTH sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

546.     Defendant CARDINAL HEALTH is one of the top distributors of opioids in Kentucky. Defendant CARDINAL HEALTH violated its obligations under Kentucky law as a large-scale distributor to prevent abuse.

547.     Defendant CARDINAL HEALTH's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

548.     Defendant CARDINAL HEALTH's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and

prescribers in violation of Kentucky Statutes.

549. Any and all allegations against CARDINAL HEALTH and the Distributor Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant CARDINAL HEALTH, and their DEA registered subsidiaries and affiliates, including, CARDINAL HEALTH 110, LLC.

## 2. *McKesson Medical-Surgical, Inc., McKesson Specialty Distribution, LLC and McKesson Specialty Care Distribution Corporation*

550. Defendant MCKESSON through its various DEA registered subsidiaries and affiliated entities, including, Defendants MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY DISTRIBUTION, LLC, and MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION, is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country, including in Plaintiff's community.

551. MCKESSON is a distributor of wholesale brand, generic and specialty pharmaceuticals. At all relevant times, MCKESSON distributed prescription opioids throughout the United States, including in Plaintiff's community.

552. As referred to herein, the conduct of MCKESSON, as hereinafter set forth, shall be deemed to include and encompass the conduct of any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns, and any of its officers, directors, employees, agents, representatives, and other persons acting on its behalf.

553. Defendant MCKESSON sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

554. Defendant MCKESSON is one of the top distributors of opioids in Kentucky. Defendant MCKESSON violated its obligations under Kentucky law as a large-scale distributor to prevent abuse.

555. Defendant MCKESSON's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

556. Defendant MCKESSON's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

557. Any and all allegations against MCKESSON and the Distributor Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant MCKESSON, and their DEA registered subsidiaries and affiliates, including, Defendants MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY DISTRIBUTION, LLC, and MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION.

### 3. *Anda Entities*

558. Defendant ANDA through its various DEA registered subsidiaries and affiliated entities, is the fourth largest distributor of generic pharmaceuticals in the United States. Defendant ANDA is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country, including in Plaintiff's community.

559. In October of 2016, Defendant TEVA acquired ANDA from ALLERGAN,

PLC (i.e. Defendant Actavis), for $500 million in cash. At all relevant times, ANDA distributed prescription opioids throughout the United States, including in Plaintiff's community.

560.     As referred to herein, the conduct of ANDA, as hereinafter set forth, shall be deemed to include and encompass the conduct of any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns, and any of its officers, directors, employees, agents, representatives, and other persons acting on its behalf.

561.     Defendant ANDA sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

562.     Defendant ANDA is one of the top distributors of opioids in Kentucky. Defendant ANDA violated its obligations under Kentucky law as a large-scale distributor to prevent abuse.

563.     As a registrant, ANDA had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

564.     Defendant ANDA's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

565.     Defendant ANDA's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon

it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

566.     Any and all allegations against ANDA and the Distributor Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against newly named Defendant ANDA PHARMACEUTICALS, INC., and any other of their DEA registered subsidiaries and affiliates.

### 4.     *Walgreens*

567.     Defendant WALGREENS through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Defendant WALGREENS distributed prescription opioids throughout the United States, including, in Plaintiff's community.

568.     As a registrant, WALGREENS had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

569.     During all relevant times, WALGREENS has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to Kentucky's hospitals, clinics, and other healthcare facilities serving patients of Kentucky's healthcare system. WALGREENS has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business with and within Kentucky.

570.     Defendant WALGREENS sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of

diversion at many facilities in Kentucky. Defendant WALGREENS also dispensed unreasonable quantities of opioids in Kentucky from its own retail pharmacies in Kentucky despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Kentucky law. Defendant WALGREENS has been investigated and fined for some of its many failures to secure its supply chain and its own pharmacy stores, but continues to allow inappropriate and harmful distribution of opioids.

571. Defendant WALGREENS is one of the top distributors of opioids in Kentucky. Defendant WALGREENS also operates a vast network of Kentucky pharmacies, which dispense opioids. Defendant WALGREENS violated its obligations under Kentucky law as both a large-scale distributor and a chain pharmacy to prevent abuse.

572. Defendant WALGREENS's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

573. Defendant WALGREENS's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

574. Any and all allegations against the Distributor Defendants or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant WALGREENS, and their DEA registered subsidiaries and affiliates.

### 5.    *Walmart Inc.*

575.    Defendant WALMART, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, WALMART distributed prescription opioids throughout the United States, including, in Plaintiff's community.

576.    As a registrant, WALMART had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

577.    At all relevant times, WALMART has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. WALGREENS has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

578.    Defendant WALMART sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky. Defendant WALMART also dispensed unreasonable quantities of opioids in Kentucky from its own retail pharmacies in Kentucky despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Kentucky law. Defendant WALMART has been investigated and fined for some of its many failures to secure its supply chain and its own pharmacy stores, but continues to allow inappropriate and harmful distribution of opioids.

579.    Defendant WALMART is one of the top distributors of opioids in Kentucky. Defendant WALMART also operates a vast network of Kentucky pharmacies, which dispense

opioids. Defendant WALMART violated its obligations under Kentucky law as both a large-scale distributor and a chain pharmacy to prevent abuse.

580. Defendant WALMART's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

581. Defendant WALMART's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

582. Any and all allegations against the Distributor Defendants or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant WALMART, and their DEA registered subsidiaries and affiliates.

### 6. *CVS Entities*

583. Defendant CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Defendant CVS distributed prescription opioids throughout the United States, including, in Plaintiff's community.

584. As a registrant, CVS had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

585. At all relevant times, Defendant CVS has sold and continues to sell prescription

opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant CVS has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

586. Defendant CVS sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky. Defendant CVS also dispensed unreasonable quantities of opioids in Kentucky from its own retail pharmacies in Kentucky despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Kentucky law. Defendant CVS has been investigated and fined for some of its many failures to secure its supply chain and its own pharmacy stores, but continues to allow inappropriate and harmful distribution of opioids.

587. Defendant CVS is one of the top distributors of opioids in Kentucky. CVS also operates a vast network of Kentucky pharmacies, which dispense opioids. CVS violated its obligations under Kentucky law as both a large-scale distributor and a chain pharmacy to prevent abuse.

588. The opioid crisis described herein is a direct and foreseeable result of Defendant CVS's actions. Plaintiff was damaged by Defendant CVS's actions.

589. CVS's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

590. Defendant CVS's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made

with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

591.    Any and all allegations against the Distributor Defendants or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant CVS, and their DEA registered subsidiaries and affiliates.

7.    *Kroger*

592.    Defendant KROGER through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Defendant KROGER distributed prescription opioids throughout the United States, including, in Plaintiff's community.

593.    As a registrant, KROGER had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

594.    At all relevant times, Defendant KROGER has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant KROGER has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

595.    Defendant KROGER sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

596. Defendant KROGER is one of the top distributors of opioids in Kentucky. KROGER violated its obligations under Kentucky law as both a large-scale distributor and/or retailer to prevent abuse.

597. The opioid crisis described herein is a direct and foreseeable result of Defendant KROGER's actions. Plaintiff was damaged by Defendant KROGER's actions.

598. KROGER's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

599. Defendant KROGER's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

600. Any and all allegations against the Distributor Defendants and/or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant KROGER, and their DEA registered subsidiaries and affiliates.

## 8. *API*

601. American Associated Pharmacies (hereinafter, "AAP"), through its various DEA registered subsidiaries and affiliated entities, including, Defendant API, conducts business as a licensed wholesale distributor. AAP is a nationwide member-owned cooperative comprised of over 2,000 independent pharmacies. AAP began operations on September 1, 2009 when two major pharmacy cooperatives - United Drugs of Phoenix, Arizona and

Associated Pharmacies, Inc. of Scottsboro, Alabama - joined forces to form one of America's largest and most comprehensive independent pharmacy organizations.

602. API is AAP's distribution operation offering brand Rx, generic Rx and select OTC's at competitive prices and offers rebates. t all relevant times, Defendant API distributed prescription opioids throughout the United States, including, in Plaintiff's community.

603. As a registrant, API had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

604. At all relevant times, Defendant API has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant API has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

605. Defendant API sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

606. Defendant API is one of the top distributors of opioids in Kentucky. API violated its obligations under Kentucky law as both a large-scale distributor and/or retailer to prevent abuse.

607. The opioid crisis described herein is a direct and foreseeable result of Defendant API's actions. Plaintiff was damaged by Defendant API's actions.

608. API's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

609.    Defendant API's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

610.    Any and all allegations against the Distributor Defendants and/or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant API, and their DEA registered subsidiaries and affiliates.

### 9.    *Masters Pharmaceuticals, Inc.*

611.    Defendant MASTERS through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Defendant MASTERS distributed prescription opioids throughout the United States, including, in Plaintiff's community.

612.    MASTERS supplies prescription medications in bulk to pharmacies across the United States and in Plaintiff's community. They advertise that they are a national pharmaceutical wholesaler for independent, chain, and specialty pharmacies, as well as LTCs and mail-order pharmacies. MASTERS is a sales and marketing division of Masters Drug Company, Inc.

613.    As a registrant, MASTERS had an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

614. On October 17, 2008, a DEA Deputy Assistant Administrator issued an Order to Show Cause why they should not revoke MASTERS' certificate of registration. The Order alleged that MASTERS had *"failed to maintain effective controls against diversion"* of hydrocodone, a powerful opioid. And, *"Throughout 2007 and 2008,"* MASTERS violated the Reporting Requirement by failing to notify DEA when "rogue Internet pharmacies" placed suspicious hydrocodone orders.[527]

615. In addition, MASTERS allegedly filled those hydrocodone orders without performing adequate due diligence, in violation of the Shipping Requirement.[528]

616. On April 1, 2009, DEA and MASTERS agreed to settle the charges in the 2008 Order. The settlement agreement required MASTERS to pay $500,000 to the agency and bring the company into compliance with DEA regulations by implementing a compliance system "to detect suspicious orders" for controlled substances and "prevent diversion of controlled substances" into illegal channels.[529]

617. MASTERS further promised that orders *"identified as suspicious"* by the compliance system would *"be reported to . . . DEA."* [530]

618. To fulfill its obligations under the settlement agreement, MASTERS created a compliance system called the *"Suspicious Order Monitoring System"* or *"SOMS,"* consisting of a computer program and a protocol for MASTERS' employees.

619. On August 9, 2013, a Deputy Assistant Administrator of DEA issued a second Order to Show Cause why MASTERS' certificate of registration should not be revoked

---

[527] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html80; Fed. Reg. at 55,421-22.*

[528] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html; See 80 Fed. Reg. at 55,421-22.*

[529] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html; Settlement and Release Agreement and Administrative Memorandum of Agreement at 2 (Apr. 1, 2009), J.A. 899.*

[530] *Id.*

alleging that *"MASTERS consistently ignored and/or failed to implement"* its controlled substance policies and failed to comply with the Reporting Requirement.[531]

620. The 2013 Order further alleged that MASTERS violated the Shipping Requirement by filling orders for millions of dosage units of oxycodone for eight illegitimate pharmacies in Florida and Nevada.

621. In 2014, after an investigation, the DEA rendered a decision to revoke MASTERS' certificate of registration. The revocation order turned on DEA's conclusion that MASTERS had shirked its legal obligation to report suspicious orders for controlled substances.

622. MASTERS brought a case to challenge the DEA's 2014 decision to revoke its certificate of registration, without which MASTERS could not sell controlled substances.

623. The United States District Court for the District of Columbia, in June of 2017, denied MASTERS' petition for review of the Final Order of the Drug Enforcement Administration to revoke its certificate of registration.

624. Circuit Judge Pillard filed an Opinion for the Court that held that MASTERS' employees routinely failed to investigate held orders, and, in lieu of reporting all held orders, MASTERS' employees deleted some and edited others so that they appeared to be of a normal size and pattern, and then proceeded to fill them. While deleting or editing orders may have limited the amount of oxycodone flowing to MASTERS' customers, that practice subverted the Reporting Requirement. The law requires registered suppliers like MASTERS to alert DEA when their retail pharmacy customers attempt to obtain unusual amounts of a controlled

---

[531] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html U.S. Dep't of Justice, Drug Enf't Admin., Order to Show Cause (Aug. 9, 2013), J.A. 10.*

substance, because such attempts are powerful evidence that the pharmacies are operating illegally.[532]

625.   In other instances, MASTERS' employees simply released orders from hold and filled them as written, again without reporting them to DEA or investigating to see whether they might dispel the suspicion that caused the order to be placed on hold. For many of those orders, MASTERS had no record that any employee even took the initial investigative step of calling the ordering pharmacy. Records were absent despite MASTERS' representation to DEA that "[d]ocumentation on all orders held for review and their disposition are permanently retained."[533]

626.   Even when MASTERS' employees took some steps to probe the reasons orders were held, their efforts were too tentative, pro forma, and incomplete to dispel suspicion, yet MASTERS failed to report the orders to DEA.[534]

627.   Many of MASTERS' files contained entries suggesting that a MASTERS' employee called a pharmacy to request an explanation for a held order, but either failed to obtain any explanation or, if it got one, to make corresponding entries showing that the employee verified that explanation.[535]

628.   Further, MASTERS' records showed that investigations into held orders often ended with an employee recording a demonstrably false explanation for the order, or with the employee's harboring unresolved doubts about the order's validity, yet failing to share those doubts with DEA. For instance, MASTERS' employees often concluded that an order for controlled substances was justified because it was consistent with the pharmacy's utilization

---

[532] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html*
[533] https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html
[534] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html*
[535] *https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html*

report, even where there was no current utilization report on file or when the utilization report showed *"highly suspicious"* dispensing patterns. In other cases, MASTERS' employees said that orders were justified because they were within the Controlled Substance Limit established by the SOMS computer program, despite the fact that the orders had been held because they violated that limit. Finally, MASTERS' employees frequently ended their investigations by noting that they were filling controlled substance orders *"with reservation."*[536] Such *"reservation[s]"* suggested that MASTERS' employees were dissatisfied with the explanations they received for particular controlled substance orders. Yet, they repeatedly failed to report those orders to DEA.[537]

629.    MASTERS has fought the DEA's enforcement at every step and continued to sell opiates while its case was under appeal. The company operates distribution centers in Fairfield and Forest Park, Ohio. Even though a federal appeals court judge in Washington, D.C. ruled against the company, clearing the way for the DEA to suspend its license, the company, upon information and belief, continues to stay in business because the DEA approved a license for a new MASTERS facility in Mason in December 2016, even as the previous case was working its way through appeals process.[538]

630.    At all relevant times, Defendant MASTERS has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant MASTERS has engaged in consensual commercial dealings with Kentucky and its citizens,

---

[536] https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html; See, e.g., 80 Fed. Reg. at 55,427, 55,432-33, 55,437-38, 55,448, 55,459; 80 Fed. Reg. at 55,428.
[537] https://law.justia.com/cases/federal/appellate-courts/cadc/15-1335/15-1335-2017-06-30.html
[538] https://www.wcpo.com/news/opinion/analysis-cities-counties-states-target-opioid-wholesalers-over-the-heroin-epidemic

and has purposefully availed itself of the advantages of conducting business within Kentucky.

631. Defendant MASTERS sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

632. Defendant MASTERS is one of the top distributors of opioids in Kentucky. MASTERS violated its obligations under Kentucky law as both a large-scale distributor and/or retailer to prevent abuse.

633. The opioid crisis described herein is a direct and foreseeable result of Defendant MASTERS's actions. Plaintiff was damaged by Defendant MASTERS's actions.

634. MASTERS's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

635. Defendant MASTERS's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

636. Any and all allegations against the Distributor Defendants and/or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant MASTERS, and their DEA registered subsidiaries and affiliates.

### 10. *Miami-Luken, Inc.*

637. As a wholesaler, MIAMI-LUKEN, is a middleman between pharmacy drug

manufacturers and pharmacists. They advertise that they offer full-line service to their customers throughout Ohio, Indiana, Kentucky, Tennessee, West Virginia, western Pennsylvania and southern Michigan.

638. MIAMI-LUKEN has been under investigation by the DEA for failing to flag the suspiciously large orders of pills by pharmacies.[539] The DEA sought to yank the company's license, which allows it to buy pharmacy drugs from manufacturers and then distribute the drugs — including powerful opioid painkillers — to pharmacies.

639. In November of 2015, the DEA served MIAMI-LUKEN with an Order to Show Cause that said from as early as 2007 through 2015, MIAMI-LUKEN failed to disclose suspicious orders of opioid painkillers to customers in the Appalachian tri-state region of southern Ohio, eastern Kentucky and southern West Virginia.

640. The DEA's Order asked MIAMI-LUKEN to show why the DEA should not revoke its license. The Order was issued after the DEA had served 22 subpoenas on MIAMI-LUKEN, with each subpoena stating that a criminal investigation was being conducted and demanded information related to the company's distribution practices in relation to the Controlled Substances Act.[540]

641. MIAMI-LUKEN is facing not only the DEA investigation but also faced a congressional inquiry over whether it filled orders for unsafe levels of opioids when instead the company should have alerted authorities about the suspicious orders.

642. Five leaders of pharmaceutical distributors were asked at a congressional hearing held by the U.S Committee on Energy and Commerce, in May of 2018, to answer

---

[539] https://www.daytondailynews.com/news/opioid-probe-why-springboro-drug-distributor-under-fed-scrutiny/6g1wFvdtHHaK2XvbwKyb3M/

[540] https://www.daytondailynews.com/business/springboro-drug-distributor-insurer-won-cover-dea-opioid-investigation/X4eslIKDV73I2kiO1gbqMM/

whether they thought actions distributors took contributed to the opioid crisis. *"Yes,"* was the response of Dr. Joseph Mastandrea, chairman of MIAMI-LUKEN. The four other executives said *"No"*. The other executives testifying were from AmerisourceBergen, Cardinal Health, and McKesson, known as the "big three" distributors, as well as the former president and CEO of H.D. Smith, a distributor that sold in January to AmerisourceBergen.

643.    For a year, the U.S Committee on Energy and Commerce had been investigating whether wholesalers played a role in fueling the opioid crisis.[541] Several times during the hearing, Dr. Joseph Mastandrea, chairman of MIAMI-LUKEN, admitted to shortcomings in response to questions by the committee members, at times in contrast to the other executives who refuted the questions. *"Do you acknowledge that your company had past failings in maintaining effective controls to prevent the diversion of opioids?"* asked U.S. Rep. Gregg Harper, of Mississippi. *"Yes,"* said Mastandrea. Further, Rep. Harper asked if the *"extraordinary"* volume of pill shipments to small West Virginia towns indicates a breakdown in the system the distributors were supposed to have to monitor for suspicious orders. *"Yes,"* Dr. Joseph Mastandrea said.

644.    MIAMI-LUKEN previously provided the committee with documents showing it shipped more than 24 million high power painkillers to four small pharmacies in West Virginia between 2005 and 2015. In one rural town in 2008 alone, that divided out to 5,624 pills for every person in town including children. Specifically, in Kermit, West Virginia, which has a population of just over 400, MIAMI-LUKEN shipped more than half of the 4.3 million hydrocodone and oxydone pills that poured into the town in 2008 alone. MIAMI-LUKEN's share divides out to 5,624 pills for every adult and child. U.S. Rep. Diana DeGette, of

---

[541] *https://www.daytondailynews.com/news/did-drug-distributors-contribute-opioid-crisis-yes-says-local-exec/SaOPtcgwKo01PUMzOg3V0H/*

Colorado, asked if the 15 pages of documentation that MIAMI-LUKEN had on the volume of pills it shipped to Kermit seemed like enough due diligence. *"No,"* said Dr. Joseph Mastandrea.

645. In February 2016, MIAMI-LUKEN settled with West Virginia's attorney general for $2.5 million over allegations of flooding the state with painkillers.

646. MIAMI-LUKEN, upon information and belief, in October of 2019, discontinued operations altogether.[542]

647. At all relevant times, Defendant MIAMI-LUKEN sold prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant MIAMI-LUKEN has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

648. Defendant MIAMI-LUKEN sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

649. Defendant MIAMI-LUKEN was one of the top distributors of opioids in Kentucky. MIAMI-LUKEN violated its obligations under Kentucky law as both a large-scale distributor and/or retailer to prevent abuse.

650. The opioid crisis described herein is a direct and foreseeable result of Defendant API's actions. Plaintiff was damaged by Defendant MIAMI-LUKEN's actions.

651. MIAMI-LUKEN's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

---

[542] *https://www.daytondailynews.com/business/springboro-drug-distributor-goes-out-business-federal-report-says/Au3eYUK2Ff11jVQAptRU7I/*

652. Defendant MIAMI-LUKEN's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

653. Any and all allegations against the Distributor Defendants and/or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant MIAMI-LUKEN, and their DEA registered subsidiaries and affiliates.

### 11. *Keysource Medical, Inc.*

654. Defendant KEYSOURCE is a secondary wholesaler of generic pharmaceutical drugs, including controlled substances that are regulated by the DEA. KEYSOURCE sells both controlled and non-controlled substances and over-the-counter products to independent retail pharmacies as well as a mix of small chain, long-term care, hospice, and specialty pharmacies in forty-seven states. KeySourceUSA is the parent company of KEYSOURCE.

655. KEYSOURCE specialized in generic hydrocodone and oxycodone, which the DEA calls the most widely abused pills in the country. Although it is a relatively small supplier, KEYSOURCE became one of the top wholesalers of pain pills to Florida pharmacies, the DEA said.

656. KEYSOURCE and its employees have been accused of manipulating records to hide unusually large orders from pill mills.

657.     In a two-year period, KEYSOURCE sold more than 59 million doses of oxycodone to customers in 40 states, the DEA said. The vast majority of that -- 78 percent -- was sold to pharmacies in Florida, which was known as a haven for pill mills, the DEA said.

658.     Some of those pills made their way back to Kentucky via what DEA officials called the *"Florida Pipeline"* or the *"Oxycontin Express."* Drug traffickers would hire people to drive to pill mills in Florida every two weeks or so, buy oxycodone for $40 a bottle, drive it back to Ohio or Kentucky and sell it on the black market for $1,500 a bottle, according to a DEA narrative.[543]

659.     The company *"was the number one independent distributor in the country for sales of oxycodone in 2010 and in the first three months of 2011,"* the investigator said. *"No other single-facility distributor distributed more oxycodone during that period."*[544]

660.     Between 2008 and 2011, KEYSOURCE increased its purchases of hydrocodone and oxycodone, two drugs commonly associated with abuse and diversion.[545]

661.     According to a database maintained by the DEA, KEYSOURCE doubled the amount of hydrocodone it purchased in 2008 and doubled it again in 2009, when it purchased and distributed 28.6 million units of the drug.[546]

662.     KEYSOURCE also increased its purchases of oxycodone, which more than doubled in 2008 (to 2.4 million dosage units), increased fivefold in 2009 (to 16.2 million dosage units), and tripled in 2010 (to 50.9 million dosage units).[547]

663.     In terms of drug strength, most of KEYSOURCE's controlled substances sales

---

[543] *Analysis: Meet the opioid wholesalers who became middlemen for the heroin epidemic,*
*https://www.wcpo.com/news/opinion/analysis-cities-counties-states-target-opioid-wholesalers-over-the-heroin-epidemic*
[544] *Id.*

[545] *https://cases.justia.com/federal/district-courts/ohio/ohsdce/1:2011cv00393/147299/22/0.pdf?ts=1428846484*
[546] *Id.*
[547] *Id.*

that were reported to the DEA were of two particular drugs – oxycodone 30 mg and hydrocodone 10 mg – that have a high street value and pose a substantial risk of diversion.[548]

664.    The DEA began an investigation of KEYSOURCE in December 2010. This investigation involved a review of purchasing data showing KEYSOURCE's sales of oxycodone into Florida, correspondence from one of KEYSOURCE's suppliers raising concerns that KEYSOURCE was *"selling what appears to be an unusually large amount of Oxycodone 15 mg and 30 mg into the State of Florida"* and customer information relating to several pharmacies obtaining oxycodone from KEYSOURCE.[549]

665.    In 2011, the DEA raided KEYSOURCE's Blue Ash office and seized sales records, emails and letters. It suspended the company's license to sell narcotics *"to stop KEYSOURCE from adding any more fuel to the flame of what is an imminent and serious public health problem."* KEYSOURCE *"was sending tens of millions of pills of oxycodone into Florida, the national epicenter of the pill problem,"* a DEA investigator said in court documents.[550]

666.    Based on its review of this information, the DEA Administrator issued an Order to Show Cause for Immediate Suspension of Registration on June 9, 2011. The immediate suspension reflected the DEA's conclusion that allowing KEYSOURCE to continue distributing controlled substances posed an imminent danger to the public health and safety.[551]

667.    The Order to Show Cause set forth at least two reasons for the immediate suspension. First, the DEA determined that KEYSOURCE failed to detect suspicious orders and repeatedly filled suspicious orders without notifying the DEA. Second, the DEA found

---

[548] *Id.*
[549]    *Id.*
[550]    *Id.*
[551]    *Id.*

that KEYSOURCE frequently received and filled orders from customers who ordered dosage units of the same oxycodone product using multiple lines of the same form.[552]

668.    The DEA also had concerns that KEYSOURCE's top management discussed encouraging customers to increase orders of non-controlled substances so that KEYSOURCE could supply them with more controlled substances.[553]

669.    The U.S. District Court for the Southern District of Ohio, Western Division, denied KEYSOURCE's motion for a preliminary injunction and permitted the DEA Order to stand as it was issued on June 9, 2011. The Court found that between February 2009 and February 2011, KEYSOURCE did not exercise appropriate due diligence to detect and report suspicious orders of controlled substances.[554] KEYSOURCE's customer files were incomplete and lacking the kind of information required for detecting suspicious orders. The court further found the files that were maintained on the pharmacies discussed in the DEA Order were disorganized and should have raised serious concerns of diversion, based on high ratios of cash to insurance sales, high volumes of sales to pain management clinics, high ratios of sales of controlled substances as compared to non-controlled substances, and drug usage reports and doctors' reports reflecting predominant sales of oxycodone. The court also found that KEYSOURCE's orders were not monitored; pharmacies were not visited; photos were not verified; and suspicious orders were not detected.[555]

670.    Chief Judge Susan J. Dlott stated in her opinion noted that *"While KEYSOURCE had standard operating procedures on paper, it is not clear that these procedures were followed in a routine fashion. KEYSOURCE's lack of an effective suspicious*

---

[552] *Id.*
[553] *Id.*
[554] *See 21 C.F.R. § 1301.74(b).*
[555] *Id.*

order monitoring system is particularly striking in light of the volume of oxycodone that KEYSOURCE sold to pharmacies in Florida. KEYSOURCE distributed over 44 million dosage units of oxycodone into Florida in 2010 and early 2011".

671.    Judge Dlott further noted that "Although KEYSOURCE did report numerous suspicious customers during 2010 and 2011, KEYSOURCE did not meet its obligation to detect and report suspicious orders. For example, KEYSOURCE failed to sufficiently detect or report orders that varied in size and frequency." She further stated that "KEYSOURCE's failure to report such orders is particularly troubling given that the prescription drug problem in Florida is well-known throughout the pharmaceutical industry and, in fact, throughout the general public."

672.    After receiving the Administrative Inspection Warrant, in February of 2011, that provided formal notice regarding the DEA's concerns about KEYSOURCE's practices, Judge Dlott said, "At that point in time, KEYSOURCE had an opportunity to implement a suspicious order monitoring system that would have shown that its continued registration to distribute controlled substances did not pose an imminent danger to the public health and safety." According to Judge Dlott, "KEYSOURCE implemented a number of half-measures that failed to address legitimate concerns regarding its practices."[556]

673.    At all relevant times, Defendant KEYSOURCE has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant KEYSOURCE has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

---

[556] Id.

674. Defendant KEYSOURCE sold and shipped unreasonable quantities of opioids into Plaintiff's community, and/or contributed to the diversion of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

675. Defendant KEYSOURCE is one of the top distributors of opioids in Kentucky. KEYSOURCE violated its obligations under Kentucky law as both a large-scale distributor and/or retailer to prevent abuse.

676. The opioid crisis described herein is a direct and foreseeable result of Defendant KEYSOURCE's actions. Plaintiff has been damaged by Defendant KEYSOURCE's actions.

677. KEYSOURCE's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

678. Defendant KEYSOURCE's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

679. Any and all allegations against the Distributor Defendants and/or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant KEYSOURCE, and their DEA registered subsidiaries and affiliates.

### 12. *Qualitest Pharmaceuticals, Inc.*

680. At all relevant times, Defendant QUALITEST has sold and continues to sell prescription opioids at locations within Kentucky, including, in close proximity to its hospitals, clinics, and other healthcare facilities serving patients in the healthcare system. Defendant QUALITEST has engaged in consensual commercial dealings with Kentucky and its citizens, and has purposefully availed itself of the advantages of conducting business within Kentucky.

681. As a registrant, QUALITEST has an obligation to report to DEA suspicious orders for controlled substances and to take other precautions to ensure that those medications would not be diverted into illegal channels.

682. Defendant QUALITEST sold and shipped unreasonable quantities of opioids into Plaintiff's community, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Kentucky.

683. Defendant QUALITEST is one of the top distributors of opioids in Kentucky. QUALITEST violated its obligations under Kentucky law as both a large-scale distributor and/or retailer to prevent abuse.

684. The opioid crisis described herein is a direct and foreseeable result of Defendant QUALITEST's actions. Plaintiff was damaged by Defendant QUALITEST's actions.

685. QUALITEST's deceptive, unfair, and unconscionable actions are continuing and continue to harm the Plaintiff and its community.

686. Defendant QUALITEST's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Kentucky law to prevent abuse and diversion were material, were false, were made with intent to deceive, were

made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud consumers and prescribers in violation of Kentucky Statutes.

687.    Any and all allegations against the Distributor Defendants and/or the Pharmacy Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall also hereinafter specifically include and be asserted against Defendant QUALITEST, and their DEA registered subsidiaries and affiliates.

688.    Defendants WALGREENS, WALMART, CVS, KROGER, API, MASTERS, MIAMI-LUKEN, KEYSOURCE and QUALITEST are sometimes referred to as "National Retail Pharmacies" or "Pharmacy Defendants". Hereinafter, the Pharmacy Defendants and the Distributor Defendants may sometimes be referred to collectively as the "Distributor Defendants".

689.    Any and all allegations against the Distributor Defendants in the Plaintiff's existing Complaint are expressly incorporated by reference to this Short Form, as if fully set forth herein, and shall be deemed to include AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH, INC., CARDINAL HEALTH 110, LLC, MCKESSON CORPORATION, MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY DISTRIBUTION, LLC, MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION, H.D. SMITH, ANDA, INC., ANDA PHARMACEUTICALS, LLC, WALGREENS, WALMART, CVS, KROGER, API, MASTERS, MIAMI-LUKEN, KEYSOURCE and QUALITEST and their DEA registrant subsidiaries and affiliates. Further, this Short Form Supplemental and Amended Complaint also specifically designates that any allegations in the existing Complaint against only Defendants AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH, INC., MCKESSON CORPORATION, H.D

SMITH and ANDA as the "Distributor Defendants" shall hereinafter now include the newly named defendants, CARDINAL HEALTH 110, LLC, MCKESSON MEDICAL-SURGICAL, INC., MCKESSON SPECIALTY DISTRIBUTION, LLC, MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION, ANDA PHARMACEUTICALS, LLC, WALGREENS, WALMART, CVS, KROGER, API, MASTERS, MIAMI-LUKEN, KEYSOURCE and QUALITEST and their DEA registrant subsidiaries and affiliates.

## 2.3 *Distributor and Pharmacy Defendants Breached Their Duties by Failing to Identify, Monitor, and Report Suspicious Sales of Opioid Drugs and Participated in A Drug Diversion Concealment Enterprise.*

690.    Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient. Pharmacies purchase drugs from wholesalers, and occasionally directly from manufacturers, and then take physical possession of the drug products.

691.    Since they are the final point of sale for pharmaceuticals and the interface between the supply chain and the consumer, pharmacies generate the data that manufacturers as well as wholesale distributors rely upon to measure consumer activity for sales purposes.

692.    The Distributor and/or Pharmacy Defendants had knowledge of not just the widespread public coverage of the prescription opioid epidemic, but also had industry-specific knowledge of the particular risks and harms from filling prescriptions for non-medical purposes and the resulting widespread opioid abuse.

693.    The DEA[557], state pharmacy boards[558], and national industry associations[559],

---

[557] Michele Leonhart et al., *Pharmacist's Manual: An informational outline of the controlled substances act*, Drug Enf'tAdmin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.
[558] *Tex. State Bd. Of Pharmacy, Abuse & Misuse of Prescription Drugs* (last visited Aug. 11, 2017), https://www.pharmacy.texas.gov/SB144.asp; *Fla. Bd. of Pharmacy, DEA Guidelines to Prescription Fraud* (June 12, 2013), http://floridaspharmacy.gov/latest-news/dea-guidelines-to-prescription-fraud/; *Va. Bd. of Pharmacy, Prescription Drug Abuse: Red flags for pharmacists and pharmacy technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8.

have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient.[560] The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are irresolvable.

694.    For instance, the industry guidance tells pharmacists how to recognize (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.[561]

695.    The Distributor and/or Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

696.    In 2016, WALGREENS issued a press release captioned "Walgreens Leads Fight Against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Deaths."[367]

697.    Despite knowing and even warning of these risks, the Distributor and/or

---

[559] *Philip Brummond et al., American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances, 74 Am. J. of Health-Sys. Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919*

[560] *364 Va. Bd. of Pharmacy, Prescription Drug Abuse: Red flags for pharmacists and pharmacy technicians (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8; Philip W. Brummond et al., American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances, 74 Am. J. of Health-System Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.*

[561] *Fla. Bd. of Pharmacy, DEA Guidelines to Prescription Fraud (June 12, 2013), http://floridaspharmacy.gov/latest- news/dea-guidelines-to-prescription-fraud/; Mass. Bd. of Registration in Med., Policy 15-05, Prescribing Practices Policy and Guidelines (Oct. 8, 2015), http://www.mass.gov/eohhs/docs/borim/policies- guidelines/policy-15-05.pdf.*

Pharmacy Defendants recklessly or negligently permitted diversion to occur. In failing to take adequate measures to prevent substantial opioid-related injuries to Plaintiff, the Distributor and/or Pharmacy Defendants have breached their common law duties under the "reasonable care" standard (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), professional duties under the relevant standards of professional practice, and requirements established state and federal laws and regulations.

698.    The Distributor and/or Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the Plaintiff in part because of their history of being penalized for violating their duties and legal requirements.

699.    Pharmacies have the most accurate data on individual health care professionals' prescribing habits. The Distributor and/or Pharmacy Defendants provided the Manufacturer Defendants with prescribing data regarding individual health care professionals in exchange for rebates, or other forms of consideration.

700.    The Distributor and/or Pharmacy Defendants all participate in the pharmacy networks established by managed health care plans, and as such had a duty to submit only non-fraudulent claims.

701.    The Distributor and/or Pharmacy Defendants have an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not participate in the "violation of any applicable law, rule and/or regulation."

702.    Managed health care plans and third party payors rely on the Pharmacy Defendants to identify fraudulent claims and deter potential diversion.

703.    The Distributor and/or Pharmacy Defendants' role in facilitating access to formulary drugs (i.e., access to drugs on third party payors' formularies) for long-term opioid

use - coupled with their failure to prevent, monitor, identify, and report drug diversion - all contributed to a vast increase in opioid overuse and addiction.

704.    The Distributor and/or Pharmacy Defendants' conduct thus directly contributed to the public-health crisis, increasing costs for excessive prescribing and addiction-related treatment costs for Plaintiff.

705.    Most pharmacies purchase their drug supply from a wholesale distributor, although some retailers are large institutional and retail chain pharmacies that obtain drugs directly from a manufacturer.

706.    These organizations can deal directly with manufacturers because they already possess the operational infrastructure necessary to bypass wholesalers – warehousing facilities, distribution vehicles, and inventory control systems. Once a pharmacy takes possession of the drug products it distributes the products to physicians or directly to consumers.

707.    The Distributor and/or Pharmacy Defendants' policies of speed over accuracy were negligent. Adopting performance metrics and quotas placed significant and unrealistic time pressures on pharmacists. Many Pharmacy Defendants required pharmacists to fill one prescription every three minutes or more than 600 prescriptions per work shift. All measurements focus on productivity with the end goal of maximizing the Pharmacy Defendants' profits. Meeting such unrealistic goals would violate the law regarding professional responsibilities and governing practice rules. To satisfy these increased productivity demands with decreased staffing required pharmacists employed by the Pharmacy Defendants to cut corners in their performance of due diligence obligations and violate their legal obligations under federal and state laws. The Pharmacy Defendants' high-volume-and-increased-profits business model also led to a greater number of errors in dispensing, which

can result in significant harm to pharmacy customers.

708.    The Pharmacy Defendants failed to adequately train their pharmacists and pharmacy techs on how to properly and adequately handle prescriptions for opioids, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal.

709.    The Pharmacy Defendants failed to instruct their pharmacists and pharmacy techs on how to address situations in which they are forced to decline filling a prescription for a customer who submitted a prescription which a pharmacist has identified as suspicious.

710.    The Pharmacy Defendants have failed to train their pharmacists and pharmacy techs on how to properly exercise their judgment and intuition with respect to determinations about whether a prescription is one that should be filled, or whether, under the applicable laws, the pharmacist should refuse to fill it.

711.    The Distributor and/or Pharmacy Defendants failed to adequately use data available to them to identify health care professionals that were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids.

712.    The Distributor and/or Pharmacy Defendants failed to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that contributed to the opioid crisis. The Distributor and/or Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number opioid prescriptions filled relative to other drugs; and (d) the increase in annual

opioid sales relative to the increase in annual sales of other drugs.

713. The Distributor and/or Pharmacy Defendants failed to conduct internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly. The Distributor and/or Pharmacy Defendants failed to have trained personnel monitoring media and journal publications regarding issues with all drugs being sold, including opioids.

714. The Distributor and/or Pharmacy Defendants failed to heed communications from government agencies, and to the public and to take action.

715. The Distributor and/or Pharmacy Defendants failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

716. The Distributor and/or Pharmacy Defendants' own sales representatives, agents, employees, contractors, and other persons who rendered services in furtherance of selling more of the Distributor and/or Pharmacy Defendants' drugs, raised a significant number of complaints, statements of concern, and observations of regarding suspicious prescriptions, which the Distributor and/or Pharmacy Defendants failed to investigate, act upon, and in some cases even acknowledge or create records of.

717. The Distributor and/or Pharmacy Defendants knew, reasonably should have known, or, if they did not know, intentionally remained willfully blind to the fact of the media and journal attention published about the opioid epidemic. They intentionally remained willfully blind to the fact that pill diversion and pill mills were increasing at an alarming rate. And, the Distributor and/or Pharmacy Defendants failed to act.

718. The Distributor and/or Pharmacy Defendants failed to track or observe increase

in antidote sales, which would have triggered suspicion in a reasonable person or a reasonable sales representative that levels of prescription drug abuse were rampant. The Distributor and/or Pharmacy Defendants failed to observe, take notice of, or take into account, government communications to the public and to those involved in the opioid supply chain, such as the Distributor and/or Pharmacy Defendants, and take action.

719.    The Distributor and/or Pharmacy Defendants failed to track profit changes for opioids, which skyrocketed once the epidemic was truly underway and would have signaled to any reasonable person, pharmacist, or executive that a crisis involving narcotic drugs was underway.

720.    The Distributor and/or Pharmacy Defendants in fact knew of massive sales and negotiated purchase contracts more favorable to them, which in turn create d further pressure on sales representatives. 1268. The Distributor and/or Pharmacy Defendants knew that supply procedures had to change to address the ever increasing volume of drugs being sold—which was so patently obvious that it required an update to a larger physical storage space for the volume of pills being moved.

721.    The Distributor and/or Pharmacy Defendants intentionally, maliciously, and repeatedly failed to investigate or act upon complaints, statements of concern and observations of employees.

722.    The Distributor and/or Pharmacy Defendants clearly knew that an opioid epidemic existed as that they considered and/or implemented changes to their security procedures to address retail outlet concerns regarding customers who were, may have been, or had the potential to become addicts.

### A. WALGREENS failed to Track and Report Suspicious Sales of Opioid Drugs

723. Defendant WALGREENS is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

724. The Agreements also required Defendant WALGREENS to identify "fraudulent prescription drug claims or any information in support thereof," and states the agreement is terminable if the Provider is in "violation of any applicable law, rule and/or regulation."

725. Contrary to its duties as a registrant and under the Agreements, in 2013, as a result of a multi-jurisdictional investigation by the DOJ, including the Eastern District of Michigan, Defendant WALGREENS was fined $80 million for its violations of the CSA.

726. According to the investigation Defendant WALGREENS committed an unprecedented number of record-keeping and dispensing violations under the CSA. According to documents filed in the underlying administrative actions, Defendant WALGREENS negligently allowed controlled substances listed in Schedules II – V of the Act, such as oxycodone and other prescription pain killers, to be diverted for abuse and illegal black market sales.

727. Defendant WALGREENS has also settled with a number of state attorneys general, including West Virginia ($575,000)[562] and Massachusetts ($200,000).[563] The

---

[562] Caleb Stewart, Kroger, CVS, and Walgreens Settle Lawsuit with West Virginia for $3 Million, WHSV (Aug. 16, 2016), http://www.whsv.com/content/news/Kroger-CVS-and-Walgreens-settle-lawsuit- with-West-Virginia-for- 3-million-390332992.html.

[563] Felice J. Freyer, Walgreens to Pay $200,000 Settlement for Lapses with Opioids, The Boston Globe (Jan. 19, 2017), https://www.bostonglobe.com/metro/2017/01/18/walgreens-agrees-better-monitor-opioid-

Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple WALGREENS stores across the state failed to monitor the opioid use of patients who were considered high-risk. Such patients are supposed to obtain all prescriptions from only one pharmacy, and that pharmacy is required to track the patient's pattern of prescription use. Some of the state's 160 WALGREENS accepted cash for controlled substances from patients in MassHealth (the state's combined program for Medicaid and Children's Health Insurance), rather than seeking approval from the agency. In some cases, MassHealth had rejected the prescription; at other times, MassHealth was never billed. In response, WALGREENS simply agreed to update its policies and procedures and train its staff to ensure that pharmacists properly monitor and not accept cash payments from patients deemed high-risk.

728.    On September 20, 2017, Defendant WALGREENS announced that the pharmacy was launching its "#ItEndsWithUs" campaign to educate teens about the opioid epidemic. As part of that initiative, the company created a website that serves as an online "#ItEndsWithUs" hub and resource center aimed at disseminating the risks of opioid abuse, guides on how to properly dispose of unused opioids, and even testimonials from individuals who personally overcame opioid addictions.

729.    Additionally, the "#ItEndsWithUs" hub provides the locations of free-to-use medication-disposal kiosks where individuals can deposit their unused medication into a safe-box, the contents of which will be later disposed of in a safe and proper manner.

730.    In the wake of a recent $500,000 fine, WALGREENS adopted a "good faith

_____

*dispensing/q0B3FbMo2k3wPt4hvmTQrM/story.html.*

dispensing" policy that allows a pharmacist to refuse to dispense pain relievers if the pharmacist feels that the prescriber failed to write a prescription for a legitimate medical purpose.

731. In a letter issued to prescribing physicians, Defendant WALGREENS stated: "According to 21 C.F.R. 1306.04, pharmacists are required to ensure that prescriptions for controlled substances are issued for a legitimate medical purpose." The precise text of the regulation to which WALGREENS' letter referred, in pertinent part, is as follows:

> *The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.*

732. Defendant WALGREENS also took additional steps to combat the opioid crisis, although such efforts were admittedly late in the game including launching a safe medication disposal program in which the company installed drug disposal kiosks in more than 500 WALGREEN drugstores in states and Washington D.C., as well as eliminating the requirement persons present a prescription before being permitted to obtain the life-saving medication, Naloxone (in 35 states including Washington, D.C.). When a patient receives naloxone, WALGREENS provides mandatory counseling on the risks of opioids, risk factors for and how to avoid overdose, how to identify and respond to an overdose, and how to use and administer Naloxone.

733. In addition to measures alleged above, Defendant WALGREENS could and should have unilaterally taken action that and/or offered a program to third party payors to

accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

734.   Having knowledge and/or notice of the damages that WALGREENS conduct had caused to Plaintiff and others, Defendant WALGREENS failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant WALGREENS, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) ran public education campaigns in which WALGREENS ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

735.   Defendant WALGREENS could have and should have implemented these measures at any point in the last 15 years.

736.     And the failure to take such steps that Defendant WALGREENS should have taken was negligent and did result in significant damages to Plaintiff.

737.     Defendant WALGREENS had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### B.   WALMART Failed to Track and Report Suspicious Sales of Opioid Drugs

738.     Defendant WALMART is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

739.     Defendant WALMART has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

740.     Other Pharmacy Defendants, including Defendant WALMART, have engaged in similar conduct in violation of their responsibilities to prevent diversion.

741.     In 2009, WALMART paid $637,000 to resolve allegations of numerous record keeping violations at its pharmacies in Texas. Those allegations included that WALMART had failed to timely file records indicating loss or theft of drugs to the DEA, in violation of the CSA.[564]

742.     Defendant WALMART's actions and omissions in failing to effectively prevent

---

[564] See generally Emma Perez-Trevino, WALMART Fined for Alleged Recording Keeping Violations, Brownsville Herald, Jan. 7, 2009, WALMART Fined for Pharmacy Record-Keeping Violations, Ozarks First, Jan. 7, 2009, http://www.ozarksfirst.com/news/health-and-medical/WALMART-fined-for-pharmacy-record-keeping-violations.

diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioid drugs.

743.    Furthermore, Defendant WALMART could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate- release formulations of opioids before extended-release opioids are dispensed.

744.    Having knowledge and/or notice of the damages that Defendant WALMART's conduct had caused to Plaintiff and others, Defendant WALMART failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including WALMART, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which WALMART ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and h) required the use of immediate-

release formulations of opioids before extended-release opioids are dispensed.

745.    Defendant WALMART could have and should have implemented these measures at any point in the last 15 years.

746.    And the failure to take such steps that Defendant WALMART should have taken was negligent and upon information and belief, did result in significant damages to Plaintiff and their community.

747.    Defendant WALMART had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### C.    CVS Failed to Track and Report Suspicious Sales of Opioid Drugs

748.    Defendant CVS is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

749.    Defendant CVS has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

750.    In 2015, Defendant CVS agreed to pay $22 million to resolve DEA allegations that retail stores in Florida distributed controlled substances including opioids based on prescriptions that had not been issued for legitimate medical purposes. The DEA described the settlement as part of a "crackdown on pill mills in Florida," in which "[p]rescription drug addicts were travelling to Florida for access to physicians who were prescribing pain

medication without regard to medical need and to pharmacies that were filling the prescriptions despite red flags that they were illegitimate."

751. Defendant CVS has settled numerous other opioid-related investigations.

752. In 2016, Defendant CVS agreed to pay $3.5 million to settle allegations that its pharmacists were filling fake prescriptions for addictive painkillers in Defendant CVS's stores in Massachusetts and New Hampshire. The same year, Defendant CVS agreed to pay $8 million to settle allegations that its Maryland pharmacies had dispensed controlled substances for prescriptions that did not serve a legitimate medical purpose.

753. In 2017, Defendant CVS agreed to pay $5 million to settle allegations that it had failed to maintain adequate records regarding controlled substances at its stores in California.

754. As recently as June 2018, Defendant CVS agreed to pay $1.5 million to resolve allegations that it had failed to timely report loss or theft of substances including the opioid hydrocodone.

755. Defendant CVS was aware of its obligations to serve as a safeguard against abuse. In 2015, CVS publicly stated that, *"the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."*

756. However, the implication that Defendant CVS was actually complying with its obligations under Kentucky law was false, and Defendant CVS continued to pay fines to resolve numerous diversion-related violations in the ensuing years.

757.     Notwithstanding these repeated investigations into its failure to prevent diversion, Defendant CVS claims, misleadingly, that its *"utilization management program" "ensure[s] that opioids are being prescribed and used appropriately."*

758.     Defendant CVS's public statements misled the public and officials of the State of Kentucky to believe that Defendant CVS was taking effective steps to fight the opioid epidemic.

759.     In addition to measures alleged above, Defendant CVS could and should  have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

760.     Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiff's community, Defendant CVS failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant CVS, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant CVS ran

public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

761.    Defendant CVS could have and should have implemented these measures at any point in the last 15 years.

762.    And the failure to take such steps that Defendant CVS should have taken was negligent and did result in significant damages to Plaintiff and their community.

763.    Defendant CVS had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

## D.    *KROGER Failed to Track and Report Suspicious Sales of Opioid Drugs*

764.    Defendant KROGER is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

765.    Defendant KROGER has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

766.    In addition to measures alleged above, Defendant KROGER could and should have unilaterally taken action that and/or offered a program to third party payors to accept that:

(a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

767. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiff's community, Defendant KROGER failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant KROGER, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant KROGER ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

768. Defendant KROGER could have and should have implemented these measures at any point in the last 15 years.

769.     And the failure to take such steps that Defendant KROGER should have taken was negligent and did result in significant damages to Plaintiff and their community.

770.     Defendant KROGER had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### E.     *API Failed to Track and Report Suspicious Sales of Opioid Drugs*

771.     Defendant API is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

772.     Defendant API has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

773.     Defendant API was aware of its obligations to serve as a safeguard against abuse.

774.     Defendant API could and should have unilaterally taken action and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

775.     Having knowledge and/or notice of prescription opioid abuse, and the damages

it was causing to Plaintiff's community, Defendant API failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant API, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant API ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

776.     Defendant API could have and should have implemented these measures at any point in the last 15 years.

777.     And the failure to take such steps that Defendant API should have taken was negligent and did result in significant damages to Plaintiff and their community.

778.     Defendant API had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### F. *MASTERS Failed to Track and Report Suspicious Sales of Opioid Drugs*

779.    Defendant MASTERS is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

780.    Defendant MASTERS has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

781.    Defendant MASTERS was aware of its obligations to serve as a safeguard against abuse.

782.    Defendant MASTERS could and should have unilaterally taken action and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

783.    Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiff's community, Defendant MASTERS failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant MASTERS, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise

diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant MASTERS ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

784.    Defendant MASTERS could have and should have implemented these measures at any point in the last 15 years.

785.    And the failure to take such steps that Defendant MASTERS should have taken was negligent and did result in significant damages to Plaintiff and their community.

786.    Defendant MASTERS had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### G.    *MIAMI-LUKEN Failed to Track and Report Suspicious Sales of Opioid Drugs*

787.    Defendant MIAMI-LUKEN is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

788. Defendant MIAMI-LUKEN has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

789. Defendant MIAMI-LUKEN was aware of its obligations to serve as a safeguard against abuse.

790. Defendant MIAMI-LUKEN could and should have unilaterally taken action and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

791. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiff's community, Defendant MIAMI-LUKEN failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant MIAMI-LUKEN, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant MIAMI-LUKEN ran public education programs; (d) limited to 7 days the

supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

792.    Defendant MIAMI-LUKEN could have and should have implemented these measures at any point in the last 15 years.

793.    And the failure to take such steps that Defendant MIAMI-LUKEN should have taken was negligent and did result in significant damages to Plaintiff and their community.

794.    Defendant MIAMI-LUKEN had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### H.    *KEYSOURCE Failed to Track and Report Suspicious Sales of Opioid Drugs*

795.    Defendant KEYSOURCE is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

796.    Defendant KEYSOURCE has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

797.    Defendant KEYSOURCE was aware of its obligations to serve as a safeguard against abuse.

798. Defendant KEYSOURCE could and should have unilaterally taken action and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

799. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiff's community, Defendant KEYSOURCE failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant KEYSOURCE, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant KEYSOURCE ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

800.     Defendant KEYSOURCE could have and should have implemented these measures at any point in the last 15 years.

801.     And the failure to take such steps that Defendant KEYSOURCE should have taken was negligent and did result in significant damages to Plaintiff and their community.

802.     Defendant KEYSOURCE had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

### I.     *QUALITEST Failed to Track and Report Suspicious Sales of Opioid Drugs*

803.     Defendant QUALITEST is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

804.     Defendant QUALITEST has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

805.     Defendant QUALITEST was aware of its obligations to serve as a safeguard against abuse.

806.     Defendant QUALITEST could and should have unilaterally taken action and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e)

required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

807.    Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiff's community, Defendant QUALITEST failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Defendant QUALITEST, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant QUALITEST ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

808.    Defendant QUALITEST could have and should have implemented these measures at any point in the last 15 years.

809.    And the failure to take such steps that Defendant QUALITEST should have taken was negligent and did result in significant damages to Plaintiff and their community.

810.    Defendant QUALITEST had knowledge and/or notice of the damages caused

and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

3.    **COMMON FACTUAL ALLEGATIONS**

811.    By putting an "X" next to the statements below, in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Summit County* Pleadings as identified in the Court's Order implementing the Short Form procedure. Doc. #1282.

      **X**    Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)

      **X**    RICO Marketing Enterprise Common Factual Allegations (Paragraphs 814-848)

      **X**    RICO Supply Chain Enterprise Common Factual Allegations (Paragraphs 849-877)

812.    If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here. Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):

> Other than what is set forth above in this Short Form supplemental and amended Complaint, none other at the present time; however, Plaintiff reserves the right to supplement or amend this pleading at a later date.

4.        **CLAIMS**

813.    The following federal **RICO causes of action** asserted in the *Summit County* Pleadings as identified in the Court's implementing order and any subsequent amendments, Doc. #1282, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):

**X**    First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants PURDUE, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Summit County* Pleadings, Paragraphs 878-905)

**X**    Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants PURDUE, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Summit County* Pleadings, Paragraphs 906-938)

814.    Plaintiff also asserts RICO violations (*18 U.S.C. § 1961 et seq*.) against all Defendants, including, Manufacturing Defendants, as listed in its existing Complaint and in this Short Form supplemental and Amended Complaint, for an Opioid Marketing Enterprise, an Opioid Diversion Enterprise, and a Formulary Access and Coverage Enterprise as specifically set forth herein and in the Summit County Pleadings; and against the Distributor Defendants and National Retail Pharmacy Defendants, as listed in its existing Complaint and in this Short Form supplemental and Amended Complaint, for an Opioid Supply Chain Enterprise and an Opioid Diversion Enterprise, as specifically set forth herein and in the *Summit County* Pleadings.

815.    Plaintiff asserts the following **additional claims** as indicated (below or attached):

Other than what is set forth above in this Short Form supplemental and amended Complaint, none other at the present time; however, Plaintiff reserves the right to supplement or amend this pleading at a later date.

816.    To the extent Plaintiff(s) wish(es) to **dismiss claims** previously asserted in Plaintiff(s)'s Existing Complaint, they are identified below and will be dismissed without prejudice. None at the present time. Plaintiff reserves the right to supplement or amend this pleading at a later date.

None at the present time; however, Plaintiff reserves the right to supplement or amend this pleading at a later date.

WHEREFORE, Plaintiff(s) prays for relief as set forth in the *Summit County* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated: March 11, 2019          *Attorney for Plaintiff(s)*

**BONAR, BUCHER & RANKIN, PSC.**

By:  _____
Barbara D. Bonar, Esq. (#42213)
3611 Decoursey Avenue
Covington, Kentucky 41015
(859) 431-3333
**Attorney for Plaintiff**


**BRINDISI, MURAD & BRINDISI PEARLMAN, LLP**

By:  _____
Eva Brindisi Pearlman, Esq. (#101219)
2713 Genesee Street
Utica, New York 13501
(315) 733-2396
**Attorneys for Plaintiff**


By:  _____
Louis Brindisi, Esq. (#1610096)
2713 Genesee Street
Utica, New York 13501
(315) 733-2396
**Attorneys for Plaintiff**

**CHERUNDOLO LAW FIRM, PLLC**

By: _____

John C. Cherundolo, Esq. (#101339)
AXA Tower I, 17th Floor
100 Madison Street
Syracuse, New York 13202
(315) 449-9500
**Attorneys for Plaintiff**


**ROBERT F. JULIAN, P.C.**

By: _____

Robert F. Julian, Esq. (#601157)
2073 Genesee Street
Utica, New York 13501
(315) 797-5610
**Attorneys for Plaintiff**